E-FILED
Thursday, 05 January, 2006  03:39:30 PM
Clerk, U.S. District Court, ILCD

THE UNITED STATE DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal Number 06-_____ |
| | ) | Violations: 33 U.S.C. Sections |
| | ) | 1311(a) & 1319(c)(2)(A), & |
| GERALD LIPPOLD, | ) | 18 U.S.C. Section 2 |
| CURRY READY MIX & BUILDERS' | ) | |
| SUPPLY, INC., CURRY ICE & COAL | ) | |
| OF SPRINGFIELD, INC., and LIPPOLD & | ) | |
| ARNETT, INC. | ) | |

## INDICTMENT

The Grand Jury charges that all times material to this Indictment

### Count One

(Knowing Illegal Pollution Discharge to Protected Waters)

#### The Defendants and the Curry facility

1.      Until in or about 1999, defendant Gerald Lippold was part owner of Lippold &
Arnett, Inc., a bulk hauling company. This company operated a bulk hauling facility at 3600 N.
Dirksen Parkway, in Springfield, Sangamon County, Illinois. This indictment hereafter refers to
this facility as "the Curry facility."

2.      Defendant Curry Ready Mix & Builders' Supply, Inc. ("Curry Ready Mix"), was
a bulk hauling and ready-mix concrete business incorporated in the State of Delaware and
authorized to do business in the State of Illinois. In or about 1999, defendant Curry Ready Mix
purchased the Curry facility from defendant Gerald Lippold and another individual. As part of
the purchase agreement, from in or about 1999 to the present defendant Curry Ready Mix agreed
to pay defendant Lippold an annual salary of $100,000 for consulting services. From in or about
1999 to at least in or about the summer of 2003, defendant Lippold worked to increase the
business of the Curry facility and exercised substantial authority over the Curry facility
operations.

3.      Defendant Curry Ice & Coal of Springfield, Inc. ("Curry Ice & Coal"), an Illinois

corporation, was a subsidiary of defendant Curry Ready Mix. After its purchase in 1999 defendant Lippold & Arnett, Inc., an Illinois corporation, also became a subsidiary of defendant Curry Ready Mix. From in or about 1999 to the present, the defendant Curry Ready Mix directed, controlled and supervised the operations of defendant Curry Ice & Coal and defendant Lippold & Arnett, Inc. at the Curry facility.

## Protected Waters of the United States

4.      An unnamed intermittent tributary of the Sangamon River ("the Sangamon tributary") flowed through the Curry facility. Water in the Sangamon tributary flowed to the Sangamon River in Sangamon County. The Sangamon River was a navigable water.

5.      The Sangamon tributary was a water of the United States within the meaning of 33 U.S.C. Section 1362(7) and 40 C.F.R. Section 122.2.

6.      The Clean Water Act protected waters of the United States from illegal polluters. The Clean Water Act prohibited the discharge of any pollutant from a point source into waters of the United States except in compliance with a National Pollutant Discharge Elimination System ("NPDES") permit issued by either the United States Environmental Protection Agency ("U.S. EPA") or the Illinois Environmental Protection Agency ("IEPA").

7.      The State of Illinois received authority from the U.S. EPA to administer an NPDES permit program on October 23, 1977.

8.      Defendant Curry Ice & Coal had an IEPA general permit and a general NPDES permit allowing defendant Curry Ice & Coal to discharge storm water into surface waters of the state. No defendant had an NPDES permit for any discharges other than storm water into the Sangamon tributary.

## The Boron Ash Wastewaters

9.      In or about March and April 2001, defendants Curry Ready Mix, Curry Ice & Coal and Lippold & Arnett, Inc. accepted approximately 35,000 tons of industrial waste from a utility company. This industrial waste included fly ash waste and bottom ash waste from coal

-2-

combustion. Defendants Curry Ready Mix, Curry Ice & Coal and Lippold & Arnett, Inc.used this industrial waste to begin filling a large excavation at the Curry facility.

10.    Beginning in or about June 2001, the IEPA issued violation notices to defendants Curry Ready Mix, Curry Ice & Coal and Lippold & Arnett, Inc. alleging that those defendants had managed the industrial waste in violation of Illinois law. Beginning in or about summer 2001, IEPA discussed and negotiated with defendants Curry Ready Mix, Curry Ice & Coal and Lippold & Arnett, Inc. the removal and proper disposal of the industrial waste in the excavation at the Curry facility. In or about 2001, defendants Curry Ready Mix, Curry Ice & Coal and Lippold & Arnett, Inc. agreed to remove and properly dispose of the industrial waste. This removal continued to at least the winter of 2005.

11.    Beginning in 2001 and while the industrial waste remained in the large excavation at the Curry facility, rain water began filling that large excavation. Boron leached out of the industrial waste into the rain water that had accumulated in the excavation. This caused the accumulated water to be contaminated with a level of boron that was approximately 13 times greater than the concentration that IEPA would allow for purposes of water quality. This Indictment hereafter refers to the boron contaminated rain water at the Curry facility as "boron ash wastewater." By 2003, several million gallons of boron ash wastewater had accumulated in the large excavation at the Curry facility.

12.    Beginning in or about February 2002, defendant Lippold, acting as an agent for defendants Curry Ready Mix, Curry Ice & Coal and Lippold & Arnett, Inc., was the primary person responsible for supervising the removal of the industrial waste and disposing of the boron ash wastewater at the Curry facility.

### Prior Warnings and Orders Not to Discharge Boron Ash Wastewater

13.    In or before the spring of 2002, IEPA communicated to defendants Curry Ready Mix, Curry Ice & Coal and Lippold & Arnett, Inc. that the defendants could not discharge the boron ash wastewater to the Sangamon tributary without getting an NPDES permit for such a

discharge.

14.    By at least May 2002 the defendant Lippold was aware that an NPDES permit was required for the discharge of any of the boron ash wastewater to the Sangamon tributary.

15.    In or about March 2002, defendant Curry Ice & Coal submitted to IEPA an application for an NPDES permit for the Curry facility to discharge the boron ash wastewater to the Sangamon tributary.

16.    In or about May or June 2002, IEPA informed defendants Curry Ready Mix and Curry Ice & Coal that IEPA intended to deny the NPDES permit application to discharge the boron ash wastewater to the Sangamon tributary. In or about June 2002, defendant Curry Ice & Coal withdrew the NPDES permit application.

17.    In or about June 2002, lawyers for defendant Curry Ice & Coal sent a letter to IEPA requesting special permission, called a "provisional variance," for the Curry facility to discharge the boron ash wastewater to the Sangamon tributary even though such discharge would exceed the IEPA water quality standards. That request was withdrawn at the end of July 2002 and resubmitted with modifications at the beginning of August 2002.

18.    In or about the end of August 2002, IEPA sent a letter denying the request for a provisional variance to the lawyers for defendant Curry Ice & Coal.

19.    In or about February 2003, IEPA officials met with defendant Lippold and other employees of defendant Curry Ready Mix and defendant Curry Ice & Coal. At this meeting, an IEPA official stated that analytical monitoring was necessary to determine if the industrial waste in the excavation at the Curry facility had also contaminated the area groundwater and drinking wells.

## The Illegal Discharges

20.    At the Curry facility a dirt and gravel parking lot existed East of the excavation containing the boron ash wastewater. That parking lot sloped toward the Sangamon tributary and the excavation. A second dirt and gravel parking lot at a higher elevation existed on the

-4-

other side of the Sangamon tributary at the Curry facility. This parking lot also sloped toward the Sangamon tributary. These parking lots were used for parking the trucks used by defendants Curry Ice & Coal and Lippold & Arnett, Inc..

21.    In or before April 2003 defendant Lippold ordered, a drainage ditch to be dug between the excavation and the lower parking lot. This drainage ditch collected water runoff from the lower parking lot's surface.

22.    In or before April 2003 defendant Lippold ordered, a discharge pipe to be installed at the bottom of this drainage ditch. The discharge pipe was buried under a berm and ran from the bottom of the drainage ditch to the other side of the berm where it emptied onto a slope approximately 15 yards uphill from the Sangamon tributary.

23.    In or about March or April 2003 the IEPA agreed to allow defendants Curry Ready Mix, Curry Ice & Coal, Lippold & Arnett, Inc.and Lippold to spread the boron ash wastewater on the parking lots at the Curry facility to control dust on the condition that there was no run off from the parking lots into the Sangamon tributary.

24.    Beginning in or about March or April 2003 and continuing until approximately the beginning of June 2003 defendant Lippold had pumps and hoses installed at the excavation to pump the boron ash wastewater into tanker trucks to be spread on the parking lots at the Curry facility. During that time period at defendant Lippold's direction a portion of the boron ash wastewater was spread on the parking lots. On some occasions the volume of boron ash wastewater applied exceeded the ability of the parking lots to absorb it. On those occasions the run off flowed into the Sangamon tributary.

25.    Beginning in or about March or April 2003 and continuing until approximately the beginning of June 2003 defendant Lippold ordered that the boron ash wastewater at the Curry facility be pumped out of the excavation 24 hours a day, even though little or none of such wastewater could be spread on the parking lots at night because trucks were parked there.

-5-

26.    Beginning in or about March or April 2003 and continuing until approximately the beginning of June 2003 defendant Lippold on some occasions ordered that the tanker trucks be allowed to overflow so that the boron ash wastewater entered the drainage ditch where it flowed into the discharge pipe and discharged onto a slope and then into the Sangamon tributary.

27.    Beginning in or about March or April 2003 and continuing until approximately the beginning of June 2003 defendant Lippold on some occasions ordered that the hose from the excavation containing the boron ash wastewater discharge directly into the drainage ditch where it flowed into the discharge pipe and discharged onto a slope and then into the Sangamon tributary.

28.    Beginning in or about March or April 2003 and continuing until approximately the beginning of June 2003 defendant Lippold on some occasions ordered that a hose from the excavation containing the boron ash wastewater discharge directly to slope adjacent to the Sangamon tributary.  On those occasions the boron ash wastewater would enter the Sangamon tributary from the slope.

29.    By in or about the early part of June 2003, defendants Curry Ready Mix, Curry Ice & Coal, Lippold & Arnett, Inc. and Lippold had discharged a substantial portion of the boron ash wastewater from the excavation at the Curry facility into the Sangamon tributary.

### The Violation

30.    The Clean Water Act defined a "pollutant" to include solid waste, incinerator residue, chemical wastes, industrial waste and municipal waste discharged into water.  33 U.S.C. Section 1362(6).  The boron and the above-described boron ash wastewater were pollutants.

31.    The Clean Water Act also defined a "point source" as any discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit or discrete fissure from which pollutants may be discharged.  33 U.S.C. Section 1362(14).  The above-described discharge pipe, tanker trucks and hose were point sources.

-6-

32.    In or about March and continuing until approximately the end of May 2003, in Sangamon County in the Central District of Illinois, the defendants

**GERALD LIPPOLD,
CURRY READY MIX & BUILDERS' SUPPLY, INC.,
CURRY ICE & COAL, INC., AND
LIPPOLD & ARNETT, INC.**

knowingly discharged pollutants and caused pollutants to be discharged from point sources into waters of the United States without an NPDES permit under Title 33, United States Code, Section 1342, in that, acting without an NPDES permit, the defendants knowingly caused boron ash wastewater to be discharged from: a discharge pipe; a hose; and tanker trucks into the Sangamon tributary;

All in violation of Title 33, United States Code, Sections 1311(a) and 1319(c)(2)(A) and Title 18, United States Code, Section 2.

A TRUE BILL,

s/ Foreperson
FOREPERSON

s/Greg Harris
RODGER A. HEATON    for
UNITED STATES ATTORNEY

-7-