IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Criminal No. 06-30002 |
| v. | ) | |
| | ) | |
| GERALD LIPPOLD, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNMENT'S FIRST SUPPLEMENTAL DISCLOSURE OF EXPERTS**

The United States of America by its attorneys Rodger A. Heaton, United States Attorney for the Central District of Illinois, and Patrick J. Chesley, Assistant United States Attorney, discloses the following supplemental information concerning the expert witnesses previously disclosed on June 21, 2006:

**Paul Connelly**

Opinions:

1. Samples numbered B304660 through B304684 all contain levels of boron between 13,000 ug/l and 14,000 ug/l and levels of vanadium between 23 ug/l and 28 ug/l.

2. The presence of both boron and vanadium in the concentrations set forth in the prior paragraph is consistent with each of the samples having come from a coal ash waste ponds or power plants.

Bases and reasons:

1. Mr. Connelly's opinions are based on his review and analysis of the identified samples, which he received after they had been prepared by Phil Fatka. Mr. Connelly will explain the preparation process and the paperwork associated with it (Bates numbers 2863 and 2864). He conducted Inductively Coupled Plasma (ICP) tests on all of the samples and on a duplicate sample from sample number B304675, a matrix spike sample created from sample number 304675 and a blank spike sample (See Phil Fatka's Bases and Reasons for an explanation of

what the blank and matrix spike samples are). The ICP tests in summary use spectrophotometry to record what spectral lines are produced from samples after they are atomized. The spectral lines from the samples are then compared with the spectral lines from known elements in order to identify the presence and concentration of particular elements in the samples. The ICP test equipment includes a nebulizer, spray chamber, torch, induction coil, a sweet pot and equipment to analyze the results. Mr. Connelly will explain how the machine operates. Inductively Coupled Plasma tests are widely accepted scientific tests used to identify the presence and concentrations of elements that exist in samples. Mr. Connelly conducted the ICP tests following the U.S. Environmental Protection Agency's standard procedures. Mr. Connelly will testify that the equipment used to conduct the ICP tests on the identified samples was operating properly to determine the presence of boron during the tests. The duplicate, blank spike and matrix spike samples mentioned above are all used for quality control to test the correctness of the operation of the ICP testing equipment. The duplicate sample tests whether the equipment generates approximately the same results from two different tests on the same sample. The blank spike checks to see that the equipment is generating results that are consistent with the existence and concentrations of the known elements that were added to create the blank spike sample. The matrix spike sample checks to see that the existence and concentrations of the known elements will show up in the unknown samples. Additional quality control checks are done intermittently during the testing of the samples. One such check involves a quality control calibration check after every 10 samples are tested. Mr. Connelly also did a post spike on sample number 304675 to check the correct operation of the equipment. The error rate for the ICP tests is plus or minus 10 percent. The ICP tests resulted in the above-described levels of boron and vanadium for the identified samples. The equipment prints the results for each sample on a separate sheet of paper. Paperwork concerning the preparation of the samples and spikes, the tests of the samples, the quality control checks and/or the results can be found at Bates numbers 102 to 132, 153 to 181, 775 to 778, and 2851 to 3820.

2. During Mr. Connelly's 11 ½ years with the Illinois Environmental Protection Agency he has spent approximately one-half of that time analyzing water samples from power plants. During that time, he has tested approximately 200 to 300 water samples per year from power plants many of which were identified as coming from ash ponds. All of such samples have had high levels of boron and vanadium similar to the levels found in the samples from this case. It is based upon this experience that he reaches his conclusion

Qualifications:

1. He runs ICP tests on some samples virtually everyday as part of his employment with the Illinois Environmental Protection Agency. The rest of his qualifications have been previously provided.

2. Previously provided.

**Phil Fatka**

Opinion:

1. Samples numbered B304660 through B304684 were properly prepared for Inductively Coupled Plasma testing.

Bases and reasons:

1. On April 16, 2003 he obtained and prepared the samples. In preparing the samples for Inductively Coupled Plasma (ICP) test, Mr. Fatka followed the Illinois EPA's protocols. The pH of each sample was adjusted to 2 or less. Fifty milliliters of each of the adjusted samples was placed in a digestion cell. From sample number 304675 three separate adjusted cells were created. One adjusted cell from that sample was the original. A second adjusted cell from that sample was a duplicate of the original. A third adjusted cell from that sample was called a matrix spike cell because it is spiked with 0.5 milliliters of specified concentration levels of each of the elements for which tests were to be run. In addition to those adjusted cells, a separate blank spike cell was created by adding the same 0.5 milliliters of the same specified concentration levels of the elements for which tests were to be run. The duplicate, the matrix spike and the blank spike cells are used to check the equipment is operating properly during the ICP test. From this point, all of the above-described cells were prepared in the same manner. Two and one-half milliliters of 6 Molar hydrochloric acid was then added to all the adjusted cells. The cells were is heated at 95 degrees Celsius until they condensed to 15 milliliters. After the cells were allowed to cool, de-ionized water was added until the final volume for each cell was 50 milliliters. The only paperwork that relates to Mr. Fatka's preparation of the samples is found at Bates numbers 2863 and 2864.

Qualifications:

Previously provided.


**John R. Davis**

Opinion:

1. Coal, bottom ash and fly ash contain boron.

2. Boron is soluble in water and will leach out of CWLP's bottom ash and fly ash into rainwaters that comes in contact with such ash stored at the CWLP site.

Bases and reasons:

1. Mr. Davis has been the plant manager of CWLP since 2004. He has been employed in a

number of other positions with CWLP since he began his employment there in 1987. As part his employment he is required to be knowledgeable about coal, since the utility burns coal to generate electricity. In addition, he is responsible for the proper handling and disposal of the bottom and fly ash generated from burning coal. Based upon his CWLP work experience, he knows that coal and bottom and fly ash contain boron. He is familiar with the results from the analysis of the coal and the bottom and fly ash that show the presence of boron. He knows that up until the late 90's CWLP gave away its bottom and fly ash to be used as fill but had to abandon that project because of problems with boron.

2. Based upon his work experience at CWLP, he knows that boron is soluble in water. The bottom and fly ash are moved from the power generating facility to a storage site located northeast of the plant across East Lake Drive. The ash is transported to such site by adding water to it and pumping it though pipes to the site. He knows that the boron in the bottom and fly ash leaches into the water used to transport the ash to the storage site. The boron also leaches into the rainwater runoff from the bottom and fly ash at the site. As part of his employment, he knows that the water used to transport the ash and the rainwater runoff creates pools of liquid at the storage site that contain high levels of boron in the range of 11 to 15 parts per million (11,000 ug/l to 15,000 ug/l). He is presently involved in a boron mitigation project to reduce the levels of boron in the pools at the site.

Qualifications:

1. & 2. Previously provided.


**Douglas L. Dorsey**

Mr. Dorsey has been out of his office and will need to return to his office to check his paperwork concerning his supplemental information. He is expected to return to his office on Tuesday August 29, 2006.


**Warren (Bud) Bridgewater**

1. The burning of coal produces bottom and fly ash both of which contain boron.

2. The boron in such bottom and fly ash is a pollutant within the Clean Water Acts definition of that term.

3. The boron in such bottom and fly ash leaches into the water to which they come in contact causing such water to have high levels of boron. As a result, discharges from coal ash ponds contain elevated levels of boron typically in the range of 11,000 ug/l to 14,000 ug/l.

4. A National Pollutant Discharge Elimination System permit was required to discharge the

"boron ash wastewater" from the excavation at the Curry at 3600 North Dirksen Parkway, Springfield, Illinois, to waters of the United States and in order for the Illinois Environmental Protection Agency to issue such a permit it would have set a boron discharge limit of 1,000 ug/l unless a variance or other relief was granted from the Illinois Pollution Control Board.

5. Mr. Bridgewater has made an estimate of the amount of liquid in the excavation as of April 2003 but needs additional time to verify that estimate. It is expected that he will have that information by Monday August 28, 2006.
Bases and reasons:

1. Mr. Bridgewater, as part of his employment with Koppers Company and its successor (Koppers Co.), worked on projects at power plants. From such projects he learned about the coal that was burned and the bottom and fly ash generated from such process. He also worked for Central Illinois Public Service Company (CIPS) as an engineer. In both jobs he was made aware that coal and bottom and fly ash generated from the burning of such coal contain boron

2. Mr. Bridewater is familiar with the Clean Water Act as a result of working on numerous water projects as part of his employment in the private sector and as part of his employment with the Illinois Environmental Protection Agency, which included working as an engineer in the permit section of the agency. His experience is more fully set forth in his resume. He is aware that the Clean Water Act defines pollutant to include, among other things, solid waste, incinerator residue, industrial waste and municipal waste. The bottom and fly ash at the Curry site were generated by the burning of coal by CWLP. As a result such ash and the boron contained in it constituted solid wastes, incinerator residues, industrial wastes and municipal wastes.

3. As a result of his experience withs Koppers Co. and CIPS concerning power plants, Mr. Bridgewater is familiar with coal ash ponds and that they contain boron that has leached out the bottom and fly ash from such plants. In addition, he knows the same information from his employment at the IEPA in the water permit section and the field operations section. In that connection he has visited more than 20 ash pond sites from power plants and has sample the ash ponds and the discharges from them on occasions. From such experience he knows that the discharges contain such levels of boron.

4. Mr. Bridgewater, as set forth in his resume, worked in the water permit section of the IEPA. As a result of such work experience and also his experience in the water field operations section of the IEPA, he is familiar with the NPDES program and its permitting process. He knows that since any discharge of the liquid from the excavation at the Curry site would contain boron, a pollutant, and that an NPDES permit would be required for a discharge to a water of the United States. A variance or some other relief from the Pollution Control Board would be needed because the discharge of such liquid would contain levels of boron that exceeded the limit of 1,000 ug/l allowed by the Illinois Environmental Protection Agency.

Respectfully submitted,

RODGER A. HEATON
UNITED STATES ATTORNEY


s/ Patrick J. Chesley
Patrick J. Chesley Bar Number 0434841
United States Attorney's Office
318 South Sixth Street
Springfield, IL 62701
Telephone: 217/ 492-4450
Fax: 217/ 492-4044
E-mail: pat.chesley@usdoj.gov

**CERTIFICATE OF SERVICE**

      I hereby certify that on August 25, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

      Tom Schanzle-Haskins
      Claire A. Manning
      Brown, Hay & Stephens
      205 South Fifth Street, Suite 700
      Springfield, IL 62705-2459

      Charles J. Northrup
      Todd M. Turner
      Sorling, Northrup, Hanna, Cullen & Cochran
      Suite 800 Illinois Building
      607 East Adams Street
      Springfield, IL 62705

      Jon G. Noll
      Noll Law Office
      802 South Second Street
      Springfield, IL 62704

                                                s/ Patrick J. Chesley