E-FILED
Tuesday, 31 October, 2006  03:50:41 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,        ) | |
|                                  ) | |
|         Plaintiff,                  ) | |
|                                  ) | |
|                                  ) | Criminal No. 06-30002 |
| v.                           ) | |
|                                  ) | |
| GERALD LIPPOLD, et al.,              ) | |
|                                  ) | |
|         Defendants.               ) | |

**<u>GOVERNMENT'S DISCLOSURE OF EXPERT WITNESS MELGIN</u>**

      The United States of America by its attorneys Rodger A. Heaton, United States Attorney for the Central District of Illinois, and Patrick J. Chesley, Assistant United States Attorney, discloses the following information concerning expert witness Wendy L. Melgin:

      The opinions and bases and reasons for such opinions are contained in the report, which is attached as attachment one.

      The witness' qualifications are attached as attachment two.


Respectfully submitted,

RODGER A. HEATON
UNITED STATES ATTORNEY


s/ Patrick J. Chesley
Patrick J. Chesley Bar Number 0434841
United States Attorney's Office
318 South Sixth Street
Springfield, IL 62701
Telephone: 217/ 492-4450
Fax: 217/ 492-4044
E-mail: pat.chesley@usdoj.gov

## CERTIFICATE OF SERVICE

      I hereby certify that on October 31, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

      Tom Schanzle-Haskins
      Claire A. Manning
      Brown, Hay & Stephens
      205 South Fifth Street, Suite 700
      Springfield, IL 62705-2459

      Charles J. Northrup
      Todd M. Turner
      Sorling, Northrup, Hanna, Cullen & Cochran
      Suite 800 Illinois Building
      607 East Adams Street
      Springfield, IL 62705

      Jon G. Noll
      Noll Law Office
      802 South Second Street
      Springfield, IL 62704

                                s/ Patrick J. Chesley

**Curry Trucking Field Visit**
**July 20, 2006**
**Wendy L. Melgin**
**Hydrologist, U.S. EPA Region 5**

**Background**

I was asked by U.S. EPA Region 5's Office of Regional Counsel to conduct a site visit on the Curry Trucking property and make a hydrologic assessment of an unnamed tributary (Curry tributary) and its connection to the Sangamon River. I walked and evaluated the Curry tributary, and the unnamed tributary that it flows into (Joint tributary), under the current statutory and regulatory definitions as well as, hydrological considerations derived from the recent Supreme Court decision, *Rapanos v. United States*, 126 S.Ct. 2208 (2006).

A site inspection was conducted of the Curry Trucking facility located in Springfield, IL to determine if the Curry tributary intersecting the facility property was a Water of the United States. The Curry tributary is mapped as an intermittent stream on the U.S. Geological Survey's Springfield East, IL Quadrangle Map (1965; photorevised in 1979 and 1976) and the 1980 U.S. Department of Agriculture's (USDA) Soil Survey of Sangamon County, IL. The Curry tributary flows into the Joint tributary, which is mapped as a Palustrine Forested Broad Leaf Deciduous, temporarily flooded wetland system on the National Wetland Inventory map for the Springfield East Quadrangle (1988).

According to the Rock Island District of the U.S. Army Corps of Engineers, the Sangamon River is a navigable-in-fact, Section 10, Water of the U.S., from its mouth to mile 120.0 in Peoria County. Navigable Waters (Section 10) of the United States (Traditional) are administratively defined to mean waters that have been used in the past, are now used, or are susceptible to use as a means to transport interstate or foreign commerce up to the head of navigation. The Joint tributary flows directly into the Sangamon River, approximately one mile north of the Curry Trucking facility.

**Pre-Rapanos Regulatory Definitions**

Waters of the United States include:

(1) all waters that are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters subject to the ebb and flow of the tide;

(2) all interstate waters;

(3) certain intrastate lakes, mudflats, sand flats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, natural ponds, rivers or streams (including intermittent streams); or

(4) tributaries of waters set forth in (1)-(3), above. *See* 40 C.F.R. § 122.2 for the complete definition.

Ordinary high water mark: In the absence of adjacent wetlands, the limits of jurisdiction in non-tidal waters extend to the ordinary high water mark. The ordinary high water mark is that line on the shore established by the fluctuations of water and indicated by physical characteristics such as:

(1) a clear, natural line impressed on the bank;
(2) shelving;
(3) changes in the character of soil;
(4) destruction of terrestrial vegetation;
(5) the presence of litter and debris; or
(6) other appropriate means that consider the characteristics of the surrounding areas. *See* 33 C.F.R., Parts 328-329.

**Post-Rapanos Considerations**

I was asked to evaluate the following factors derived from the Kennedy and Scalia opinions in *Rapanos v. United States*, 126 S.Ct. 2208 (2006):

(1) the tributaries' flow
(2) the tributaries' hydrologic connection to the Sangamon River
(3) proximity of discharge points to the Sangamon River
(4) size of the tributaries' watershed
(5) the extent to which ground water helps maintain the tributaries' flow
(6) slope or elevation drop between discharge points and the Sangamon River

**Field Determination**
The field inspection on July 20, 2006, started from the northern parking lot area of the Curry Trucking facility. Present during the inspection were Special Agent Christopher Pullos of the USEPA Criminal Investigations Division; Kris Vezner, Regional Criminal Enforcement Counsel, USEPA Region 5; Special Agent Mattew Bryant of the U.S. Fish and Wildlife Service; Assistant United States Attorney Pat Chesley and two representatives of Curry Trucking. I walked directly to the point of confluence of the Curry tributary with the Joint tributary (photo 5). There was a significant amount of water at the confluence of the two tributaries and water had spread out over the channel into the surrounding vegetation (photos 5-7). Sediment was flowing from the Curry tributary into the Joint tributary, resulting in a distinct sediment plume (photo 5). I concluded that this sediment was coming from a road at the Curry Trucking facility we walked along to obtain access to the stream. This road was gullied and I observed water and sediment running in the gullies toward the Curry tributary.

From the confluence, I walked back up the channel of the Curry tributary toward the Curry Trucking facility. There was water flowing in the channel and in some areas, the flow was at bankfull stage (photo 3). Bankfull stage is when the water fills the channel completely. Although there was a thunderstorm with a heavy downpour just before the site inspection, there are enough indicators, such as channel morphology and condition, to determine that flow does not occur only in response to a recent rain event. The Curry tributary has a defined bed and bank and the signs of Ordinary High Water such as debris and litter deposits, water marks on culverts, and vegetation laid down in the direction of flow (Photos 1-7). The water mark inside the concrete culvert (photo 4) indicates that a significant amount of flow is carried by the Curry tributary.

We then drove to the intersection of Sand Hill Road and the Joint tributary, north of the Curry property. The Joint tributary, mapped as a Palustrine Forested Broad Leaf Deciduous, temporarily flooded wetland system on the National Wetland Inventory map for the Springfield East Quadrangle (1988), flows directly into the Sangamon River. Water was observed flowing in the channel, which is wider and deeper than the Curry tributary. The joint tributary appeared to carry more flow than the Curry tributary based on channel size and the amount of woody debris in the channel. The gradient of the channel decreases downstream as width and depth increase. The Joint tributary contained woody debris jams and sediment deposits and a distinct sediment plume was seen flowing from the tributary into the Sangamon River.

After observing the confluence of the Joint tributary with the Sangamon River, we inspected the Curry tributary just upstream of the Curry Trucking facility. The Curry tributary was flowing and maintained a clear bed and bank southeast of the trucking facility through a trailer park and eventually into an agricultural field south of Bissell Road, approximately 1 mile upstream of the Curry Trucking facility. As a result of the field visits, I personally observed flow in well defined channels from the agricultural fields upstream of the Curry Trucking facility to the Sangamon River, a total distance of less than 2 miles.

I also evaluated the area, and observed the pipe, where the discharge occurred from the pit on the Curry Trucking facility property, which contained between two and three million gallons of liquid. Special Agent Christopher Pullos measured the distance from a pipe, which previously led from the large pit on the property, to the bank of the Curry tributary (Investigative Activity Report, Stream Measurement on August 29, 2006). The distance from the pipe to the bank of the Curry tributary was approximately 70 feet. He then measured the distance from where the pipe would discharge to the confluence of the Curry Tributary with the Joint Tributary. This distance was 624 feet.

Several million gallons of liquid were discharged from the pit, either through the pipe or by land application and runoff over the surface of the ground. Based on our inspection on July 20, 2006 and observing water, from a recent rain storm, running through gullies from the Curry Trucking facility towards the Curry tributary, it is safe to assume that a several million gallon discharge would flow into the Curry tributary. I observed sediment from the Curry Trucking facility moving into the Curry tributary and then

observed a sediment plume from the Curry tributary flowing into the Joint tributary. Furthermore, the Curry tributary just downstream of the Curry Trucking facility had a significant amount of sediment deposition, showing that sediment moved from the Curry Trucking property into the Curry tributary. Furthermore, if a million gallons of liquid, or even several thousand gallons of liquid, were discharged through a pipe 70 feet from the Curry tributary, this would establish an almost direct discharge to the Curry tributary and subsequently into the Joint tributary and the Sangamon River.

Other Flow Information
Investigative reports included interviews, conducted by investigative agents, of long time residents of the area. Local observations of flow are extremely useful, especially over the long term, since they have witnessed the flow and sometimes experienced problems, such as flooding, caused by the flow. It also establishes that the Curry tributary is permanent and has been conveying water for a long time. These residents have first hand knowledge of the Curry tributary, including frequency of flow and its connection to the Sangamon River. One resident, Mr. Coleman, lived at his property, which is adjacent to and upstream of the Curry Trucking facility, for 40 years. The Curry tributary runs through Mr. Coleman's property before entering the Curry Trucking property. Mr. Coleman stated that the Curry tributary flows "pretty much most of the year" except in times when there is a two to three month drought. Mr. Coleman's interest in the Curry tributary is apparent since he took the time to mark a tree with a nail to indicate the high water mark of a flood event which occurred about 15 years ago. He has also walked the Curry and Joint tributaries to the Sangamon River.

The second resident, Mr. Chernis, also owns property adjacent to the Curry Trucking facility. He has lived there for 18 years but his father purchased the property in 1957. As a child, Mr. Chernis and his brother would catch fish in the Curry tributary. He also noted that when the Sangamon River would rise, the Curry tributary would "back up" and fish would come farther upstream. Mr. Chernis indicated that he has always seen water at the confluence of the Curry tributary and the tributary that runs through his property. In addition, he indicated that there is a high watertable on his property and describes this by encountering water in a pit dug at about 8 feet deep.

The importance of ground water contribution is to sustain a baseflow in the tributary. Baseflow is that part of the stream flow that is derived from ground water seeping into the stream. Perennial streams are streams that flow continuously and not just in response to precipitation events. Ground water sustains flow when there is no precipitation. Intermittent streams are any nonpermanent flowing drainage feature having a definable channel and evidence of scour or deposition. This includes what are sometimes referred to as ephemeral streams if they meet these two criteria (Glossary of Stream Restoration Terms, el.erdc.usace.army.mil/emrrp/pdf/sr01.pdf - 2004-08-18). Intermittent streams may also receive ground water but most of the flow consists of runoff generated by precipitation. Without stream gauging information on the tributaries, I can not determine for certain whether or not the Curry tributary is a perennial stream. However, I can conclude that ground water provides some flow to stream flow based on the frequency of flow observed in the stream over the long term.

On October 5, 2006, personnel from the Illinois Environmental Protection Agency and Illinois Department of Natural Resources conducted a site visit. Water was observed in the Curry tributary and fish were collected. Since fish are dependent on water, it is safe to conclude that flow exists and has existed in the Curry tributary for some time.

The USDA's Soil Survey (1980) maps the Curry tributary as the Radford silt loam and the Joint tributary as Sawmill silty clay loam. Both soils are described as nearly level, somewhat poorly drained soils on the bottom land of streams and rivers. They are subject to flooding for brief periods in spring and are found in long and narrow areas along small streams and in areas of irregular shapes along rivers. Both soils are mapped as hydric soils by the Natural Resources Conservation Service (NRCS) List of Hydric Soils (NRCS, 2006- http://soils.usda.gov/use/hydric/lists/state.html).

A hydric soil is described by NRCS as:

> "a soil that formed under conditions of saturation, flooding or ponding long enough during the growing season to develop anaerobic conditions in the upper part. The concept of hydric soils includes soils developed under sufficiently wet conditions to support the growth and regeneration of hydrophytic vegetation. Soils that are sufficiently wet because of artificial measures are included in the concept of hydric soils. Also, soils in which the hydrology has been artificially modified are hydric if the soil, in an unaltered state, was hydric. Some series, designated as hydric, have phases that are not hydric depending on water table, flooding, and ponding characteristics." (http://soils.usda.gov/use/hydric/intro.html)

The presence of hydric soils along both tributaries to the Sangamon River confirms the presence of sufficient hydrology to maintain this type of soil and provides further evidence of another hydrologic connection between the tributaries and navigable-in-fact water. The hydrologic connection would be the evidence of sufficient hydrology, through saturation, flooding and ponding, to maintain hydric soils from the Curry tributary to the Sangamon River.

Conclusion
I conducted a site inspection on July 20, 2006, which included walking the Curry tributary from the Curry Trucking facility to the confluence of Joint tributary and the confluence of the Joint tributary to the Sangamon River. The presence of sediment coming from the Curry Trucking facility and flowing through gullies into the Curry tributary was evident at the confluence of the two tributaries. This confirms the hydrologic connection between the two tributaries. The Joint tributary has a well defined bed and bank, sediment deposits and woody debris within the channel and a well established forested riparian corridor. The Joint tributary has been mapped as a Palustrine Forested Broad Leaf Deciduous, temporarily flooded wetland system on the National Wetland Inventory map for the Springfield East Quadrangle (1988). This tributary flows directly into the Sangamon River, a Section 10 navigable-in-fact Water of the U.S.

Pre-Rapanos, both the Curry and joint tributaries are Waters of the U.S., based on Ordinary High Water mark and their hydrologic connections to the Sangamon River.

Post Rapanos, I conclude that both the Curry and Joint tributaries have a significant nexus to the Sangamon River and are relatively permanent based on long term observations by local residents. I conclude that the Curry tributary has a hydrologic connection to the Sangamon River based on: the field inspection conducted on July 20, 2006; observing the Curry tributary flowing through the Curry Trucking facility; walking and establishing the hydrologic connection (significant nexus) between the Curry tributary and the Sangamon River; additional information from witness reports (Interview of Ronald Coleman on July 17, 2006; Interview of Joe Chernis on August 29, 2006; Creek walk on October 5, 2006); USGS topographic maps; the Sangamon County Soil Survey; and National Wetland Inventory map. Based on the post-Rapanos considerations set forth above, I conclude that both the Curry and Joint tributaries are a Water of the U.S.

I also conclude that the Curry Tributary has a chemical connection to the Sangamon River. Sediment was observed coming from the Curry Trucking facility through gullies in an access road, and flowing into the Curry tributary. Sediment plumes were observed at the confluence of the Curry tributary with the Joint tributary and at the confluence of the Joint tributary with the Sangamon River. I can conclude that pollutants, such as sediment, would flow from the Curry Trucking facility, one mile north downstream to the Sangamon River.

**WENDY L. MELGIN**
1222 W. Nelson
Chicago, IL 60657
(home) 773-248-2036
(work) 312-886-7745

**SYNOPSIS**
Twenty years of experience in research, regulation, consulting, and management involving surface and ground water quality and quantity, wetland ecology and regulation, watershed management, soil science, forestry, geology and environmental land use planning.

**EDUCATION**
M.S.  Hydrology/Hydrogeology. University of Nevada Reno, 1985.
B.A.  Geology. University of Montana, 1979.

- Ph.D. course work and research at the University of California, Davis and George Mason University, Fairfax, VA
- Certified Professional Erosion and Sediment Control Specialist, #822, Society of Soil and Water Conservation
- 40-hour Reg IV Wetland Delineation Training, April 18-22, 1994
- 40-hour OSHA-SARA Standard (29 CFR 1910.120) Hazardous Waste Operations, Health and Safety Training, September, 1992

**WORK EXPERIENCE**

**1. 2002 - Present.  Deputy Chief, Watersheds and Wetlands Branch, U.S. Environmental Protection Agency, Region V Chicago.**  Supervises staff and directs work of wetlands, nonpoint source and TMDL programs to provide effective restoration and protection of the nation's waters and wetlands.  Provides day to day managerial duties as well as, technical oversight.  Prepares branch strategic plans and participates in developing division goals and tactical plans which set the foundation for our work. Works with and supports program teams so they have the tools to succeed, works with States and Tribes to achieve our shared goals and a true partnership, and directs branch resources in the most effective way possible.  Serves as contact for criminal wetlands enforcement cases.  Represents EPA on the U.S. Forest Service Roads/Riparian/Restoration National Core Team.

**2. 2000-2002. HYDROLOGIST.  U.S. Environmental Protection Agency, Region V Chicago.**  Provides and coordinates technical and programmatic aspects of the TMDL program, including reviewing State 303(d) lists, State methodologies for listing, submitted TMDLs and other documents related to the TMDL program and providing technical assistance for TMDL development.  Responsibilities also include developing wetland enforcement cases, reviewing Army Corps of Engineers public notices, and providing technical assistance to NEPA projects and other wetland projects.

**3. 1997-1999. REGIONAL HYDROLOGIST.** U.S. Environmental Protection Agency, **Region IX San Francisco.**  Served as hydrologic technical expert in support of Regional programs, such as ground water, drinking water, NPDES, TMDLs, watersheds, NEPA, Air and Radiation and wetlands.

Specific projects included: working with OGWDW and ORIA to draft the ground water protection standard and resolve technical issues between EPA, DOE and NRC for the proposed Yucca Mountain Nuclear Repository; leading an Interagency Team on Cumulative Watershed Effects for forest lands; member of the Roads/Riparian/Restoration National Core Team; providing soils and hydrology expertise to wetlands program; providing input on ground water models for gold and copper mines, and leading and directing the Sole Source Aquifer Program. As Co-chair of the Regional Science and Engineering Steering Committee, led the effort to write the Science Chapter of the Regional Reinvention Plan, which outlined a process to advance and promote science in the Region. Served on the Region 9 Labor-Management Partnership Council, served a two-year term as Co-Chair of the national Ground Water Protection Technical Forum and was Co-chair of the Regional Science Council.

**4. 1994-1997. HYDROGEOLOGIST. U.S. Environmental Protection Agency, Region IX San Francisco.** Source Water Protection Section. Led and directed the Sole Source Aquifer Program, under the Safe Drinking Water Act; Served as hydrogeological technical expert for the section; Served as Regional representative to the High Plains Ground Water Recharge Demonstration Project; Co-chaired the Ground Water Technical Forum; Presented information at national meetings on EPA's ground water programs to groups such as the Association of State Geologists; Provided Region 9's Wetlands Section with hydrologic and soils expertise; Provided assistance to NEPA section for mining and flood control EISs.

**5. 1993-1994. HYDROLOGIST/WETLAND SCIENTIST. U.S. Environmental Protection Agency, Region IX San Francisco.** Wetlands Permits and Enforcement Section. Responsible for the enforcement of Section 404 of the Clean Water Act. This included conducting field wetland delineations and providing soils and hydrology expertise to others conducting investigations, preparing enforcement case documentation, reviewing and commenting on Section 404 permits, including the NEPA/404 process, and supervising a U.S. Fish and Wildlife Service employee conducting enforcement investigations in the Sacramento area for EPA. Provided technical assistance to the Natural Resources Conservation Service (NRCS) for the implementation of the program giving NRCS federal jurisdiction over wetlands on agricultural lands.

**6. 1990-1993. WETLAND PROGRAM MANAGER/SENIOR HYDROLOGIST.**
**Ebasco Environmental**, Sacramento, California. Manager and technical lead for wetlands group responsible for all wetland delineations, soils, and hydrological analyses, NEPA and CEQA documents, wetland and riparian restoration plans, and supervision of wetlands staff. Specific projects included preparing the natural and physical science sections of Natural Gas Pipeline and dam construction EISs for Federal Energy Regulatory Commission, preparing the natural and physical science sections of Base Closure EISs, and managing wetland delineations, riparian, vernal pool and threatened and endangered species surveys for over 5,000 acres in Sacramento and Placer Counties and projects in Riverside and San Bernadino Counties.

**7. 1989-1990. SENIOR WETLAND SCIENTIST/HYDROLOGIST. William H. Gordon Associates**, Reston, VA. Conducted field work, delineated wetlands, and supervised wetlands team for residential, commercial, and recreational developments. Responsible for all wetland, soil, and hydrologic analyses, including Section 404 permits, mitigation planning, and surface and ground water monitoring programs.

**8. 1987-1989. STAFF OFFICER. National Academy of Sciences**, Water Science and Technology Board, Washington, D.C. Project Manager for the Committee on Ground Water Modeling and Staff Officer for the Committees on Opportunities in the Hydrologic Sciences, Western Water Management, and Ground Water Recharge in Surface-Mined Areas. Contributed to the NAS reports: *Opportunities in the Hydrologic Sciences, Ground Water Models: Scientific and Regulatory Applications*, and *Surface Coal Mining Effects on Ground Water Recharge*. Responsible for all aspects of project management, including management of committee activities, preparation and editing of technical reports, and coordination with state and federal agencies.

**9. 1985-1987. HYDROLOGIST. Tahoe Regional Planning Agency** (TRPA), Zephyr Cove, NV. Responsible for all hydrologic assessments including monitoring of sensitive lands, golf courses, watershed plans and ski areas. Managed the land capability program, the revision of the Handbook of Best Management Practices, and the Streamzone (riparian/wetland) Restoration Report and maps. Assisted in the development of the Individual Parcel Evaluation System (IPES) and contributed to the Regional and 208 Water Quality Plans. Participated in consensus-building process to settle the lawsuit between the California Attorney General-League to Save Lake Tahoe and TRPA, which resulted in the lifting of the construction moratorium and the adoption of the Regional Plan.

**10. 1982-1985. GRADUATE FELLOW. University of Nevada, Reno.**
Researched the hydrological and chemical processes and pathways that regulate nitrate transport in a 200-acre watershed adjacent to the Lake Tahoe Basin. This two and one-half year study utilized an extensive instrument network to monitor precipitation quality and quantity, snowpack chemistry, soil water chemistry, streamflow and water quality, ground water quality, and soil moisture. This study, and other studies conducted in the same area, were used to determine the impacts of development and land use on the watershed and to determine nutrient transport into Lake Tahoe.

**11. 1983. HYDROGEOLOGIST. Hydro-Search, Inc.** Reno, NV. Conducted geologic and geophysical investigations, designed production and monitoring wells, and supervised all phases of drilling operations for large capacity production water wells for FMC gold mining activities in Gabbs, NV.

**12. 1982. PHYSICAL SCIENCE TECHNICIAN. USDA Soil Conservation Service**, Reno, Nevada. Snow Survey Unit. Maintained and installed SNOTEL Telemetry stations, forecasted water supplies, and performed snow surveys. Assisted soil scientists with soil surveys, using SCS soil classification and taxonomy.

**13. 1979-1980. PHYSICAL SCIENCE TECHNICIAN. USDA Forest Service**, Kootenai National Forest, Libby, Montana. Seismic Crew Supervisor. Conducted seismic surveys to determine suitability of material for logging road construction; collected soil and water quality samples. Used both unified soil classification system and SCS soil classification and taxonomy.

**OTHER EXPERIENCE**

Member, National Certification Committee, Society of Wetland Scientists, 1992-94

Member, Tahoe Regional Planning Agency Stream Environment Zone Technical Advisory

Committee, 1991-93.

Member, Surface Water Technical Committee, American Geophysical Union, July, 1988 - June, 1990.

## PUBLICATIONS

Jemison, R, W.L. Melgin, and A. Edwards. 2001. Road Technologies to Maintain and Restore Riparian Area Functions. American Water Resources Conference. Albuquerque, NM.

Melgin, W.L. and V. Alvarez. 1993. Avoidance: The best mitigation. Prepared for the Society of Wetland Scientists, Western Wetlands Conference, March 25-27, 1993, Davis, CA.

Northern Virginia Builders Industry Association. 1990. Chesapeake Bay Water Quality and Wetlands Regulations. NVBIA Journal. May issue.

Water Science and Technology Board Newsletter. 1989. The Controversy over Wetlands. Vol. 6, No. 2.

Brown, D.L., C.M. Skau, J.J. Rhodes, and W.L. Melgin. 1988. Nitrate Cycling in Subalpine Watersheds Near Lake Tahoe. Presented and published at the International Mountain Watershed Symposium: Subalpine Processes and Water Quality. Crystal Bay, NV. June, 1988.

Melgin, W. 1986. Volume II. Handbook of Best Management Practices. Water Quality Management Plan for the Lake Tahoe Region. Tahoe Regional Planning Agency.

Melgin, W. and J. Etra. 1986. Guide to Fertilizer Use in the Lake Tahoe Basin. Tahoe Regional Planning Agency.

The Influence of Hillslope Hydrology on Nitrate Transport in a Forested Watershed Near Lake Tahoe. 1985. M.S. Thesis, University of Nevada, Reno.

Rhodes, J.J., C.M. Skau, and W.L. Melgin. 1984. Nitrate-Nitrogen Flux in a Forested Watershed-Lake Tahoe, USA. Presented and published at the Zone of Aeration Conference, Munich, Germany. October, 1984.