E-FILED
Thursday, 12 July 2007 03:45:25 PM
Clerk, U.S. District Court, ILCD

FILED
JUL 1 2 2007
JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

THE UNITED STATE DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Criminal Number 06- 30002 |
| GERALD LIPPOLD, | ) ) | Violations: 33 U.S.C. Sections 1311(a) & 1319(c)(2)(A), and |
| Defendant. | ) ) ) | 18 U.S.C. Section 2 |

## SUPERSEDING INDICTMENT

The Grand Jury charges that at all times material to this Superseding Indictment:

### Count One
(Knowing Illegal Pollution Discharge to Protected Waters)

**Defendant Lippold, the Curry Companies and the Curry Facility**

1.    Until in or about 1999, defendant Gerald Lippold was part owner of a bulk hauling company that operated from property located at 3600 N. Dirksen Parkway, in Springfield, Sangamon County, Illinois.

2.    In or about 1999, Curry Ready Mix & Builders' Supply, Inc. ("Curry Ready Mix") purchased the above-described property and stock in various companies from defendant Lippold and another individual.  This indictment hereafter refers to the property described in paragraph one as "the Curry facility."

3.    As part of the purchase agreement, the companies purchased by Curry Ready Mix agreed to pay defendant Lippold an annual salary of $100,000 for consulting services.

4.    After the purchase in 1999, several subsidiaries of Curry Ready Mix conducted business at the Curry facility.  This indictment hereafter refers to Curry Ready Mix and/or any or all of such subsidiaries as the "Curry Companies."

5.    From in or about 1999 to at least in or about the summer of 2003, defendant Lippold frequently was present and worked at the Curry facility.  He exercised substantial authority over the Curry facility's operations and the Curry Companies' agents and employees.

## Protected Waters of the United States

6.      An unnamed stream flowed in a westerly direction through the Curry facility. This stream is referred to as "the Curry Stream." A second stream flowed in a northerly direction, just west of and at times just on the Curry facility property. The Curry Stream joined with this second stream either just on the Curry facility property or immediately adjacent to it. The combination of these two streams is referred to as "the Joint Stream." The water in both the Curry Stream and the Joint Stream flowed approximately one mile downstream from the junction of the two streams to the Sangamon River, which was a navigable water and a water of the United States.

7.      Either the Curry Stream or the Joint Stream, or both, were waters of the United States within the meaning of 33 U.S.C. Section 1362(7) and 40 C.F.R. Section 122.2.

8.      The Clean Water Act protected waters of the United States from illegal polluters. The Clean Water Act prohibited the discharge of any pollutant from a point source into waters of the United States except in compliance with a National Pollutant Discharge Elimination System ("NPDES") permit issued by either the United States Environmental Protection Agency ("U.S. EPA") or the Illinois Environmental Protection Agency ("IEPA"), if it had been delegated authority.

9.      On October 23, 1977, the State of Illinois received authority from the U.S. EPA to administer an NPDES permit program, through the IEPA.

10.     One of the Curry Companies had a general NPDES permit that allowed it to discharge storm water from the Curry facility into surface waters of the United States.  No other NPDES permits have been issued to anyone that would allow other types of discharges of any pollutants to be made from the Curry facility to waters of the United States.

## The Boron Contaminated Waters

11.     In or about March and April 2001, the Curry Companies accepted, at the Curry facility, approximately 35,000 tons of industrial waste from a utility company.  This industrial

waste included fly ash waste and bottom ash waste from coal combustion. The Curry Companies used this industrial waste to begin filling a large excavation at the Curry facility.

12.     Beginning in or about June 2001, the IEPA issued violation notices to the Curry Companies alleging that they had managed the industrial waste in violation of Illinois law. Beginning in or about the summer of 2001 and thereafter, IEPA discussed and negotiated with defendant Lippold and the Curry Companies the removal and proper disposal of the industrial waste in the excavation at the Curry facility. In or about 2001, the Curry Companies agreed to remove and properly dispose of such industrial waste. This removal continued to at least the winter of 2006.

13.     Beginning in 2001, rain water began filling the large excavation at the Curry facility, which contained the industrial waste. Boron leached out of the industrial waste into the rain water that had accumulated in the excavation. This caused the accumulated water to be contaminated with a level of boron that was approximately 13 times greater than the concentration that IEPA would allow for purposes of water quality. This Indictment hereafter refers to the boron contaminated water at the Curry facility as "boron contaminated water." By 2003, approximately two million gallons of boron contaminated water had accumulated in the large excavation at the Curry facility.

14.     Beginning in or about February 2002, and continuing until at least the summer of 2003, defendant Lippold, acting as an agent for the Curry Companies was the primary person responsible for supervising the removal of the industrial waste and the disposal of the boron contaminated water from the Curry facility.

**Prior Warnings and Orders Not to Discharge the Boron Contaminated Water**

15.     In or before the spring of 2002, IEPA communicated to the Curry Companies that the boron contaminated water could not be discharged to the Curry Stream or the Joint Stream without obtaining an NPDES permit for such a discharge.

16.     By at least May 2002, defendant Lippold was aware that an NPDES permit was

required for the discharge of any of the boron contaminated water into the Curry Stream or the Joint Stream.

17.    In or about March 2002, the Curry Companies submitted to IEPA an application for an NPDES permit to allow the discharge of the boron contaminated water from the Curry facility into the Curry Stream and the Joint Stream.

18.    In or about May or June 2002, the IEPA informed the Curry Companies that the IEPA intended to deny their NPDES permit application to discharge the boron contaminated water to the Curry Stream and the Joint Stream. In or about June 2002, the Curry Companies withdrew their NPDES permit application.

19.    In or about June 2002, a lawyer for the Curry Companies sent a letter to the IEPA requesting special permission, called a "provisional variance," to allow the discharge of the boron contaminated water from the Curry facility to the Curry Stream and the Joint Stream, even though such discharge would exceed the State of Illinois' water quality standard for boron. That request by Curry Companies was withdrawn at the end of July 2002 and resubmitted with modifications at the beginning of August 2002.

20.    In or about the end of August 2002, the IEPA sent a letter to the lawyer for the Curry Companies denying the request for a provisional variance.

21.    In or about February 2003, IEPA officials met with defendant Lippold and other employees and agents of the Curry Companies. At this meeting, an IEPA official stated that analytical monitoring was necessary to determine if the industrial waste in the excavation at the Curry facility had also contaminated the area groundwater and drinking wells.

### The Illegal Discharges

22.    At the Curry facility a dirt and gravel parking lot existed east of the excavation containing the boron contaminated water. That parking lot sloped toward the Curry Stream and the excavation. A second dirt and gravel parking lot at a higher elevation existed on the other side of the Curry Stream from the excavation at the Curry facility. This parking lot also sloped

toward the Curry Stream.  These parking lots were used for parking the trucks used by the Curry Companies.

23.    Beginning in or about March or April 2003 and continuing until approximately the beginning of June 2003, defendant Lippold caused the boron contaminated water from the excavation on the Curry facility to be discharged by employees or agents of the Curry Companies into the Curry Stream and the Joint Stream by the following means:

A. Defendant Lippold caused pumps and hoses to be installed at the Curry facility to pump the boron contaminated water out of the excavation. Defendant Lippold ordered that the boron contaminated water be pumped through a hose from the excavation to slopes adjacent to the Curry Stream and the Joint Stream. The boron contaminated water pumped onto the slope adjacent to the Curry Stream flowed into the Curry Stream and then into the Joint Stream. The boron contaminated water pumped onto the slope adjacent to the Joint Stream flowed into the Joint Stream.

B. Defendant Lippold caused a drainage ditch to be dug between the excavation and the lower parking lot at the Curry facility. Defendant Lippold had a discharge pipe installed at the bottom of this drainage ditch. The discharge pipe emptied onto a slope approximately 70 feet uphill from the Curry Stream. Defendant Lippold caused the boron contaminated water to be pumped from the excavation through a hose and discharged directly into the drainage ditch where the boron contaminated water flowed into the discharge pipe and emptied onto the slope above the Curry Stream. The boron contaminated water then flowed down the slope into the Curry Stream and flowed downstream approximately 600 feet where it entered the Joint Stream.

C. In or about March or early April 2003, the IEPA agreed to allow defendant Lippold and the Curry Companies, for purposes of dust control, to fill tanker trucks with the boron contaminated water and spread it on the upper and lower parking lots at the Curry facility. The IEPA allowed such applications on the condition that no runoff containing the boron contaminated water from either parking lot would enter the Curry Stream. Defendant Lippold

directed employees of the Curry Companies to spread the boron contaminated water on the parking lots at the Curry facility. On some occasions, defendant Lippold caused or allowed the volume of boron contaminated water applied to exceed the ability of the parking lots to absorb it. On those occasions, the runoffs from the parking lots containing the boron contaminated water entered the Curry Stream and then the Joint Stream.

D. Defendant Lippold, on some occasions, ordered that the tanker trucks that were being filled with the boron contaminated water be allowed to overflow into the drainage ditch. Such boron contaminated water eventually flowed into the Curry Stream and then into the Joint Stream.

24.     Beginning in or about March or April 2003 and continuing until approximately the beginning of June 2003, defendant Lippold ordered that the boron contaminated water at the Curry facility be pumped out of the excavation 24 hours a day, even though little or none of such boron contaminated water could be spread on the parking lots at night because trucks were parked there.

25.     By in or about the early part of June 2003, defendant Lippold had caused almost all of the boron contaminated water to have been removed from the excavation at the Curry facility. Defendant Lippold also caused a substantial portion of such boron contaminated water from the excavation at the Curry facility to be discharged into the Curry Stream and the Joint Street.

### The Violation

26.     The Clean Water Act defined a "pollutant" to include solid waste, incinerator residue, chemical wastes, industrial waste and municipal waste discharged into water. 33 U.S.C. Section 1362(6). The boron and the above-described boron contaminated water were pollutants.

27.     The Clean Water Act also defined a "point source" as any discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit or discrete fissure from which pollutants may be discharged. 33 U.S.C. Section 1362(14). The

above-described discharge pipe, tanker trucks and hoses were point sources.

28.    Beginning in or about March 2003 and continuing until approximately the beginning of June 2003, in Sangamon County in the Central District of Illinois, the defendant

**GERALD LIPPOLD,**

knowingly caused pollutants to be discharged from point sources either directly or indirectly by means of one or more conveyances, including but not limited to a hose, pipe, truck, ditch, channel, conduit or stream, into waters of the United States without an NPDES permit issued under Title 33, United States Code, Section 1342, in that the defendant, acting without an NPDES permit, caused discharges of boron contaminated water to be made to waters of the United States by one or more of the above-described means.

All in violation of Title 33, United States Code, Sections 1311(a) and 1319(c)(2)(A) and Title 18, United States Code, Section 2.

A TRUE BILL,

_____
FOREPERSON

_____
RODGER A. HEATON
UNITED STATES ATTORNEY