IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| GERALD LIPPOLD, CURRY READY MIX & ) | Criminal Number 06-30002 |
| BUILDERS SUPPLY, INC., CURRY ICE & COAL ) | |
| OF SPRINGFIELD, INC. and LIPPOLD & ) | |
| ARNETT, INC. ) | |
| ) | |
| Defendants. ) | |

## DEFENDANT'S DISCLOSURE OF EXPERT WITNESS ANDERSON

NOW comes Defendant Gerald Lippold, by and through his attorneys, Thomas Schanzle-Haskins and Claire A. Manning, Brown, Hay Stephens, LLP and discloses the following information concerning expert witness Dr. Brian D. Anderson.

The opinions and a summary of the bases and reasons for such opinions are contained in the Anderson Report, which is here attached.

Respectfully submitted,
**GERALD LIPPOLD**, Defendant

By:
s/Claire A. Manning
Claire A. Manning, Registration No. 3124724
Tom Schanzle-Haskins, Registration No. 02473534
Attorneys for the Defendant
Brown, Hay & Stephens, LLP
205 S. Fifth Street, Suite 700
P.O. Box 2459
Springfield, IL 62705-2459
Telephone: (217) 544-8491
Facsimile: (217) 544-9609
cmanning@bhslaw.com
ts-h@bhslaw.com

# CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Patrick J. Chesley
U.S. Attorney
318 S. Sixth Street
Springfield, IL 62701-1806
pat.chesley@usdoj.gov.

Charles J. Northrup
Todd M. Turner
Sorling, Northrup, Hanna, Cullen & Cochran
800 Illinois Building
607 E. Adams Street
Springfield, IL 62705
cnorthrup@sorlinglaw.com

Jon G. Noll
Noll Law Office
802 S. Second Street
Springfield, IL 62704
noll@noll-law.com

s/ Claire A. Manning
Registration No. 3124724
Attorney for the Defendant
Brown, Hay & Stephens, LLP
205 S. Fifth Street, Suite 700
P.O. Box 2459
Springfield, IL 62705-2459
Telephone: (217) 544-8491
Facsimile: (217) 544-9609
cmanning@bhslaw.com

# I. BACKGROUND

My name is Dr. Brian D. Anderson. I am currently the Assistant to the President for Planning and Institutional Improvement at Lincoln Land Community College and former Chair of the Department of Biological and Physical Sciences. I also have had over 20 years of experience in natural resources management and administration having formerly served the Illinois Nature Preserves Commission as Director and the Illinois Department of Natural Resources ("DNR") as the Conservation 2000 Coordinator, the Director of the Office of Scientific Research and Analysis (where I oversaw the Illinois Scientific Surveys and the Illinois State Museum), and the Director of the Office of Resource Conservation (where I was responsible for DNR's fish and wildlife programs).

As Director of the Office of Scientific Research and Analysis I gained extensive experience in promoting and applying scientific data in the formulation of policies and policy decisions. While I was Director of the Illinois Nature Preserves Commission, we urged the USCOE to assume jurisdiction over the bailfill site in northern Illinois based on use of the site by migratory birds, which ultimately lead to the Supreme Court's decision in *SWANCC v. United States,* a case which was thoroughly discussed in the Supreme Court's recent decision in *Rapanos v. United States.* I have drafted statutes and administrative regulations, testified before the General Assembly on a wide range of natural resource issues, and appeared before the Joint Committee on Administrative Rules on a wide range of state regulations. I staffed Governor Edgar's Water Resources and Land Use Priorities Task Force and Governor Ryan's Water Planning Task Force. I also served on Governor Ryan's Balanced Growth Task Force and Energy Sub-cabinet. In 2003 I coordinated the development of and edited the Report of the Subcommittee on Water Planning to the Intergovernmental Coordinating Committee on Groundwater Pursuant to Executive Order Number 5 2002. I also served as Special Assistant to the Acting Regional Director of the National Biological Service through an inter-governmental exchange.

I have given expert testimony before the Illinois Pollution Control Board and in court. I hold a Ph.D. in Biology from the University of Louisville, and a Master's Degree in Zoology from DePauw University.

I currently serve on the Board of Directors of Prairie Rivers Network and formerly served as a Board Member of the Illinois Stewardship Alliance. In 2004 I was the recipient of the Illinois Environmental Council's Environmental Leadership Award.

My resume is attached as Attachment 1.

# II.   OPINIONS

I was requested by Brown, Hay & Stephens, LLP, Counsel for Defendant, to review the indictment in this case, various USEPA and USCOE reports, the Expert Witness disclosures filed by the United States Government in this matter, the *Rapanos v. United States* decision, as well as other relevant documents, and provide expert testimony concerning issues within my area of expertise.

1

I have reviewed the expert witness testimony and other relevant materials and I am prepared to testify:

Relative to whether boron is a pollutant

The U.S. Environmental Protection Agency does not recommend the establishment of a water quality standard for boron to protect aquatic life or human health. See National Recommended Water Quality Criteria USEPA Office of Water, Office of Science and Technology 2006 (4304T); Regulatory Determinations Support Document for Selected Contaminants from the Second Drinking Water Contaminant Candidates List (CCL2), Part II CCL Contaminants Undergoing Regulatory Determination, Chapter 3: Boron, EPA 815-D-06-007.

Early in the state's history of environmental regulation, Illinois adopted a General Water Quality Standard for boron of 1.0 mg/L, citing a potential concern for water used for irrigation purposes. Since then, the Illinois Pollution Control Board has granted various exceptions to that standard, but has not changed it.

Relative to whether there was a discharge of a pollutant

No direct evidence of a discharge of water contaminated with boron at levels beyond the Illinois General Water Quality Standard is presented. Samples of water were originally taken from the pit and tested for boron, but no subsequent samples were taken at the time of any purported release, either from the pit (where the boron could have been diluted by intervening precipitation), or from the purported discharge point or points. The IEPA had in fact approved application of the boron water as a "dust control measure" to the parking lots. Photographs are presented which show standing water on and around the parking lots, but no samples of these waters were taken and assayed for boron. The degree to which rainfall or a high water table may have contributed to the standing water, and the potential effects of dilution or evaporation are not discussed and apparently were never investigated. While a photo is provided showing water leaving a pipe, there is no evidence of the boron concentration in that water, as no sample of that water was ever taken from the pipe and tested for the presence of boron.

Relative to whether the east branch of the unnamed tributary is a "water of the United States"

While no evidence is presented to document that a discharge actually occurred, had one occurred, it would have been intercepted by the east branch of the unnamed tributary and could only have occurred as surface flow or flow through a stormwater overflow pipe. This pipe lies below the access road to the pit on the southwest corner of the lower parking lot, and discharges into the ravine in which the east branch of the unnamed tributary lies. That pipe discharges well up the side of the ravine at a point where the floodplain on that side of the unnamed creek is 70-80 feet wide. No evidence was presented as to how much, if any, water leaving the stormwater overflow pipe entered the channel of the creek and no samples of water actually entering the creek, if any, were taken or tested for boron. In fact considerable flow from the pipe could have been absorbed on the floodplain before any water ever reached the creek.

2

The United States government has clear jurisdiction over navigable waters. The east branch of the unnamed tributary is not a navigable water-in-fact. The closest navigable water is the Sangamon River. The federal government can assert jurisdiction over a body of water if it is necessary to do so in order to protect the water quality or ecological integrity of the navigable river. In a recent Supreme Court case, *Rapanos v. United States,* it was determined that the federal government must prove a "significant nexus" between the navigable water and non-navigable, intrastate waters over which it seeks to exercise jurisdiction. Subsequently, the U.S. Army Corps of Engineers and USEPA issued joint guidance to their districts and regional offices, respectively, on how and when they should seek to assert jurisdiction over non-navigable tributaries.

Without commenting on the legal status of this guidance, it is clear that the federal agencies' primary stated objective was to claim outright jurisdiction over any "[flowing] waters that are relatively permanent where the tributaries typically flow year-round or have continuous flow at least seasonally, e.g., typically three months" (Joint Memorandum USEPA/USCOE: *Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in Rapanos v. United States & Carabell v. United States*). The guidance appears to require consideration of an ecological nexus only if the tributary does not flow continuously for at least three months. As a result, the prosecution's witnesses spend much energy in the utilization of indirect evidence to characterize the east branch (or by creeping implication both branches and the mainstem of the unnamed tributary) as "relatively permanent" or "flowing continuously for 3 months."

While several prosecution witnesses attempt to reconstruct through indirect methods the percentage of time there may or may not have been flow from the subject tributary, no actual observations of flow conditions at the time of the purported discharge were recorded. The sporadic direct observations, review of aerial photos, and extrapolations from flow measurements at other gauging stations put forth by witnesses for the prosecution are, by their own testimony, inconclusive. Aerial photographs may depict water, but cannot and do not depict or predict flow or hydrologic connectivity.

In my opinion the unnamed creek is clearly an intermittent creek, with intermittent and/or sporadic flow, as the prosecution witnesses appear to admit. There are times when a hydrologic connection between the east branch of the unnamed tributary and the Sangamon River may exist; Ms. Melgin describes a site visit which she believes demonstrates an hydrologic connection. Mr. Carney references a fish-sampling visit where the sample site upstream of the Curry property is dry, while the ones below the Curry property had water in them.

When I visited the creek on August 24, 2007, there was no flow of water in the creek at all. There were only isolated pools of water whose characteristic odor suggested they had been long stagnant.

The east branch of the unnamed creek only has a drainage area of 500 acres (0.78 square miles) while the west branch of the unnamed tributary has a drainage area of 1000 acres (1.56 square miles) and the combined drainage areas of the two tributaries and the main stem below their confluence is approximately 2350 acres (3.67 square miles). Dr. Knapp argues based on a single data point (October 5, 2006, the day Mr. Carney visited the east branch and found the sampling

site upstream of the Curry property dry and characterized the downstream flow as "slight") that the flows in the east branch of the unnamed tributary may be more similar to the flows in Spring Creek which has a drainage area of approximately 10,880 acres (107 square miles) and includes a considerable portion of the City of Springfield with it's many paved, impervious surfaces, and potential for supplementation from domestic water sources, all of which would enhance flows; than those recorded from Hurricane Creek which has a drainage area of 2.3 square miles (still 3 times the watershed area of the east branch) and exhibits no flow conditions 30% of the time. Dr. Knapp also betrays that he used the gauging data from Hurricane Creek, even though it is no longer operational, because it was the only gauging station in central Illinois on a stream with a watershed less than 5 square miles. This conclusively demonstrates that there is no comparable flow data for a stream in central Illinois with a drainage area of only 500 acres. The prosecution's witnesses fail to make the case that the east branch flows continuously for three months. Ultimately, whether there is a hydrologic connection between a non-navigable, intrastate water and a navigable water does not in itself demonstrate the existence of an ecological nexus between the two anyway.

When continuous flow for 3 months cannot be demonstrated the Joint USEPA/USCOE guidance also requires consideration of whether the intermittent tributary provides "habitat [for aquatic species] that supports a traditional navigable water" in establishing a nexus. Mr. Carney only conducted fish sampling at a single location in the east branch (Site #4) because Site #1 upstream of the Curry property was dry. The only fish species recovered was the creek chub (*Semotilus atromaculatus*); the same species Mr. Carney testified showed no patterns of upstream or downstream migration. He further identified the creek chub as one of the few species that can survive in the high temperatures and low dissolved oxygen conditions of stagnant pools. The aquatic invertebrates collected by Mr. Ettinger could be found in many drainage ditches in central Illinois. No evidence is presented that suggests the east branch provides habitat critical to maintaining the ecological health of the Sangamon River. In other words, the requisite nexus is neither apparent nor proven.

Of course the physical and chemical properties of boron preclude the possibility of demonstration of a "significant nexus" between the east branch of the unnamed tributary and the Sangamon River. Boron is highly soluble. If the east branch of the unnamed tributary was dry, or exhibited no flow at the time of the purported release, any boron-contaminated water would either soak into the ground or evaporate. If the creek were flowing the boron would be diluted by the flow water. It is, in my opinion, extremely improbable that water containing boron at concentrations above the General Water Quality Standard of 1.0 mg/L could reach the Sangamon River under either scenario. Consequently, there are no grounds for exercising federal jurisdiction over this creek, since it is not necessary to do so to protect the federal interest in the navigable river.

Finally, plain language and logic dictate that the unnamed tributary in question cannot reasonably be considered a water of the United States since, if a creek/ditch with a watershed or drainage area of only 500 acres is "a water of the United States," virtually all creek/ditches in the country would be considered such water. The federal government will have effectively usurped jurisdiction over all of the flowing waters of the nation (and those that much of the time do not flow at all).

<u>Relative to whether the defendant could have knowingly discharged to a water of the United States</u>

The analyses required to demonstrate a "significant ecological nexus" between a navigable and non-navigable stream are complex. Regardless of what the IEPA may have told the Defendants, a federal NPDES permit would not be required for the discharge of boron water into the east branch of the unnamed tributary if such discharge does not constitute a discharge of a pollutant into a water of the United States.

ATTACHMENT 1 to:
**DEFENDANT'S DISCLOSURE OF EXPERT WITNESS ANDERSON**

Resume of Dr. Brian D. Anderson

Dr. Brian D. Anderson
33 Taft Drive
Rochester, Illinois 62563
(217) 498-7136 - Evening
(217) 786-2792 - Day
brian.anderson@llcc.edu

## EDUCATION

Kalamazoo College
Kalamazoo, Michigan 49001
B.A. 1976. Biology major, political science minor. Teaching certification in secondary education

DePauw University
Greencastle, Indiana 46135
M.A. 1978. Zoology
Master's thesis: "A Study of a Population of <u>Passer domesticus</u> that has been Shown to be Carrying St. Louis Encephalitis"

University of Louisville
Louisville, Kentucky 40208
Ph.D. 1985. Biology
Dissertation: "A Study of the Systematics of <u>Culex pipiens pipiens</u> and <u>Culex pipiens quinquefasciatus</u> in Jefferson County, Kentucky"

## RELATED EXPERIENCE

| | |
|---|---|
| 1978 to 1982 | University of Louisville<br>Louisville, Kentucky<br>University Fellow of the Department of Biology<br>Research |
| 1976 to 1978 | DePauw University<br>Greencastle, Indiana<br>Graduate Teaching Assistance<br>Taught Introductory Zoology, Human Anatomy, and Human Physiology |
| 1977 | Indiana State Board of Health<br>Indianapolis, Indiana<br>Arbovirus Surveillance Program<br>Avian Sampling and Population Estimates |

1

| | |
|---|---|
| 1975 | Kalamazoo Sewage Treatment Plant<br>Kalamazoo, Michigan<br>Laboratory Technician<br>Water Chemistry Laboratory |
| 1974 | Port Huron Paper Company<br>Port Huron, Michigan<br>Laboratory Technician<br>Paper Laboratory |

**PROFESSIONAL EXPERIENCE**

| | |
|---|---|
| 2006-Present | Assistant to the President for Planning and Institutional Improvement<br>Lincoln Land Community College<br>5250 Shepherd Road, P.O. Box 19256<br>Springfield, IL 62794-9256 |

As Assistant to the President for Planning and Institutional Improvement coordinates the college's strategic and program planning and supervises the college's Institutional Research Program. Serves as project manager for varied projects aimed at improving institutional processes and procedures. Is responsible for compliance with Illinois Community College Board reporting requirements and institutional accreditation through the Higher Learning Commission.

| | |
|---|---|
| 2004 –2006 | Chairperson, Department of Biology and the Physical Sciences<br>Lincoln Land Community College<br>5250 Shepherd Road, P.O. Box 19256<br>Springfield, IL 62794-9256 |

As Chair of the Department of Biological and Physical Sciences administered the academic science programs of Lincoln Land Community College. Oversaw 14 full-time faculty and a cadre of over 20 adjunct faculty. Built and staffed class schedules, reviewed and assessed academic programs, monitored and promoted enrollment, and administered the Department's budget. Co-chaired the college's Strategic Planning efforts and Core Indicator's Workgroup, and served on the Program Review, Curriculum and Sick Bank Committees.

| | |
|---|---|
| 2003 to 2004 | Director, Office of Resource Conservation<br>Illinois Department of Natural Resources<br>One Natural Resources Way<br>Springfield, IL 62702 |

As Director of the Office of Resource Conservation oversaw the natural resource protection and management programs of the Department of Natural Resources (IDNR), including the state's hunting and fishing programs and natural areas and endangered species protection programs. Directed over 250 biologists housed in district and regional offices statewide. Administered a large budget which

2

included many restricted funds.

| | |
|---|---|
| 1999 to 2003 | Director, Office of Scientific Research and Analysis<br>Illinois Department of Natural Resources<br>524 S. Second Street, Lincoln Tower Plaza<br>Springfield, Illinois 62701-1787 |

As Director of the Office of Scientific Research and Analysis, coordinated administration of the Illinois Natural History Survey, Illinois Geologic Survey, Illinois State Water Survey, the Waste Management Resource Center, and the Illinois State Museum with the IDNR. Served as Departmental liaison to the Board of Natural Resources and Conservation and the State Museum Board. Coordinated budget, personnel, and programmatic issues across the 5 science institutions whose 800 scientists support the programmatic efforts of the IDNR and other state agencies.

| | |
|---|---|
| 1995 to 1999 | Ecosystem Projects Coordinator<br>Illinois Department of Natural Resources<br>524 S. Second Street, Lincoln Tower Plaza<br>Springfield, Illinois 62701-1787 |

As Ecosystem Projects Coordinator with the Office of Realty and Environmental Planning, coordinated the Conservation 2000 program and manages the Ecosystems Program. The Ecosystems Program encourages the formation of and provides support to local partnerships taking an ecosystem approach to addressing regional natural resource issues. Coordinated the Department's efforts in implementing ecosystem-based management as an agency priority. Administered an $11.6 million annual budget.

| | |
|---|---|
| 1985 to 1995 | Director<br>Illinois Nature Preserves Commission<br>524 S. Second Street<br>Lincoln Tower Plaza<br>Springfield, Illinois 62701-1787 |

As Director of the Illinois Nature Preserves Commission directed activities of 4 regional Field Representatives in natural areas identification, protection, stewardship and defense. Supervised the Deputy Director/Legal Counsel, Stewardship Coordinator, and Executive Assistant. The Illinois Nature Preserves System included over 200 preserves encompassing over 30,000 acres of high quality natural lands. The director is responsible to a 9-person Commission appointed by the Governor and undertakes all other aspects of program administration, including: rulemaking and legislation, budget, policy development, program promotion, organization of quarterly Commission meetings, and represents the Commission on a day-to-day basis.

| | |
|---|---|
| 1994 and 1995 (5 months) | Special Assistant to the Acting Regional Director<br>National Biological Service<br>Intergovernmental Personnel Assignment<br>Washington, DC |

On leave from the Illinois Nature Preserves Commission through an inter-governmental

exchange, served as Special Assistant to the Acting Regional Director of the National Biological Service (NBS) in Washington, DC. Provided staff support to the Acting Regional Director over the four NBS Regional offices; acted as primary contact with state agencies and the International Association of Fish and Wildlife Agencies; consulted in the development of NBS's state partnerships program; represented the Acting Regional Director in working group meetings aimed at developing NBS policy; participated in strategy planning sessions with NBS Executive Staff. Served as a liaison with outside agencies and organizations, and prepared white papers and reports on various issues pertinent to the implementation of the National Biological Service organization plan and their subsequent integration into the U.S. Geological Survey.

| | |
|---|---|
| 1992 and 1993 | Staff Coordinator<br>Governor's Water Resources and<br>Land Use Priorities Task Force<br>Springfield, Illinois |

On administrative leave to the Governor's Office, coordinated and facilitated the development by 27 representatives of the agriculture, business, sportsmen's, environmental, and recreation constituencies 184 consensus recommendations to the Governor. Recommendations address a broad spectrum of land and water use issues ranging from habitat concerns, wetlands issues, flooding and stormwater problems, to hazardous waste cleanup.

| | |
|---|---|
| 1979 to 1985 | Kentucky Nature Preserves Commission<br>Frankfort, Kentucky 40601<br>Field Representative/Kentucky Natural Heritage<br>Program Coordinator |

As Coordinator of the Kentucky Natural Heritage Program, duties included maintenance of the Kentucky Natural Heritage Database, a computerized inventory of over 600 rare, threatened, or endangered species of Kentucky plants and animals; supervision of data acquisition, computerization, and recommendation of species' status revisions. Other duties as Field Representative included the primary responsibility of conducting environmental reviews and coordinating project reviews with other wildlife and natural resource agencies; recommending mitigation and management strategies for monitored species; conducting faunistic surveys for all animal taxa, including both invertebrates and vertebrates; the curation of research collection; design and implementation of landowner contact and natural areas registry program; recommendation of lands for acquisition and preserve selection, design, and management.

**JOB RELATED TRAINING**

    Facilitation Training, 1992
    Hiring and Interview Practices, 1994
    Sexual Harassment Training 1995

**JOB RELATED SKILLS**

- Photography; dark room development, black and white prints and slides
- Transmission Electron Microscopy
- Virological and immunological techniques
- Computer Software familiarity: Corel Office, Microsoft Office, ArcView GIS, Desktop Publishing, CAD, Graphics, etc.
- Real Estate Experience: specializing in less-than-fee interests in real property

**PROFESSIONAL PUBLICATIONS AND PRESENTATIONS**

Anderson, Brian D. and Charles E. Mays. 1978. A study of a population of Passer domesticus that has been shown to be carrying St. Louis encephalitis. Proceedings of Indiana Academy of Science 88:436-447.

Anderson, Brian D. 1979. A study of a house sparrow (Passer domesticus) population dynamics in relation to St. Louis encephalitis. Proceedings of the Indiana Vector Control Association.

Anderson, Brian D. Partial albinism in Jefferson County house sparrows. Kentucky Warbler 59 (1):26-27.

Anderson, Brian D. and William S. Davis. Evidence of a chromo center in the salivary gland chromosomes of Culex pipiens complex mosquitos. Presented at the 1981 meeting of the Kentucky Academy of Science.

Anderson, Brian D., Marc Evans and Richard R. Hannan. 1984. Bald Eagle study for the Lower Ohio River navigation project. Technical Report. Kentucky Nature Preserves Commission.

Anderson, Brian D., Robert K. Brown, and Jerry Learn. The application of a hybrid index in examining the distribution of Notophthalmus viridescens viridescens and Notophthalmus viridescens louisianensis in Kentucky. Presented at the 1982 meeting of the Association of Southeastern Biologists.

Anderson, Brian D. and Sherri A. Evans. Least Tern (Sterna antillarum) survey of the Mississippi River adjacent to Kentucky: results and management considerations. Presented at the 1984 meeting of the Kentucky Academy of Science.

Anderson, Brian D. (editor). 1988. A landowner contact and preservation program for *Cyperus grayioides* (umbrella sedge). Technical Report. Illinois Nature Preserves Commission for The Office of Endangered Species, U.S.F.W.S.

Anderson, Brian D. 1988. Preserving oak woodlands. Presented at the Symposium on the

Management of Oak Woodlands, sponsored by the Illinois Academy of Science.

Anderson, Brian D. 1989. Controlling deer on Illinois nature preserves: lessons learned. Presented at the 16th Annual Meeting of the Natural Areas Association.

Anderson, Brian D. 1990. Considerations in establishing state recovery programs. Presented at the 2nd Annual Conference of the Society of Ecological Restoration.

Anderson, Brian D. 1990. Landscape scale protection in preserving biodiversity. Presented at the 8th Continuing Forestry Education Workshop of the Illinois Society of American Foresters.

Anderson, Brian D. 1991. Closing remarks. in Page and Jeffords. 1991. Our Living Heritage: The Biological Resources of Illinois. Illinois Natural History Survey Bulletin. Vol. 34, Article 4. April 1991. pp. 460-462.

Anderson, Brian D. 1991. Macrosites - new opportunities for wildlife management. Presented at the 27th Annual Meeting of the Illinois Chapter of The Wildlife Society.

Anderson, Brian D. 1991. Preserving Illinois' aquatic biodiversity: a challenge for the Nature Preserves Commission. Presented at the 29th Annual Meeting of the Illinois Chapter of the American Fisheries Society.

Anderson, Brian D. 1991. Landscape scale preservation: opening remarks. Presented at a Symposium on Landscape Scale Preservation sponsored by the Illinois Nature Preserves Commission.

Anderson, Brian D. 1992. Riparian Zones. The Illinois Steward 1(3):6-9.

Anderson, Brian D. 1996. Panel on Ecological Restoration. Presented at the Symposium on Ecological Restoration sponsored by the Northeastern Illinois Planning Commission.

Anderson, Brian D. 1997. Illinois' Ecosystems Program. Presented at the Annual Meeting of the Illinois Floodplain and Stormwater Management Association.

Anderson, Brian D. and Others. 1997. Workshop: What is the Chicago Wilderness? Preserving Natural Resources in a Developing Region. in Putting the Pieces Together: A Regional Exchange of Cooperative Techniques and Opportunities. Northeastern Illinois Planning Commission. 1997. pp. 5-7.

Anderson, Brian D. 1994-1998. The Politics of Wildlife Management. Guest Lecturer, Wildlife Management Seminar, Southern Illinois University-Carbondale.

Anderson, Brian D. 1998. The Ecosystems Program of Conservation 2000 in ABSTRACTS: Illinois Renewable Natural Resources Conference.

Anderson, Brian D. 1999. Sustainability: The Holy Grail of Ecosystem Management? Presented at The 2nd Illinois Trails and Greenways Conference.

Anderson, Brian D. (editor). 2003. Report of the Subcommittee on Water Planning to the Intergovernmental Coordinating Committee on Groundwater Pursuant to Executive Order Number 5 2002. Technical Report. State of Illinois.

Anderson, Brian D. 2005. The Fruits of The Illinois Natural Areas Inventory. Keynote Address. Annual Meeting of the Illinois Academy of Science 2005.

Anderson, Brian D. 2006. Program Planning: Doing Things Better, Faster, or Cheaper. Presented at Employee Development Day, Lincoln Land Community College.

Anderson, Brian D. 2006. Adapting Data Driven, Inclusive, Strategic Planning to Your College's Culture, Calendar, and Current Circumstances. Presented at the Illinois Association of Institutional Research Annual Conference.

Anderson, Brian D. and Karen A. Witter 1993. Compiled and edited Report of the Governor's Water Resources and Land Use Priorities Task Force. Technical Report, Office of the Governor of Illinois.

Evans, Marc, Brainard Palmer-Ball, Jr., John R. MacGregor, and Brian D. Anderson. 1987. The vertebrate fauna and vascular flora of Ballard County Wildlife Management Area, Ballard County, Kentucky. Technical Report. Kentucky Nature Preserve Commission.

Girard, G. Tanner, Brian D. Anderson, and Taylor Delaney 1990. Managing Conflicts with Animal Advocates. Presented at the 52nd Midwest Fish and Wildlife Conference.

Girard, G. Tanner, Brian D. Anderson, and Taylor Delaney 1993. Managing Conflicts with Animal Activists: White-tailed Deer and Illinois Nature Preserves. Natural Areas Journal 13(1):10-17.

Hannan, Richard R., Catherine A. Justis, and Brian D. Anderson. 1982. Evaluation and protection methodologies for Kentucky's natural areas. Technical Report, Kentucky Nature Preserves Commission.

Illinois Nature Preserves Commission. Compiled and edited 1984-85, 1986-87, 1988-89 Biennial Reports of the Illinois Nature Preserves Commission.

Warren, Melvin L., Jr., et al. 1986. Endangered, threatened and rare plants and animals of Kentucky. Transactions of the Kentucky Academy of Science 47 (3-4):83-98.