E-FILED
Friday, 31 August, 2007 04:00:38 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS**

UNITED STATES OF AMERICA,

Plaintiff,

v.

GERALD LIPPOLD, CURRY READY MIX & BUILDERS SUPPLY, INC., CURRY ICE & COAL OF SPRINGFIELD, INC. and LIPPOLD & ARNETT, INC.

Defendants.

Criminal Number 06-30002

**DEFENDANT'S DISCLOSURE OF EXPERT WITNESS RAPPS**

NOW comes Defendant Gerald Lippold, by and through his attorneys, Thomas Schanzle-Haskins and Claire A. Manning, Brown, Hay Stephens, LLP and discloses the following information concerning expert witness Michael W. Rapps.

The opinions and a summary of the bases and reasons for such opinions are contained in the Rapps Report, which is here attached.

Respectfully submitted,
**GERALD LIPPOLD**, Defendant

By:
s/Claire A. Manning

Claire A. Manning, Registration No. 3124724
Tom Schanzle-Haskins, Registration No. 02473534
Attorneys for the Defendant
Brown, Hay & Stephens, LLP
205 S. Fifth Street, Suite 700
P.O. Box 2459
Springfield, IL 62705-2459
Telephone: (217) 544-8491
Facsimile: (217) 544-9609
cmanning@bhslaw.com
ts-h@bhslaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Patrick J. Chesley
U.S. Attorney
318 S. Sixth Street
Springfield, IL 62701-1806
pat.chesley@usdoj.gov.

Charles J. Northrup
Todd M. Turner
Sorling, Northrup, Hanna, Cullen & Cochran
800 Illinois Building
607 E. Adams Street
Springfield, IL 62705
cnorthrup@sorlinglaw.com

Jon G. Noll
Noll Law Office
802 S. Second Street
Springfield, IL 62704
noll@noll-law.com

s/ Claire A. Manning
Registration No. 3124724
Attorney for the Defendant
Brown, Hay & Stephens, LLP
205 S. Fifth Street, Suite 700
P.O. Box 2459
Springfield, IL 62705-2459
Telephone: (217) 544-8491
Facsimile: (217) 544-9609
cmanning@bhslaw.com

## I. BACKGROUND

My name is Michael Rapps. I am the President and Chief Executive Officer of Rapps Engineering & Applied Science, Inc., an Illinois corporation that is registered as a Professional Design Firm engaged in the practice of Professional Engineering. I am a 1972 graduate of the University of Illinois in Champaign-Urbana, hold a Bachelor of Science degree in General Engineering, and have performed post-graduate study in the subject area of Operations Research/Systems Analysis at Sangamon State University, now known as the University of Illinois-Springfield. I have been licensed to practice as a Professional Engineer in the State of Illinois since 1976.

My firm is based in Springfield, Illinois but performs services on client projects throughout the State of Illinois, and occasionally in other states. The practice is concentrated in the subject areas of civil and environmental engineering and related sciences. The firm's specialties include regulatory and design work with solid waste landfills, surface and underground coal-mines, and soil and groundwater remediation projects at industrial and commercial facilities. The firm routinely identifies and delineates wetlands, performs hydrologic assessments, designs stormwater detention systems, designs sediment ponds, prepares NPDES permit applications, develops mine reclamation plans, designs and obtains permits for landfills, designs surface and groundwater monitoring systems, surveys properties, constructs site plans and maps, and performs environmental assessments of commercial and industrial properties, and advises clients on environmental regulations and compliance issues, such as permit requirements and waste definitions. The work product herein contains some materials that were prepared by members of my firm at my direction.

My professional experience is principally in the subject area of environmental engineering, with emphasis in the area of solid waste management and related subjects. Incidental to this, I have routinely participated in government rule-making related to waste management issues, consulted by or for government agencies regarding such issues, or represented industry groups or private sector clients in matters involving waste management.

I began my career as a professional engineer in 1972 at the newly created Illinois Environmental Protection Agency ("Agency"). In the five years that I spent with that Agency, I reviewed permit applications for more than one hundred solid waste disposal sites. I also reviewed groundwater monitoring data for Illinois landfills from 1975 to 1977 and triggered follow-up investigations where appropriate.

I later became the Agency's Hazardous Waste Manager where I was responsible for the oversight of off-site disposal of industrial wastes in Illinois landfills and incinerators. In that capacity, I drafted the first Illinois Special Waste Hauling Regulations, adopted by the Illinois Pollution Control Board in 1976, which included the still current Illinois definition of special waste. During this time I also worked with the Agency to develop a waste leaching procedure in Illinois. That procedure is similar to the one later adopted by the USEPA. During my state tenure, I also consulted with USEPA officials in Washington, D.C. in the construction of the original RCRA hazardous waste regulations.

In 1977 I accepted the position of Technical Director for the Chemical Waste Division of Waste Management Inc., the largest solid waste company in the world. In that position I worked on company disposal site projects in approximately 20 states, overseeing many technical issues attendant to acquisition of the hazardous waste facilities in the U.S. During this time I took a brief leave to consult with the World Health Organization in the State of Sao Paulo Brazil where I made recommendations for a special waste management program (residuos especial). I later duplicated that work in a five-week project in the State of Rio de Janeiro in 1980.

In 1978 I founded Rapps Engineering & Applied Science, Inc., an environmental consulting firm that operates throughout Illinois. The company performs consulting work on projects involving the siting, permitting and construction of landfills, the permitting of coal-mines, and environmental investigations and remediations at commercial and industrial sites. The firm has worked on projects in 50 of Illinois' 102 counties. I have a strong background in the subject area of hydrogeology, which is a significant component in the field of solid waste management.

Although in the private sector, I have served as an appointed commissioner on the Illinois Environmental Review Commission and I am an appointed member of the Illinois Low-level Radioactive Waste Task-Group. The latter was formed to develop technical criteria to be used in siting a low-level radioactive waste disposal site in Illinois. I am also a former member of the Central Mid-West Low-Level Radioactive Waste Compact Commission (Illinois-Kentucky).

I continue to be an active participant in environmental rulemaking on behalf of numerous trade groups. As examples, I have testified in regulatory proceedings related to waste, waste hauling, livestock waste, underground storage tanks and remediation standards.

I have also testified in local landfill siting proceedings pursuant to the Illinois Environmental Protection Act, both as a representative of a landfill applicant and as a consultant for local government in reviewing an applicant's request for siting. I have also testified in court proceedings.

My resume is attached as Attachment 1.

## II. OPINIONS

I was requested by Brown, Hay & Stephens, LLP, Counsel for Gerald Lippold, to review the indictment in this case, the various IEPA investigation reports and the Expert Witness disclosures filed by the United States Government in this matter, as well as other relevant documents, including Illinois Environmental Protection Agency reports and analytical data and provide expert testimony concerning issues within my area of expertise.

Based upon that review, I will provide testimony concerning the following opinions:

1. Boron is a non-metallic element. It is not toxic in the conventional sense, and is not federally regulated as a pollutant.

2. Water contained in the excavation at the Curry site was naturally occurring precipitation, stormwater, and groundwater that had come in contact with flyash. The flyash was intended for beneficial use as fill material at the Curry site. In this context, it is not "industrial waste" and the natural water with which it mixed is not "industrial waste water."

3. Water from the Curry site that may have been discharged from the Curry excavation into the intermittent tributary would not have caused or contributed to a violation of the Illinois Pollution Control Board water quality standard relevant to Illinois water bodies.

4. The water present in the Curry excavation in the Spring of 2003 could easily have been eliminated by absorption and evaporation through the spreading of such water on the surface of the Curry parking lots and surrounding facility roadways.

5. The existing Curry NPDES stormwater permit (a) covered any runoff of water from the parking lot and (b) contemplated any drainage pipe necessary to eliminate parking lot water runoff, such as that which is referred to in the Superceding Indictment.

6. There is no record of a significant flow of water between the tributaries that traverse the Curry property, both documented "intermittent streams", and their eventual confluence with the Sangamon River, a documented "navigable" water body, for the period of time relevant to the alleged elimination of water from the Curry excavation.

## III. SUMMARY OF BASIS FOR OPINIONS

**1. OPINION: Boron is a non-metallic element. It is not toxic in the conventional sense, and is not federally regulated as a pollutant.**

Boron is "a chemical element, B, atomic number 5, atomic weight 10.811, in Group III of the periodic table. It has three valence electrons and is nonmetallic in behavior. It is classified as a metalloid and is the only nonmetallic element which has fewer than four electrons in its outer shell (Parker, 1983)."

Boron is a naturally occurring element that is ubiquitous in the environment at relatively low concentrations. It is not found in its elemental form in nature: it is usually found as sodium or calcium borate salt (USEPA, 1986). Calcium borate is crystalline and is not water-soluble. The boron found in flyash is water-soluble; thus, it likely is sodium borate (i.e., borax).

The NALCO Water handbook (Kemmer, 1979) classifies Borate, a compound of boron as a non-metal in the group of secondary constituents which are naturally in water concentrations in the

range of 1-10 mg/L. NALCO reports that "it (borate) has little known significance in water chemistry. Its concentration is not limited in municipal waters by potable water standards."

With respect to beneficial water uses, the benchmark Water Quality Criteria (McKee & Wolf, 1963) reports that boron is an essential trace nutrient for plant growth but that it may be harmful to the growth of some plants at relatively low concentrations when used in irrigation water. Boron is not harmful to humans at low levels and is reportedly in the ordinary human diet at levels of 10 to 20 milligrams per day. It has been reported that concentrations of boron of up to 30 milligrams per liter are not harmful in drinking water. Toxic effects on livestock and fish are reported only at significantly higher levels. The principal harmful effect attributed to low concentrations of boron in water relates to crop irrigation of certain sensitive crops such as pears, apples and various citrus crops. Human exposure to boron compounds is common and generally inconsequential. Water-soluble sodium borate (i.e., borax), for example, is a common household cleanser.

In establishing water quality criteria USEPA (USEPA, 1986, ibid.) examined 145 chemical compounds, families of compounds, indicator tests, and elements with respect to acute or chronic toxicity to fresh water fish, and to marine fish. The same parameters were also examined with respect to human health via water and fish ingestion, fish ingestion only, and carcinogen properties. Boron was included among the examined parameters. Upon completion of its review USEPA did not establish a water quality criterion for boron for any of the examined categories. Moreover, the only deleterious effect of boron in water cited in the literature is as pertains to its use in crop irrigation.

Dissolved boron, as with chloride salts in sea-water, is not easily removed from water and is virtually untreatable by conventional methods that are employed by sewage treatment plants or drinking water plants. Boron is not subject to chemical precipitation and filtration, volatilization, or biological decay. Dissolved boron is also a conservative tracer that is not readily attenuated by passage through the soil. Boron that is in solution may be deposited in or on soil through the evaporation of water that has been applied to the ground surface. However, because the boron is water soluble and mobile, it would eventually be returned to solution by precipitation and stormwater. Boron is among many of the trace elements present in Illinois coal that remain in the ash following combustion.

In its most recent review, the USEPA specifically declined to develop a federal water quality standard for boron. Likewise, the USEPA has specifically declined to establish a federal drinking water standard relevant to boron (USEPA, December, 2006). Accordingly, there are no federal surface water (water quality standards) for boron nor are there any federal drinking water standards.

But for the State of Missouri, this is consistent with the all of the states that surround Illinois. Indiana, Iowa, Kentucky and Wisconsin, all authorized by USEPA to administer the Clean Water Act, do not impose a boron standard for surface water, drinking water, waste water effluent, or irrigation. Missouri has a drinking water standard and an irrigation standard of 2.0 mg/L for boron. Illinois does not have an effluent standard for boron, nor a boron drinking water standard.

Illinois does however, have a General Use Standard water quality standard of 1.0 mg/L for boron and a Class I groundwater standard of 2.0 mg/L, for boron, inexplicably twice that of the General Use standard. Class I groundwater standards equate to potable drinking water standards. The boron standards for Illinois and the states that surround it are as follows:

| **State** | **Surface Water Std.** | **Drinking Water Std.** | **Effluent Std.** | **Irrigation Std.** |
|---|---|---|---|---|
| Indiana | None | None | None | None |
| Iowa | None | None | None | None |
| Kentucky | None | None | None | None |
| Missouri | None | 2.0 mg/L | None | 2.0 mg/L |
| Wisconsin | None | None | None | None |
| Illinois | 1.0 mg/L* | None | None | None |

* - General Use Standard; Illinois also has a Class I groundwater Standard of 2.0 mg/L

The Illinois Pollution Control Board originally adopted the present boron General Use water quality standard as part of Water Pollution Rule 203(f), by Order dated March 7, 1972, in consolidated proceedings R70-8, R71-14, and R71-20 ("March 7, 1972 Order"). *In the Matter of Water Quality Standards Revisions,* No. 70-8, 71-14, 71-20, 1972 WL 8156 (Ill. PCB March 7, 1972). Subsequently, the water quality standard was codified in its present location in Title 35 of the Illinois Administrative Code, Section 302.208(e). The 1.0 mg/L numerical value for the boron General Use water quality standard has not changed from the value adopted in 1972. When the Board adopted the standard in 1972, the standard was based upon evidence that higher levels of boron can harm irrigated crops. The Board recognized that "100% irrigation is unlikely in Illinois," but that "the uncontrolled discharge of large quantities of boron is clearly undesirable." March 7, 1972 Order.

Since that time, the Board has revised boron standards, through an "adjusted standard" or "site specific rule" proceeding, for specific discharges. The following are examples:

- CWLP is allowed a daily discharge limit of 7.543 gallons per day (MGD) of water, with a concentration of 11 mg/L of boron. From December 2004-October 2005, boron concentrations of 11.6 – 20.3 mg/L were found in the CWLP effluent. The discharge is to Sugar Creek, which empties into the Sangamon River at a distance of approximately 1.4 miles from the point of entry to Sugar Creek, which is approximately 1.7 river miles upstream of the Curry site. (Zook, 2005)

- The Board in 1978 granted Illinois Power a 15 mg/L site specific regulation for boron in its release of waste water into a segment of Wood River Creek in Madison County. The Board opinion is instructive; it contains summaries of scientific studies and data, all of which confirm that boron has little or no environmental impact at low concentrates. The Board opinion states: "Several studies have shown that for fresh water fish the toxic level of boron is 2000 +/- 950 mg/L of boron."

- The Board in 1996 granted Illinois Power an adjusted standard for boron for its release of waste water into the Kaskaskia River (anywhere from 1.2 mg/L – 9.9 mg/L, depending on the location in the river).

Moreover, in a recent NPDES draft permit published for public comment, IEPA proposed to permit the discharge of 170 million gallons of cooling water containing 13.4 mg/L of boron, from Ameren, Duck Creek Station to the Illinois River (IEPA, March 8, 2007). See Illinois Environmental Protection Agency, Public Notice/Fact Sheet, Draft Reissued NPDES Permit No. IL0055620 March 8, 2007.

2. **OPINION: Water contained in the excavation at the Curry site was naturally occurring precipitation, stormwater, and groundwater that had come in contact with flyash. The flyash was intended for beneficial use as fill material at the Curry site. In this context, it is not "industrial waste" and the natural water with which it mixed is not "industrial waste water."**

Flyash is a combustion by-product formed by the burning of coal. Coal combustion creates heat that can be used to fire boilers. Coal combustion generates the gaseous off-products of carbon dioxide, sulfur dioxide, and steam. But, it also produces solid non-combustible inorganic by-products that include the heavier and denser "bottom ash" and the lighter, less dense flyash.

Flyash in the Curry excavation was generated by the City of Springfield's municipal utility, City Water, Light & Power (CWLP). It was generated by the combustion of coal at the CWLP power plant. CWLP flyash is reportedly generated at a rate of 80,000 tons per year. (Zook, 2005, ibid)

CWLP ash, along with other by–products (scrubber sludge, and water treatment sludge) are all deposited in a pond/landfill system located north of and adjacent to the CWLP power plant complex. The ash pond and scrubber sludge landfill are bounded on the south by Lake Springfield, and bounded on the west by Sugar Creek. The creek flows northward from the spillway of Lake Springfield's Spaulding Dam and thence to the east where it empties into the Sangamon River.

CWLP transferred approximately 35,000 tons of flyash to the Curry site for use as beneficial fill in an excavation that was created when fill was transferred to the Wal-Mart project on Dirksen Parkway. The water that is the subject of this indictment is a combination of precipitation events (rain and stormwater runoff) and groundwater intrusion into the excavation which contained the flyash. It was not caused by an industrial process, nor was the water used in any industrial process at the Curry site or at any other site. Accordingly, it is misleading to describe it as industrial waste water.

The boron contained in the water was caused by the CWLP flyash that Curry placed in the excavation as fill. A letter from Curry to the Illinois Environmental Protection Agency Act, demonstrates that Curry intended the flyash to be used beneficially, in accordance with relevant provisions of the Illinois Environmental Protection Act. The standard and prevailing interpretations of those provisions is that when flyash is used for certain beneficial purposes, it is

no longer coal/combustion "waste" (CCW) but instead is "coal combustion by-product" (CCB), so long as it does not contain metals in concentrations higher than the groundwater quality standards would allow. Boron is not a metal.

The provisions of the Illinois Environmental Protection Act in effect at the time of Curry's placement of the flyash in the excavation required notification to, but not approval by, the Illinois Environmental Protection Agency. Virtually the same CWLP flyash that was taken to the Curry site and placed in the excavation is used beneficially throughout Springfield and Central Illinois, as follows:

- In 2005 CWLP reportedly sent 28,236 tons of lime sludge-ash mixtures for use at various agricultural sites; 1996 tons were used for pH adjustment at sludge farms.

- In 1998 approximately 41,500 tons of CWLP flyash were transferred to the Illinois State Fairground where the flyash was used in the construction of the rodeo arena.

- In the summer of 2003 CWLP entered into an agreement with the Turris Coal Company near Elkhart (now the Viper Coal Company) to dispose of up to 100,000 tons per year of "back-hauled" flyash in mine refuse areas located on mine property. Approximately 9,000 tons were sent to the mine in 2003; 15,000 tons in 2004. The ash is used to construct berms around coal waste impoundents.

- In 2005 CWLP sent 12,443 tons of flyash to a Missouri cement manufacturer where it was used as an ingredient in Portland Cement. Another 236 tons of flyash was used by Southern Illinois University in Carbondale for project demonstration projects.

- CWLP flyash was used as structural fill material in connection with the construction of the Stanford Avenue Bridge in Springfield that linked a new six-lane roadway that connects Wabash Avenue with Fifth Street. The Stanford Avenue Bridge and roadway opened in October, 2003. Use of the flyash reportedly saved $400,000 in construction costs (Hanson, 2005). The project reportedly was scheduled to use 83,000 tons of flyash (CWLP, 1996).

Public health officials have concerns as to the mobility of metals in flyash, principally as can be put into aqueous solution and transported in water. Hence, Illinois characterizes flyash as unsuitable for beneficial use as a construction material if, upon testing with a standardized leaching test, the flyash leachate contains concentrations of "metals" that exceed Class I groundwater standards. Boron is not a metal, and none of the metals in the flyash exceeded the relevant standard for those metals.

The IEPA disagreed with Curry's acceptance of the CLWP flyash for beneficial use. While a Notice of Violation was given to Curry and to CWLP, no enforcement case was ever filed. The parties agreed to remove the flyash to Turris Coal in Elkhart, Illinois (now Viper), where it was used for beneficial purposes.

In brief summary, the use of CWLP flyash for beneficial purposes has been extensive. State of Illinois statutes encourage such use. See 20 ILCS 1105/3(a)(2) (Department of Natural Resources); 20 ILCS 2705/2705-265 (Department of Transportation); 415 ILCS 5/3.135 (Illinois Environmental Protection Agency). CWLP flyash has been widely distributed throughout the Springfield area, and elsewhere. The CWLP flyash used in this regard, as a CCB, is not an industrial waste, nor is the precipitation or stormwater that passes through the CCB an industrial waste water.

3. **OPINION: Water from the Curry site that may have been discharged from the Curry excavation into the intermittent tributary would not have caused or contributed to a violation of the Illinois Pollution Control Board water quality standard relevant to Illinois water bodies.**

The statements in paragraph 13 of the Superseding Indictment ("This caused the accumulated water to be contaminated with a level of boron that was approximately 13 times greater than the concentration that [the State] would allow for purposes of water quality") and paragraph 19 of the Superseding Indictment ("such discharge would exceed the State of Illinois' water quality standard for boron") are misleading, as calculations would establish the high improbability of water entering a federally regulated body of water in concentrations greater than Illinois' 1 mg/L standard.

Surface water is regulated by effluent standards and by water quality standards. A water quality standard is applicable to a body of water and is indicative of the concentration of a certain substance, pollutant or contaminant a body of water can handle without negative consequences to the environment. An effluent standard is indicative of the concentration of a certain substance, pollutant or contaminant can be directly discharged, through a pipe or other point source mechanism at the source of the release, to ensure the water quality in the receiving body of water would not be adversely impacted.

The only boron measurements that were taken by IEPA in this case were taken in the pit water itself, on just two dates: August 21, 2001 and April 2, 2003. The laboratory results differed considerably. No samples of the alleged effluent were taken or analyzed. No samples of the receiving water, if any, were taken or analyzed. Furthermore, water quality in the pit on any given date is not indicative of water quality at any other point in time due to such factors as evaporation, precipitation, stormwater and groundwater infiltration and exfiltration.

There is no record of any evidence of the amount of water that was allegedly released into the Curry ditch ("intermittent tributary"). Likewise, there is no evidence of any measured water quality of the alleged release. However, the Sangamon River, which lies approximately 0.75 miles north of the Curry site, was tested for boron during the period of the de-watering project. The measured boron levels in the Sangamon River were consistently lower downstream of the Curry site than they were upstream. See Figures 1 and 2, which identify the three USGS sampling points nearest the Curry site and Attachment 2, which contains sampling data for boron for the period of 2000 through 2003. The sampling data is summarized in Table 1.

## Table 1. - Water Quality Monitoring Data – Sangamon River
### Water Concentrations (2000-2003)
### Dissolved Boron (Micrograms per Liter)

| Sampling Location | (2000 –2003) Range | Average | (March-July, 2003) Range | Average |
|---|---|---|---|---|
| **Riverton** (Upstream) | 43 – 1300 | 373 | 120 – 750 | 365 |
| **Petersburg** (Downstream) | 31 – 440 | 116 | 43 – 120 | 88 |
| **Oakford** (Downstream) | 49 – 1100 | 246 | 120 – 450 | 213 |

It can be noted that the concentration of boron in the Sangamon River is consistently greater upstream of the confluence of the intermittent tributary and the river than it is at sampling points located down steam of the Curry tributary. This is true for the entire period of the years 2000 through 2003, as well as for the period of March 2003 through July 2003, when the Curry excavation was de-watered. That the level of boron in the Sangamon River is greater upstream of the Curry facility than downstream is obviously due to a source of boron that is upstream of the Curry tributary.

There is no record of a measured flow of water in either of the two intermittent tributaries that converge on or about the Curry site. The closest gauged stream is Spring Creek that discharges to the Sangamon River at a point that is approximately two miles west of the Curry site. The Spring Creek watershed encompasses 107 square miles and differs significantly in character from the watershed that drains to the intermittent tributaries. The tributary that enters the Curry property from the east collects from a watershed comprised of approximately 500 acres; and the western tributary from a basin of approximately 1000 acres. These two watersheds meet with the drainage area that lies between the Curry site and the Sangamon River to form a combined watershed that includes only approximately 3.67 square miles.

Given the differences that exist between the Spring Creek and Curry watersheds, regarding size, land use, and other factors, it cannot be concluded they have identical drainage or flow characteristics.

Nonetheless, even if it is assumed that the two watersheds behave in an analogous manner, the gauged Spring Creek records can be used to conservatively speculate as to any potential flow in the Curry intermittent tributaries. The USGS (2007, ibid.) records of the mean daily discharge at the Spring Creek gauge for the estimated time frame during which the Curry excavation was de-watered are:

**Spring Creek Discharge**
**Mean daily flow, cubic feet per second (cfs)**

| Period | Total Time | Sum of Daily Means (cfs) |
|---|---|---|
| March 7-31 | 25-days | 989.5 |
| April 1-30 | 30-days | 978 |
| May 1-31 | 31-days | 2473 |
| June 1-5 | 5-days | 197 |
| Totals | 91-days | 4638.5 cfs |

Daily Mean 4638.5 cfs / 91-days = 50.9725 cfs per day

Areal Distribution for Spring Creek Watershed:

**50.9725 cfs / 107 sq. miles = 0.4764 cfs per sq. mile**

The confluence of the Curry intermittent tributaries drains a combined watershed of approximately 1500 acres. This is equivalent to 2.34375 square miles. If the Spring Creek drainage factor is applied to the Curry watershed then the estimated average daily flow during the de-watering period can be computed as:

**( 0.4764 cfs per sq. mile ) x ( 2.34375 sq. miles ) = 1.116 cfs**

It is known that a great deal of the excavation water was spread on the surface of the Curry parking area for dust control. It has also been alleged that the rate of application was at times such that runoff was created. The volume of such, if any, is unknown and subject to speculation. However, if it is assumed that the confluence of the intermittent streams carried an average flow of 1.116 cfs, as would be analogous to Spring Creek during the same period, it is possible to estimate the volume of discharge necessary to cause a violation of the General Water Use standard. The actual boron concentration of the excavation water during the de-watering period is unknown. But, if it is assumed that the boron concentration was the same as when it was last measured in 2003 in the pit, i.e., 13.1 mg/L, then a dilution factor of at least 13.1 to one is necessary to reduce any stream discharge to the requisite concentration of 1.0 mg/L. If a dilution factor of 13.1 is applied to the hypothetical mean daily flow of 1.116 cfs, the volume of direct discharge into the Curry intermittent tributary that would be necessary to exceed the 1.0 mg/L standard for boron can be estimated as:

**1.116 cfs / 13.1 = 0.0852 cfs ( 55,062 gallons per day)**

Although hypothetical, given the absence of any actual measurements, foregoing calculations indicate that the volume of direct discharge necessary to raise the concentration of boron in the intermittent tributaries above the general use standard would have to be exceedingly large. This

is not plausible. The computed volume of 55,062 gallons actually exceeds the entire reported average daily de-watering rate of 50,000 gallons per day (O'Neal, 8-11-03). Moreover, that volume was reportedly routinely spread over the parking lot where it was dispersed, not directly discharged. While it is unrealistic to assume that none of the excavation water reached the unnamed tributaries during the de-watering program, it is not plausible to project that all of the water directly entered the tributaries.

4. **OPINION: The water present in the Curry excavation in the Spring of 2003 could easily have been eliminated by absorption and evaporation through the spreading of such water on the surface of the Curry parking lots and surrounding facility roadways.**

While the IEPA indicated it would not grant Curry an NPDES permit, a variance or an adjusted standard for the release of the water in the pit, the IEPA allowed Curry to eliminate the water by spreading it on its parking lots as a dust control measure. This practice is consistent with USEPA policy (USEPA, 2002) and the State of Illinois stormwater program.

Curry Ice & Coal of Springfield, Inc. houses an office, a maintenance shop, and a truck parking area at 3600 N. Dirksen Parkway, Springfield, Illinois (the "Curry site"). The facilities are situated on an irregularly shaped 30.4 acre parcel. The north and south parts of the property are dissected by an unnamed intermittent stream that runs in an east-west plane. That stream intersects another unnamed intermittent stream that runs in a general south-north plane along the western property line. The latter drains to the Sangamon River at or about roughly 0.75 miles north of the Curry site. The Curry property has many rural characteristics and is heavily wooded along its periphery. Portions of the property are difficult to access. The Curry property contains two parking areas; a north parking area consisting of approximately 7.06 acres and a south parking area that encompasses approximately 6.04 acres. The property also contains an excavated borrow pit that resides in a footprint that consists of approximately 6.9 acres.

Figure 3 is a drawing created with an auto-CAD software package. The drawing was constructed as a compilation of a series of drawings, maps and aerial photos. A localized topographic map and boundary survey prepared by Environmental Management, Inc. (EMI) was transposed atop regional topographic contours shown in the Springfield East United States Geological Survey Quadrangle Map (1998). Aerial photos obtained from the Sangamon County Assessor's Office was then used to identify surface features such as buildings and parking areas on the Curry property. The EMI boundary survey and contours of the borrow pit were taken from a drawing dated June, 2003 and that reflected Curry excavation topography developed in March, 2003.

The EMI drawing reflects the water level of the borrow pit of 539.4 feet above mean sea level (MSL). A computer drawing utility program (I.E., Eagle Point software) was used to compute the volume of water contained in the Curry borrow pit. In this regard, the water level in the pit was assumed to be 540 MSL, a level that is slightly higher than the 539.4 feet MSL reported by EMI. The volume of water contained in the excavation was then determined to occupy a volumetric space of 14,630 cubic yards. This volume equates to approximately 2,954,675 gallons of water.

The Curry parking area consists of a total of approximately 13.1 acres that resides on that part of the property set on the highest elevations. That area is underlain by a variable thickness of the Parkland Sand member of the Henry Formation. The Parkland Sand member is a wind deposited sand that has origins in river bottoms. It is highly permeable in comparison to the less pervious silty loess and topsoil that is found in nearby areas.

The de-watering process reportedly consisted of the typical distribution of 50,000 gallons of water per day with a tanker truck over the surface of the parking areas. The maximum reported distribution of water was 72,000 gallons per day. Spread over the 13.1 acre parking areas, these volumes are equivalent to between 0.14 inches per day (@50,000 GPD) and 0.20 inches per day (@72,000 GPD). Assuming that there were approximately 2,954,675 gallons of water in the excavation, this water, if dispersed over a 13.1 acre parking lot, would equate to a depth of water of 8.306 inches. Dispersion over a 91 day period equates to 0.091 inches per day.

Fundamentally, the fate of the water distributed on the Curry parking surfaces in connection with the de-watering project is three-fold; infiltration, evaporation, or runoff, or some combination of all three. There is no record of the rate of infiltration into the sub-soils in the parking areas, nor is there a record of any particular volume of surface water runoff. Notably, the parking area sub-soils consist of relatively pervious sand so there is some likelihood of the occurrence of infiltration into the soil during the de-watering program. Secondly, much of the parking area is set at grades in the range of five to ten-percent, such that there is some likelihood of a degree of runoff from the parking areas, under virtually any set of circumstances. These conditions are obvious and were either known or should have been known by IEPA when it suggested the elimination of the pit water for dust control.

Setting aside infiltration and runoff, a significant amount of evaporation from the parking surfaces was likely to have occurred during the de-watering program. The Springfield area receives an average of approximately 36-37 inches of precipitation per year. The majority of this total occurs during the warm months of March through October. This is also the period of time in which the greatest amount of evaporation occurs. The Springfield area experiences an average of approximately 36-inches per year of "lake evaporation", the evaporation that occurs in deep bodies of water. Roberts and Stall (1967) found annual lake evaporation in Springfield to range from 31.05 inches to 43.19 inches, measured from 1911 to 1962. The annual average lake evaporation during that period was 35.68 inches. Most of the lake evaporation, 92.1 percent, occurred between March and October, inclusively.

Pan evaporation is that which occurs in shallow bodies of water where the shallow depths permit rapid distribution of heat throughout the water, such as what would occur on the parking lot and in the pit. For this reason, pan evaporation is most applicable in the instant case where water was spread on the surface of the parking areas for dust control. Roberts and Stall (1967,ibid) reported average pan evaporation for the months of May through October in Springfield, measured over a 16-year period, to be 40.85-inches. Pan evaporation in the Springfield area averaged 6.03 inches in April, and 7.72 inches in May from 1980 through 1990 (ISWS, 2007). Some amount of pan evaporation would have occurred in March, particularly during the latter part of the month, as

would have also occurred during the first few days of June, 2003, during the de-watering process. But, in the aggregate, the mean pan evaporation for the months of April and May (i.e., 13.75-inches), taken alone, well exceeds the total load of water removed from the excavation and spread over the parking lot (i.e., 8.306-inches).

5. **OPINION: The existing Curry NPDES stormwater permit (a) covered any runoff of water from the parking lot and (b) contemplated any drainage pipe necessary to eliminate parking lot water runoff, such as that which is referred to in the Superceding Indictment.**

An NPDES stormwater discharge permit (No. ILR106780) was issued to Curry Ice & Coal SPFLD Inc. by the Illinois EPA on January 11, 2002. The permit allows the discharge of stormwater associated with industrial activity from construction sites. A condition of the NPDES permit required that Curry prepare a stormwater pollution prevention plan (SWPPP), subject to reporting requirements. Pursuant to that condition Hanson Professional Services, Inc. prepared an SWPPP for Curry that is dated September 27, 2002. The SWPPP calls for an Annual Facility Inspection Report that is to document, in a written report, the inspection results, including significant observations or events, and any subsequent corrective maintenance activity. The annual inspection report is to be signed by the Chief Operating Officer or the Site Manager. The first annual report in this regard would have been due on or about September 27, 2003, approximately four months following completion of the excavation de-watering program.

A general stormwater NPDES permit, including the one relevant to this site, presumes that the permittee will engage in practices during the course of construction and operations to control erosion and to manage stormwater. Specifically mentioned in the permit are "structural practices" that might be employed such as "silt fences", "earth dikes", "drainage swales", and "pipe slope drains", among others. These practices are specifically identified in a USEPA guidance document that is designed to assist in the preparation of SWPPP's for construction activities (USEPA, 1992). The addition of any such practices or features during the course of a year would require simply that they be documented in the subsequent annual SWPPP report. As such, the drainage pipe alleged to have been installed by Mr. Lippold was a permitted activity that was subject to reporting in the annual report that was to have been filed by the permittee (Curry) on or about September 27, 2003.

6. **OPINION: There is no record of a significant flow of water between the tributaries that traverse the Curry property, both documented "intermittent streams", and their eventual confluence with the Sangamon River, a documented "navigable" water body, for the period of time relevant to the alleged elimination of water from the Curry excavation.**

The intermittent tributaries that meet at or near the Curry property are not gauged so there are no measurements of flow in the stream-beds during the period of time when the Curry excavation was de-watered. I visually inspected the site of the alleged discharge on two separate occasions: March 11, 2006 and August 24, 2007. On the latter date I walked to the bed of the eastern intermittent tributary, the centerline of which was approximately 90-feet from the outlet of the

storm water pipe that is alleged to have been constructed by Mr. Lippold. On that occasion there was no flow in the tributary. Rather, the only water in the tributary was isolated in low points and was shallow, ponded and still.

The closest water shed with a gauged stream is the Spring Creek water shed that is located west of the Curry property. Spring Creek discharges to the Sangamon River at a point that is approximately two miles west of the Curry property.

There was a measured flow at the Spring Creek gauge during the period of time when the Curry excavation was being de-watered. That flow was gathered from a watershed comprised of approximately 107 square miles. The concurrent flow, if any, in the unnamed tributaries would be attributable to a watershed consisting of only 3.67 square miles. Apart from the disparity in size, the two watersheds differ significantly in character. Near the Spring Creek discharge point its watershed is largely urban with paved roads, parking areas and roofed buildings, all of which contribute a large fraction of precipitation to surface runoff. In contrast, the unnamed tributaries draw from a largely rural setting with a smaller portion of surface area occupied by roads and buildings. Further, a large portion of the Curry watershed, including the Curry property, is underlain by relatively porous soils, notably the Parkland Sand Member of the Henry Formation. Such soils are subject to a relatively greater degree of stormwater infiltration into the soil, and a lesser degree of runoff into low-lying areas.

The measured flow at Spring Creek at the time of my two visits was approximately 40 cfs on March 11, 2006, and 1.75-2.00 cfs on August 24, 2007. On March 11, 2006 I observed a flow of water in the east branch of the Curry tributaries. The same tributary did not carry a flow of water on August 24, 2007.

References

CWLP, The CWLP dispatch, September, 1996

Hanson Engineering, Press release, John Harms, February 23, 2005

Illinois Pollution Control Board, Proposed Opinion and Order of the Board, Proposed Amendments to Rule 203.1 of the Water Pollution Control Regulations, R76-18, March 16, 1978.

Illinois Environmental Protection Agency, Public Notice/Fact Sheet, Draft reissued NPDES Permit to Discharge into Waters of the State, for AmerenEnergy Resources Generating Company, NPDES Permit No. Il0055620, March 8, 2007.

Illinois State Water Survey (ISWS), Pan Evaporation Across Illinois, Illinois State Climatologist Office, http://www.sws.uiuc.edu/atmos/statecli/pan_Evap/Panevap.htm., 2007.

Kemmer, Frank N., Editor in Chief, The NALCO Water Handbook, Nalco Chemical Company, McGraw–Hill Book Company, New York, 1979.

McKee, J.E. and Wolf, H.W., Water Quality Criteria, State Water Resources Control Board, State of California, second edition, 1973 reprint, 1963.

O'Neal, B. Interview of Bruce Michael Garner, August 11, 2003.

Parker, Sybil B., Editor-in Chief, McGraw-Hill Encyclopedia of Chemistry, McGraw Hill Book Company, New York, 1983.

Roberts, Wyndham and Stall, John B., Lake Evaporation in Illinois, Illinois State Water Survey, Report of Investigation 57, Urbana, Illinois, 1967

Suloway, John J., Roy, William R., Skelly, Thomas M., Dickerson, Donald R., Schuller, Rudolph M, Griffin, Robert A., Chemical And Toxicological Properties Of Coal Fly Ash, Illinois Department of Energy and natural resources, State Geological Survey Division, State Natural History Survey Division, Environmental Geology Notes 105, Champaign, Illinois, 1983.

USEPA, Quality Criteria for Water 1986, Office of Water Regulation and Standards, EPA 440/5-86-001, Wash. D.C., May 1, 1986.

USEPA, Storm Water Management For Construction Activities, Developing Pollution Prevention Plans And Best Management Practices, Office of Water, EPA 832-R-92-005, http://cfpub.epa.gov/npdes/stormwater/swppp.cfm, September 1992.

USEPA, Construction Site Storm Water Runoff Control, http://cgpub.epa.gov/npdes/stormwater/menuofbmps/site_11.cfm, (last update) November 25, 2002

USEPA, Regulatory Determinations Support Document for Selected Contaminants from the Second Drinking Water Contaminant Candidate List (CCL2), Draft, December 2006.

USGS, Discharge Tables for Spring Creek at Springfield, Illinois, http://pubs.usgs.gov/wdr/2995/wdr-il-05/data/disc2003/05577500.htm, 2007

Zook, Report concerning a December, 15, 2005 inspection of CWLP facilities by the Illinois Environmental Protection Agency, Bureau of Water, December 22, 2005

ATTACHMENT 1 to

**DEFENDANT'S DISCLOSURE OF EXPERT WITNESS RAPPS**

Resume of Michael W. Rapps, P.E.

# MICHAEL W. RAPPS, P.E.
## PRESIDENT, CEO

Rapps Engineering & Applied Science
821 South Durkin Drive
Springfield, Illinois 62704
Phone: 217-787-2118
Fax: 217-787-6641
E-mail: volly1149@aol.com
Web: www.rapps.net

**EDUCATION:**

B.S. General Engineering, University of Illinois at Champaign-Urbana, Illinois, 1972.

Graduate Study- Operations Research/Systems Analysis, 1973-75, Sangamon State University, Springfield, Illinois.

**REGISTRATION:**

Professional Engineer - Illinois No. 62-35299

**ORGANIZATIONS:**

Illinois Environmental Review Commission (since 1999)
Capitol Area Development Association, Board of Directors (since 1999)
Nature of Illinois Foundation Board (since 1997)
Low-Level Radioactive Waste Task Group (since 1996)
Illinois Petroleum Marketers Association (since 1992)
American Society for Testing Materials (since 1978)
Association of Groundwater Scientists and Engineers (since 1977)

**PROFESSIONAL POSITIONS:**

**August, 1978 - Present: President, Rapps Engineering, Springfield, Illinois.**

December, 1999 – Present: Appointed to the Illinois Environmental Regulatory Review Commission. Responsibilities include recommendations to legislature for improving and streamlining statutes and regulations.

December, 1998 – Present: Appointed to state government transition team, responsibilities include implementation of environment and natural resource policies.

August, 1998 – 2002: Commissioner, Central Midwest Interstate Low-Level Radioactive Waste Commission.

August, 1996 - Present: Voting member of Illinois Low-Level Radioactive Waste Task Group; Senate appointee.

November - December, 1980: Special consultant to the World Health Organization, Pan American Division, Rio de Janerio, Brazil.

September 1977 - August, 1978: Technical Director, Chemical Waste Management, Inc., Division of Waste Management, Inc., Oak Brook, Illinois.

November 1977: Special consultant to the World Health Organization, Pan American Division, Sao Paulo, Brazil.

September 1975 - September 1977: Manager Hazardous Waste Unit, Division of Land Pollution Control, Illinois EPA, Springfield, Illinois.

October 1975: Special consultant to U.S. EPA on industrial/hazardous waste, Nashville, Tennessee.

September 1973 - September 1975: Staff engineer, Permit Section, Division of Land Pollution Control, Illinois EPA, Springfield, Illinois.

September 1972 - September 1973: Staff engineer, Field Operations Section, Division of Land Pollution Control, Illinois EPA, Springfield, Illinois.

June, 1972 - September 1972: Staff engineer, Field Operation Section, Division of Public Water Supply, Illinois EPA, Springfield, Illinois.

**EXPERIENCE:**

**Illinois Low-Level Radioactive Waste Task Group (1996 to present)**

Illinois State **Senate** appointee to this seven member group charged with developing criteria to be used in selecting a low level nuclear waste disposal site for the Illinois-Kentucky Nuclear Waste Compact. Group is also charged with the responsibility for providing oversight of the Illinois Department of Nuclear Safety and its contractors during the site selection process.

**Rapps Engineering and Applied Science (1978 to present)**

Founded Rapps Engineering & Applied Science (RAPPS) in 1978, a thirty-plus member consulting firm with annual sales at approximately $2M. Firm deals with all manners of environmental engineering problems, including civil, chemical, and geo-technical components. Specialties include solid waste (i.e., landfill design, investigation, monitoring, etc.) hydrogeology, regulatory affairs (i.e., permitting, etc.), site investigations and remediation and related matters. Clientele include commercial solid and industrial waste management companies, mining companies, manufacturers, state, county, and municipal agencies, lending institutions, real estate and developers, and other engineering or legal consultants.

Personal specialties include the subject of waste management, hydrology, and hydrogeology; as well as performance and supervision of subsurface investigations, groundwater modeling exercises, and other such studies related to Comprehensive Emergency Response & Compensation Liability Act (CERCLA), Resource Conservation & Recovery Act (RCRA), Leaking Underground Storage Tank (LUST), and solid/hazardous waste projects. Project areas include the Midwest, Northeastern U.S. and abroad with extensive experience in the State of Illinois, including the following Illinois counties:

| | | | | | |
|---|---|---|---|---|---|
| Adams | Alexander | Brown | Bureau | Carroll | Cass |
| Coles | Clark | Cook | Douglas | Fulton | Greene |
| Henry | Jasper | Jefferson | Jersey | Jo Daviess | Kane |
| Kendall | Knox | Lake | LaSalle | Lawrence | Lee |
| Logan | Macon | Macoupin | Madison | Marion | Massac |
| McLean | Mercer | Morgan | Montgomery | Ogle | Peoria |
| Perry | Randolph | Richland | Saline | Rock Island | Sangamon |
| Schuyler | Shelby | St. Clair | Tazewell | Vermillion | Wayne |
| Whiteside | Williamson | Winnebago | | | |

**Pan American Health Organization**

Nov. – Dec, 1980 - Special consultant to FEEMA, an environmental regulatory authority equivalent to

the US EPA, for the State of Rio de Janeiro, Brazil. Worked with and lectured FEEMA staff concerning industrial waste problems in Rio State. The mission's purpose was to foster an understanding of the subject that would allow FEEMA staff to develop plans and regulations to control industrial waste disposal. A report with recommendations was issued subsequent to the mission.

November 1977 - Surveyed industrial waste problem for the State of Sao Paulo, Brazil. Prepared a comprehensive industrial waste regulatory plan for CETESB a Sao Paulo EPA equivalent. Lectured and instructed CETESB staff.

**Chemical Waste Management, Inc. (1977-78)**

Technical director with responsibility for design, development, and operational plans for company's chemical waste facilities in North America. Made recommendations to corporate officials relative to prospective acquisitions. Represented the company on National Solid Waste Management Association's Chemical Waste Committee concerning RCRA rulemaking. Served as company spokesman at various public hearings concerning special or hazardous rulemaking at the Federal level and for various states throughout the U.S. Also worked on the development of Chemical Waste Process Systems, acquisitions, permits, etc. in approximately 20 states.

**Illinois Environmental Protection Agency (IEPA),Hazardous Waste Manager (1975-77)**

Authored most of “Illinois Special Waste Hauling Regulations”.
Defined term “Special Waste”.
Reviewed all data resultant from the Illinois EPA groundwater monitoring program for landfills; keyed follow-up investigations.
Emergency Action Coordinator for chemical spills, pipeline breaks, etc.
Reviewed all permit applications for special or hazardous waste disposal.
Served as IEPA representative in Washington D.C. on a working group charged with development of RCRA regulations.
Refined Illinois Supplemental Permit System for special waste disposal.
Developed Illinois database concerning land based industrial waste disposal.
Co-Founder of an Illinois task force on the matter of electroplating waste.
Originated development of an IEPA “standard leaching test”; a modified form for the test was later incorporated into RCRA rules by the U.S. EPA.
Spearheaded an IEPA policy to assist in creating sufficient disposal capacity to service State industry.

**Special Consultant to U.S. EPA ("Advisor on loan") (1975)**

Visited State offices in Nashville, Tennessee, with a US EPA staff member to investigate industrial waste disposal problems in the State as part of pre-RCRA efforts to cause passage of the RCRA.

**IEPA, Staff Engineer, DLPC Permit Section (1973-77)**

Reviewed approximately one hundred facility permit applications for solid waste disposal sites. Examined engineering, geologic, and hydrogeologic aspects of several hundred land disposal sites. Served as an IEPA witness in Illinois Pollution Control Board proceedings relative to permit appeals and enforcement actions.

**IEPA, Staff Engineer, DLPC Field Operations Section (1972-73)**

Assistant to the Section Manager responsible for supervision of approximately twenty field investigators. Conducted site visits with staff for purposes of improving performance. Also served as Division data processing coordinator responsible for data gathering and the generation of data summaries.

**IEPA Staff Engineer, DPWS Field Operations Section (1972)**

Inspected public water supplies and issued follow-up reports relative to facility features and compliance with applicable regulations.

**Representative Projects:**

Expert witness in a dispute involving groundwater conditions in a stone quarry in north-central Illinois.

Investigated the impact on groundwater quality by a large coal stockpile in southern Illinois.

Investigated groundwater contamination at a landfill site in southwestern Illinois (American Bottoms) situated in an aluminum by-product waste pile.

Investigated groundwater contamination from large surface impoundments of a pesticide manufacturing facility in East-Central Illinois.

Prepared three RCRA permit applications (groundwater portions) for two hazardous waste landfills in Illinois and one in Iowa.

Designed groundwater-monitoring systems for numerous landfills and waste storage sites throughout Illinois.

Investigated regional groundwater conditions in the area of a proposed surface mine (coal) in Central Illinois.

Investigated possible groundwater contamination at numerous Illinois landfills.

Investigated possible groundwater contamination at several "Superfund" sites in Northern Illinois.

Investigated contamination of groundwater by organic chemicals near a waste oil storage facility in Northern Illinois.

Technical advisor to the Illinois Petroleum Marketers Association (IPMA), devised LUST cleanup standards for the organization in 1994 that were adopted as an interim rule by the Illinois Pollution Control Board. The interim regulation was the predecessor of permanent risk-based soil and groundwater cleanup standards (i.e., TACO).

Represented the IPMA on the Illinois LUST advisory group, the Illinois Brownfields task force, and the IEPA Risk-Based Corrective Action (RBCA) advisory panel.

Performed groundwater flow and/or transport models for RCRA permits, RI/FS investigations, IEPA landfill permits, IEPA LUST investigations, and for Brownfields.

Testified on behalf of the Illinois Pork Producers Association with respect to proposed regulations regarding groundwater monitoring at wastewater lagoons associated with hog farms.

Designed, sited, and permitted a major regional landfill in southern Illinois. Site isequipped with a dual liner (clay-geomembrane); a 99.9% efficient leachate collection system with dual-lines leachate storage with spill protection and splash pads.

**PRESENTATIONS, PUBLICATIONS AND SPECIAL PROJECTS:**

Rapps, Michael W., Ghosh, Dipanjan, Mantha, Rashmi, and Miller, Kenneth, May, 2006, Groundwater Protection in the Illinois Coal Region, Grant No. 04-48318, for the Illinois Department of Commerce and Economic Opportunity

Rapps, Michael W., October, 2002, Reported Bird Strikes at Down State Illinois Airports, Bird Strike Committee USA – Canada, Sacramento, California

Rapps, Michael W., Environmental Forensics at a Landfill in Northern Illinois, March 27, 2002, presented to the Central Great Lakes Geologic Mapping Coalition, Peoria Forum, Peoria, Illinois.

Rapps, Michael W., 1996, Environmental Issues Survey, The Illinois Manufacturer, survey of 200 Illinois manufacturers.

Rapps, Michael W., and Ronald R. Dye,PG, 1996, LUST – Brownfields Update, Illinois Municipal Review, Trade Journal of the Illinois Municipal League.

Rapps, Michael W. and Larry Eastep, (IEPA), H. Walton (IL Power) and J. Van der Kloot (Chicago Dept. of Environment) et al., 1996, Changes to the Illinois Pre-Notice Program, February 7, 1996 panel discussion in Oak Brook, IL, at 1996 Air & Waste Management Conference by the Lake Michigan States Section of the Air & Waste Management Association.

Rapps, Michael W., 1995, Landfilling in the 1900's, The Illinois Manufacturer, trade journal of the Illinois Manufacturers Association.

Rapps, Michael W., 1995, Illinois Storage Tank Update, The Oil Can, trade journal of the IPMA.

Rapps, Michael W., 1994, Risk-based Corrective Action at Leaking Underground Storage Tank (LUST) Sites, seminar on Illinois Pollution Control Board LUST rulemaking held in Springfield, Mt. Vernon, and Rosemont Illinois.

Rapps, Michael W., 1994, Risk-based Cleanup Standard for Illinois LUST sites, designed a risk-based method to calculate soil cleanup standards for petroleum leaks for the IPMA; presented at a public hearing held by the Illinois Pollution Control Board (IPCB). The method was adopted by the IPCB as an interim regulation in September 1994.

Rapps, Michael W., 1990, CERCLA (Superfund), Phase I's and Investments, presented to the Sangamon Valley Estates Council in Springfield, IL.

Rapps, Michael W. and J. Jacoby, P.E., 1987, Regulatory Impediments to the Use of Coal Wastes, for the Illinois Department of Energy and Natural Resources.

Rapps, Michael W., 1980, Special Waste Management, lecture given to environmental regulatory staff of FEEMA (EPA equivalent) in Rio de Janeiro, Brazil.

Rapps, Michael W., 1979, Surface Impoundments for Industrial Wastes, University of Wisconsin – Madison, Instructor for Engineering Extension Course in "Hazardous Waste Management Practices".

Rapps, Michael W., May 4, 1978, E.P.A.'s Hazardous Waste Regulatory Program and State Regulatory Policy for Implementation of Federal Hazardous Waste, panel discussion at the International Waste Equipment and Technology Exposition, Miami Beach, Florida

Rapps, Michael W., 1978, Special Waste, presented at George Williams College, Oak Brook, Illinois, to engineers attending a course sponsored by the publication Pollution Engineering.

Rapps, Michael W., 1978, Special Waste Problems: Sludge – Hazardous and Toxic, presented to the Chicago Industrial Water, Waste and Sewage Group.

Rapps, Michael W., 1977, Earthline – Case Study, panel discussion given at the Sixth National Conference on Waste Management Technology and Resource and Energy Recovery

Rapps, Michael W., 1977, What is a Hazardous Waste?, presented at the Sixth National Conference on Waste Management Technology and Resource and Energy Recovery, Washington, D.C.

Rapps, Michael W., 1977, Special Waste Management in Illinois, thirty minute live radio interview on station WVEM, Springfield, Illinois.

May, 1977, Waste Age, exclusive interview with Michael W. Rapps, Manager, Hazardous Waste Sub-Unit, Illinois E.P.A.

Rapps, Michael W., 1977, Implementation of a Disposal Permit System in Illinois, presented at the University of Wisconsin Extension's "Hazardous Waste Management II Conference".

Rapps, Michael W., 1977, Industrial Wastes and Political Contaminants, presented at the Investment Recovery Conference, Travenol Laboratories, Deerfield, Illinois.

Rapps, Michael W., 1977, P.C.B. Disposal at Wilsonville, Illinois, public statement and press release given in Wilsonville, Illinois.

Rapps, Michael W., 1977, Industrial Waste in Illinois, presented at the University of Minnesota's 23rd Annual Wastes Engineering Conference.

Rapps, Michael W., 1976, Solid and Semi-Solid Waste Disposal, presented to the Chicago Industrial Water, Waste and Sewage Group.

ATTACHMENT 2 to:

**DEFENDANT'S DISCLOSURE OF EXPERT WITNESS RAPPS**

Dissolved Boron

## ATTACHMENT 2

**Dissolved Boron (ug/l)**
**2000-2003***

| Month- Year | E 26 (Riverton) | E 25 (Petersburg) | E 24 (Oakford) |
|---|---|---|---|
| | Upstream | Downstream | Downstream |
| Feb-00 | 980 | 440 | 1100 |
| May-00 | 280 | 79 | 160 |
| Aug-00 | 550 | 100 | 290 |
| Sep-00 | 930 | 220 | 560 |
| Oct-00 | 78 | 170 | 220 |
| Dec-00 | 280 | 140 | 95 |
| Jan-01 | 210 | 120 | 210 |
| Feb-01 | 43 | 36 | 49 |
| Mar-01 | 74 | 46 | 68 |
| Apr-01 | 43 | 45 | 54 |
| May-01 | 110 | 47 | 99 |
| Jul-01 | 560 | 92 | 120 |
| Oct-01 | 260 | 110 | 100 |
| Nov-01 | 170 | 160 | 250 |
| Jan-02 | 180 | 63 | 76 |
| Mar-02 | 200 | 44 | 49 |
| Apr-02 | 96 | 42 | 56 |
| May-02 | 50 | 51 | 52 |
| Jul-02 | 56 | 81 | 56 |
| Aug-02 | 230 | 82 | 180 |
| Sep-02 | 310 | 240 | 200 |
| Nov-02 | 1000 | 110 | 350 |
| Dec-02 | 440 | 270 | 780 |
| Jan-03 | 1300 | 120 | 720 |
| Mar-03 | 750 | 120 | 450 |
| Apr-03 | 180 | 43 | 150 |
| May-03 | 120 | 90 | 130 |
| Jul-03 | 410 | 100 | 120 |
| Aug-03 | 510 | 63 | 270 |
| Sep-03 | 1000 | 180 | 370 |
| Nov-03 | 760 | 170 | 530 |
| Dec-03 | 260 | 73 | 110 |

* Data obtained from USGS Water Resources, National Water Information Web Interface, and from Bill Ettinger of the IEPA Bureau of Water Regional Office

FIGURES 1-3 to:

**DEFENDANT'S DISCLOSURE OF EXPERT WITNESS RAPPS**




| E24 OAKFORD, IL | E25 PETERSBURG, IL | E26 RIVERTON, IL |
|---|---|---|
| $\bar{x}$ - 213 | $\bar{x}$ - 88 | $\bar{x}$ - 365 |
| $\sigma$ - 159 | $\sigma$ - 33 | $\sigma$ - 285 |
| MIN - 120 | MIN - 43 | MIN - 120 |
| MAX - 450 | MAX - 120 | MAX - 750 |




*ALL UNITS ARE IN µg/L

RAPPS
ENGINEERING & APPLIED SCIENCE Inc.
821 S. DURKIN DR. • SPRINGFIELD, IL 62704 • (217) 787-2118
P.O. BOX 925 • CARBONDALE, IL 62903 • (618) 521-0574
125 E. LOCUST ST. SUITE B • CANTON, IL 61520 • (309) 647-9603

C ©2007, Rapps Engineering & Applied Science Inc., All Rights Reserved

Figure 1
MARCH - JULY, 2003
DISSOLVED BORON DATA

SANGAMON & MENARD COUNTIES, ILLINOIS

PROJECT: SA07004 DRAWING: FIG B2 DATE: 03/2007




E24 OAKFORD, IL

x̄ - 246
σ - 243
MIN - 49
MAX - 1100

E25 PETERSBURG, IL

x̄ - 116
σ - 84
MIN - 31
MAX - 440

E26 RIVERTON, IL

x̄ - 373
σ - 343
MIN - 43
MAX - 1300

SCALE
1 1/2 0 3 MILES

*ALL UNITS ARE IN μg/L

RAPPS
ENGINEERING & APPLIED SCIENCE Inc.
821 S. DURKIN DR. • SPRINGFIELD, IL 62704 • (217) 787-2118
P.O. BOX 925 • CARBONDALE, IL 62903 • (618) 521-0574
125 E. LOCUST ST. SUITE B • CANTON, IL 61520 • (309) 647-9603

C ©2007. Rapps Engineering & Applied Science Inc., All Rights Reserved

Figure 2
2000 - 2003
DISSOLVED BORON DATA

SANGAMON & MENARD COUNTIES, ILLINOIS

PROJECT: SA07004 DRAWING: FIG 1 DATE: 03/2007



CULVERT
RAILROAD
EXCAVATION
PARKING SURFACE APPROXIMATELY 7.06 ACRES
NORTH PARKING AREA
TIMBERED
12" STORM PIPE
PROPERTY LINE
PARKING SURFACE APPROXIMATELY 6.04 ACRES
SOUTH PARKING AREA
DIRKSEN PARKWAY
GROUNDWATER ANALYSIS – DISS. BORON (MG/L)
(NOVEMBER 4, 2003)
MW-1 – 0.075
MW-2 – 0.069
MW-3 – 0.049
MW-4 – 0.086
FIGURE 3
CURRY TRUCKING SITE PLAN
SHEET
SCALE
50 0 100 feet
RAPPS