IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GERALD LIPPOLD, | ) | Criminal Number 06-30002 |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**GOVERNMENT'S OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS SUPERCEDING INDICTMENT
FOR VIOLATION OF DUE PROCESS**

### A.  Introduction

The United States of America by its attorneys Rodger A. Heaton, United States Attorney

for the Central District of Illinois, and Patrick J. Chesley, Assistant United States Attorney,

moves this Court to deny Defendant's Motion to Dismiss Superceding Indictment For Violation

of Due Process.  In support of its opposition, the United States of America states as follows:

### B.  Factual Background

The defendant is charged with knowingly discharging pollution to waters of the United

States without an NPDES permit, violating Title 33 U.S.C. Sections 1311(a) & 1319(c)(2)(A), &

18 U.S.C. Section 2.  To establish such a violation, the government must prove: (1) the defendant

discharged a pollutant; (2) from a point source; (3) into a water of the United States; (4) without

an NPDES permit; and (5) the defendant acted knowingly.

Until in or about 1999, defendant Lippold was part owner of Lippold & Arnett, Inc., a

bulk hauling company.  Lippold & Arnett operated a bulk hauling facility ("Curry facility") at 3600 N. Dirksen Parkway, in Springfield, Illinois.

Curry Ready Mix & Builders' Supply, Inc. ("Curry Ready Mix"), was a bulk hauling and ready-mix concrete business.  In or about 1999, Curry Ready Mix purchased the Curry facility from defendant Lippold and another individual.  As part of the purchase agreement, Curry Ready Mix agreed to pay defendant Lippold an annual salary of $100,000 for consulting services.  From in or about 1999 to at least in or about the summer of 2003, defendant Lippold worked to increase the business of the Curry facility and exercised substantial authority over the Curry facility operations.  Curry facility employees were expected to do as defendant Lippold ordered.

Curry Ice & Coal of Springfield, Inc. ("Curry Ice & Coal"), was a subsidiary of Curry Ready Mix.  After its purchase in 1999, Lippold & Arnett also became a subsidiary of Curry Ready Mix.  Curry Ready Mix and these other two companies collectively are referred to as the "Curry companies." Curry Office Supply, Inc. ("Curry Office Supply"), was a corporation employing the Curry companies' white-collar employees.

In or about March and April 2001, the Curry facility began receiving large quantities of industrial waste from a utility company.  This industrial waste included fly ash waste and bottom ash waste from coal combustion.  The Curry companies used this industrial waste to begin filling a large excavation at the Curry facility.

On April 26, 2001, officials from the Illinois Environmental Protection Agency ("IEPA") inspected the Curry facility and discovered the piles of industrial waste.  At this time the Curry facility contained approximately 35,000 tons of the industrial waste, tens of thousands of tons more than state law permitted.  Beginning in or about June 2001, IEPA issued violation notices

2

to the Curry companies alleging that they had managed the industrial waste in violation of Illinois law. Beginning in or about the summer of 2001 and thereafter, IEPA discussed and negotiated with defendant Lippold and the Curry companies the removal and proper disposal of the industrial waste in the Curry facility excavation. In or about 2001, officers of the Curry companies agreed to remove and properly dispose of the industrial waste.

Beginning in or about February 2002 defendant Lippold, acting as an agent for the Curry companies, was the primary person responsible for supervising the removal of the industrial waste. He personally directed removal activities. Throughout 2002 and 2003, defendant Lippold attended meetings between IEPA and the Curry companies regarding the excavation and was present when IEPA officials inspected the Curry facility. But instead of removing all of the industrial waste as IEPA had directed and officers of the Curry companies had stated, defendant Lippold buried some of the industrial waste under clean fill in and around the excavation. Removal of the industrial waste continued to at least the winter of 2006-2007.

Beginning in 2001, rain water began filling the Curry facility excavation containing the industrial waste. Boron leached out of the industrial waste into the rain water that accumulated in the excavation, turning that water into what this response refers to as "boron contaminated water." The boron contaminated water contained elevated boron concentrations, approximately 13 times greater than IEPA would allow for purposes of water quality. By 2003, approximately two million gallons of boron contaminated water had accumulated in the large excavation at the Curry facility.

An unnamed stream ("Curry Stream") flowed west through the Curry facility. A second stream flowed north, just west of and at times on the Curry facility property. The Curry Stream

joined with this second stream either just on the Curry facility property or immediately adjacent to it. The combination of these two streams is referred to as "the Joint Stream." The water in both the Curry Stream and the Joint Stream flowed approximately one mile downstream from the junction of the two streams to the Sangamon River.  The Sangamon River is a navigable-in-fact water.

Beginning in or about February 2002 defendant Lippold, acting as an agent for the Curry companies, was the primary person responsible for supervising the disposal of  the boron contaminated water from the Curry facility.  Throughout 2002 and 2003, defendant Lippold attended meetings between IEPA and the Curry companies regarding boron contamination and was present when IEPA officials inspected the Curry facility.  During this time the Curry companies proposed to discharge the boron contaminated water untreated into the Curry Stream and the Joint Stream.

In or before the spring of 2002, IEPA communicated to defendant Lippold personally and to the Curry companies that the boron contaminated water could not be discharged to the Curry Stream and the Joint Stream without obtaining an National Pollutant Discharge Elimination System ("NPDES") permit for such a discharge.[1]  In or about March 2002, Curry Ice & Coal submitted to IEPA an application for an NPDES permit.  The permit application stated that the

---

[1]An NPDES permit is a regulatory tool that conditions the government's permission to discharge specified levels of pollutants upon the permit holder's agreement to comply with pollution limits in the permit.  *United States v. Frezzo Brothers, Inc.*, 546 F. Supp. 713, 717 (E.D. Pa. 1982), *aff'd per curiam*, 703 F.2d 62 (3d Cir.), *cert. denied*, 464 U.S. 829 (1983). The Clean Water Act provides that except as allowed by the Clean Water Act, "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. §§ 1311(a), 1342(a). Thus, discharges without an NPDES permit violate the Clean Water Act, and may subject the discharger to civil or administrative penalties. 33 U.S.C. §§ 1319(d) and 1319(g).  IEPA issues and administers NPDES permits in the State of Illinois, under delegated Clean Water Act authority.

discharge would contained elevated boron concentrations.  In or about May or June 2002, the

IEPA informed Curry Ready Mix and Curry Ice & Coal that the IEPA intended to deny the

NPDES permit application, due to boron pollution concerns.  In or about June 2002, Curry Ice &

Coal withdrew its NPDES permit application.

In or about June 2002, lawyers for Curry Ice & Coal sent a letter to the IEPA requesting

special permission, called a "provisional variance," that would allow the Curry facility to

discharge the boron contaminated water to the Curry Stream and the Joint Stream, even though

such discharge would exceed the State of Illinois' water quality standard for boron.  A

provisional variance exempts its holder from one or more environmental regulations for up to 90

days, as set forth in the provisional variance.  Provisional variances are for very short-term relief,

usually in emergency situations such as fires or explosions at industrial facilities.  That request

by Curry Ice & Coal was withdrawn at the end of July 2002 and resubmitted with modifications

at the beginning of August 2002.  In or about the end of August 2002, the IEPA sent a letter

denying the request for a provisional variance to the lawyers for Curry Ice & Coal.

On February 21, 2003, IEPA officials met with defendant Lippold and other employees

of the Curry companies.  At this meeting, an IEPA official stated that analytical monitoring was

necessary to determine if leachate from the industrial waste in the excavation at the Curry

facility had also contaminated the area groundwater and drinking wells.  At this meeting, an

IEPA official also stated that the Curry facility should take immediate action to keep the boron

contaminated water from entering groundwater or surface waters.  Instead, beginning in or about

March or April 2003 and continuing until approximately the beginning of June 2003, defendant

Lippold ordered Curry facility employees to discharge the boron contaminated water into the

5

Curry Stream and the Joint Stream without IEPA's knowledge.

For example, the defendant ordered Curry facility employees to dig a drainage ditch between the excavation and the lower parking lot. The defendant ordered a discharge pipe installed at the bottom of this drainage ditch late at night. The defendant personally excavated at least some of the pipe's route. This discharge pipe emptied onto a slope approximately 70 feet uphill from the Curry Stream. The defendant ordered Curry facility employees to pump the boron contaminated water through a hose into this drainage ditch, where the boron contaminated water flowed through the discharge pipe and emptied onto the slope of the Curry Stream. This boron contaminated water then flowed down the slope into the Curry Stream.

In or about March or early April 2003, the Curry companies obtained permission from IEPA to spread the boron contaminated water on the upper and lower parking lots at the Curry facility for purposes of dust control. The IEPA allowed such applications on the condition that no runoff containing boron contaminated water be allowed to enter the Curry Stream. Defendant Lippold directed Curry facility employees to spread the boron contaminated water on the Curry facility parking lots using tanker trucks.

Defendant Lippold, on some occasions, ordered Curry facility employees to park tanker trucks by the drainage ditch and continually pump boron contaminated water into those parked trucks. These parked trucks then overflowed, discharging boron contaminated water via the drainage ditch and discharge pipe into the Curry Stream and then into the Joint Stream. Defendant Lippold instructed a Curry facility employee that if an inspector came by and saw the parked trucks discharging, then that employee should say that the trucks had overfilled by accident.

6

On other occasions Lippold ordered or allowed Curry facility employees to apply the boron contaminated water from tanker trucks in volumes exceeding the ability of the parking lots to absorb the liquid. On those occasions, boron contaminated water ran off the parking lots into the Curry Stream and then the Joint Stream.

Beginning in or about March or April 2003 and continuing until approximately the beginning of June 2003, defendant Lippold also ordered Curry facility employees to pump the boron contaminated water out of the excavation 24 hours a day, even though little or none of such boron contaminated water could be spread on the parking lots at night because trucks were parked there.

**C.    The Clean Water Act is Constitutional As Applied To the Defendant's Conduct**

**1.    Defendant's Argument**

The defendant asks this Court to dismiss the superseding indictment on the grounds that the Clean Water Act is unconstitutionally vague as applied to him. Specifically, the defendant argues that the Act's definitions of "pollutant" and "waters of the United States" are too vague to have notified him that discharging waste leachate into a stream is forbidden. The defendant is wrong.

**2.    The Void-For-Vagueness Doctrine**

Under the void-for-vagueness doctrine, a court may declare a statutory provision so vague as to violate the Fifth Amendment Due Process Clause and therefore be unconstitutional. "The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Server v. Mizell*, 902

F.2d 611, 613 (7th Cir. Ill. 1990) (citations omitted).  The void-for-vagueness doctrine employs

one of two standards, depending upon whether the statutory provision at issue "reaches a

substantial amount of constitutionally protected conduct" such as free speech.  *Village of*

*Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982) *reh. denied*

456 U.S. 950 (1982).  The defendant concedes that the Clean Water Act provisions at issue do

not reach a substantial amount of constitutionally protected conduct.  Therefore,

> [A court,] assuming the enactment implicates no constitutionally protected
> conduct, should uphold the challenge only if the enactment is impermissibly
> vague in all of its applications. A plaintiff who engages in some conduct that is
> clearly proscribed cannot complain of the vagueness of the law as applied to the
> conduct of others.  A court should therefore examine the complainant's conduct . .
> .

> . . . "[Vagueness] challenges to statutes which do not involve First
> Amendment freedoms must be examined in the light of the facts of the case at
> hand." "One to whose conduct a statute clearly applies may not successfully
> challenge it for vagueness."  The rationale is evident: to sustain such a challenge,
> the complainant must prove that the enactment is vague "'not in the sense that it
> requires a person to conform his conduct to an imprecise but comprehensible
> normative standard, but rather in the sense that no standard of conduct is specified
> at all.' Such a provision simply has *no* core." [*Village of Hoffman Estates,* 455
> U.S. at 494-495, n.7 (citations omitted); *see also Mizell*, 902 F.2d at 613.]

Under this "as applied" standard, the Clean Water Act definitions of "pollutant" and

"waters of the United States" are unconstitutional only if they "fail[] to give a person of ordinary

intelligence fair notice that [the defendant's] contemplated conduct was forbidden.  The

underlying principle is that no man shall be held criminally responsible for conduct which he

could not reasonably understand to be proscribed."  *United States v. Harriss*, 347 U.S. 612, 617

(1954) (citations omitted); *see also Mizell*, 902 F.2d at 613; *United States ex rel. Bradley v.*

*Lane*, 834 F.2d 645, 650 (7th Cir. C.D. Ill. 1987); *United States v. Iverson*, 162 F.3d 1015, 1021

(9th Cir. 1998) (applying this standard to a Clean Water Act provision); *Vandergriff v. City of*

8

*Chattanooga*, 44 F.Supp. 927, 936 (E.D. Tenn. 1998), *aff'd.* 182 F.3d 918 (6th Cir. 1999)

(applying this standard to a wastewater ordinance enacted under the Clean Water Act).  That is,

these Clean Water Act definitions are unconstitutional only if they are unconstitutional as

applied to the defendant's particular circumstances.  Additionally:

> The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language. [*United States v. National Dairy Products Corp.*, 372 U.S. 29, 32 (1963) (citations omitted)]

Further, as an economic regulation the Clean Water Act is subject to a more lenient

evaluation:

> [E]conomic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action.  Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process. [*Hoffmann Estates*, 455 U.S. at 498 (citations omitted); *see also United States v. Iverson*, 162 F.3d at 1021 (applying this leniency to a Clean Water Act provision); *City of Albuquerque v. Browner*, 97 F.3d 415, 429 (10th Cir. 1996), *cert. denied* 522 U.S. 965 (1997) (applying this leniency to water quality standards approved under the Clean Water Act); *United States v. Alcan Aluminum Corp.*, 755 F.Supp.531, 540 (N.D.N.Y. 1991), *cert. denied* 540 U.S. 1103 (2004) (applying this leniency to a federal hazardous waste statute and further stating, "[a]ll the more is this so when matters of public health and safety are concerned"). ]

Judicial interpretation may also define a statutory provision sufficiently to defeat a void-

for-vagueness argument.  *United States v. Broncheau*, 597 F.2d 1260, 1263 (9th Cir. 1979), *cert.*

*denied* 444 U.S. 859 (1979).  And where courts have so interpreted a statutory provision, it is fair

". . . to require that one who deliberately goes perilously close to an area of proscribed conduct

shall take the risk that he may cross the line."  *United States v. Bohonus*, 628 F.2d 1167, 1174

(9th Cir. 1980) (citations omitted), *cert. denied* 447 U.S. 928 (1980).  In *Broncheau*, the

9

defendant was indicted for being an Indian committing assault resulting in serious bodily injury in Indian country. The defendant argued that the charging statute was void-for-vagueness, because it did not define the term "Indian." The *Broncheau* court cited multiple judicial decisions defining the term "Indian" and held:

> We therefore believe that the term "Indian," as judicially developed from 1845 to the present, "has a meaning sufficiently precise for a man of average intelligence to 'reasonably understand that his contemplated conduct is proscribed.'" [*Broncheau*, 597 F.2d at1263 (citations omitted)]

Finally, courts may uphold a statutory provision against a void-for-vagueness argument where a defendant's actions indicate that he knew that his conduct was illegal. In *United States v. Weitzenhoff*, 35 F.3d 1275 (9th Cir. 1993), *cert. denied* 513 U.S. 1128 (1995), the defendant operators of a public treatment works discharged excess, partially-treated sewage to the Pacific Ocean at night. The defendants also denied to outside parties that the discharges were occurring and told a plant employee to say nothing about the discharges. In upholding the plant's NPDES permit against an as-applied, void-for-vagueness challenge, the Court noted the defendants' above conduct and held that "[w]e are further persuaded that appellants had adequate notice of the illegality of their dumping by the considerable pains they took to conceal their activities." *Id.*, 35 F.3d at 1289.

**3.      The Clean Water Act's Definition of "Waters of the United States" is Constitutional As Applied to the Defendant's Particular Circumstances**

The July 12, 2007, Superseding Indictment alleges that the defendant knowingly discharged pollutants into "waters of the United States" without an NPDES permit, specifically by discharging into the Curry Stream and Joint Stream. The defendant argues that the definition of "waters of the United States" contained in the Clean Water Act and its regulations is too

vague for him to have known that the Curry Stream or the Joint Stream were waters of the United States. In so arguing, the defendant fails to address the clear text of Clean Water Act regulations; longstanding case law; and his actual notice of the regulated status of the Curry Stream and Joint Stream. Applying the Clean Water Act to the defendant's particular circumstances of discharging waste leachate into tributaries of the Sangamon River during spring 2003, a person of ordinary intelligence would have had fair notice that his contemplated conduct was forbidden.

## a.    Clean Water Act regulations

The Clean Water Act forbids unpermitted discharges into "navigable waters." 33 U.S.C. §§ 1311(a), 1362(12). The Clean Water Act defines "navigable waters" as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). Federal Clean Water Act regulations at 40 C.F.R. § 122.2 and in effect during 2003 defined "waters of the United States" to include the following:

> (a) All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; . . .

> (e) Tributaries of waters identified in paragraphs (a) through (d) of this definition; . . . .

Paragraph (a), above, includes navigable-in-fact waters such as the Sangamon River. The defendant does not argue that the Clean Water Act is vague as applied to discharges to the Sangamon River. As tributaries of the Sangamon River, the Curry Stream and Joint Stream fall within the paragraph (e) definition of waters of the United States. Thus, in 2003, regulations clearly defined the Curry Stream and Joint Stream as waters of the United States. And a person of ordinary intelligence would have had fair notice based on this regulation alone that

11

discharging waste leachate into the Curry Stream or Joint Stream was forbidden.  Therefore the Clean Water Act was not vague as to the defendant's particular circumstances of discharging waste leachate into tributaries of the Sangamon River during spring 2003.

**b.    Case law**

Without support, defendant argues that there is a "longstanding absence of judicial explication of the CWA."  Defendant's Motion to Dismiss Superceding Indictment For Violation of Due Process, p. 6.  In so arguing, defendant misrepresents three decades of case law.  Case law has long defined the Clean Water Act as extending to tributaries such as the Curry Stream and Joint Stream.

Courts have long recognized that in creating the Clean Water Act, Congress intended "to cover, as much as possible, all waters of the United States instead of just some."  *Deltona Corp. v. United States*, 228 Ct. Cl. 476, 480 (1981), *cert. denied* 455 U.S. 1017 (1982).  In one of the earliest Clean Water Act decisions in *United States v. Ashland Oil and Transportation Co.*, 504 F.2d 1317 (6th Cir. 1974), the defendant oil company discharged crude oil into a "small tributary" that traveled through two more tributaries before reaching a navigable-in-fact water.  *Id.*, 504 F.2d at 1320.  In holding that the Clean Water Act applied up this chain of tributaries, the Court stated that:

> . . . we believe Congress knew exactly what it was doing and that it intended the Federal Water Pollution Control Act to apply, as Congressman Dingell put it, "to all water bodies, including main streams and their tributaries." Certainly the Congressional language must be read to apply to our instant case involving pollution of one of the tributaries of a navigable river. Any other reading would violate the specific language of the [Clean Water Act definition of "navigable waters"] and turn a great legislative enactment into a meaningless jumble of words. [*Id.*, 504 F.2d at 1325.]

While the government intends to offer evidence at trial that the Curry Stream and Joint

Stream are not intermittent streams, case law in 2003 had also long established that intermittently-flowing tributaries and even frequently-dry arroyos are waters of the United States. *Driscoll v. Adams*, 181 F.3d 1285, 1291 (11th Cir. 1999), *cert. denied* 529 U.S. 1108 (2000) (intermittent stream is a "navigable water" within the meaning of the Clean Water Act); *Quivira Mining Co. v. United States Environmental Protection Agency*, 765 F.2d 126, 129-130 (10th Cir. 1985), *cert. denied* 474 U.S. 1055 1986) (occasionally-flowing arroyo is a water of the United States); *United States v. Sheyenne Tooling and Manufacturing Co., Inc.*, 952 F.Supp. 1414, 1417-1418 (D. N.D. 1996), *aff'd* 162 F.3d 1166 (8th Cir. 1998) (unnamed intermittent stream could be a water of the United States).

And courts have repeatedly upheld the Clean Water Act's definition of "waters of the United States" against vague-for-voidness challenges. In an early Clean Water Act decision in *United States v. Phelps Dodge Corp.*, 391 F.Supp. 1181, 1184-1188 (D. Az. 1975), the Court discussed legislative history and Congressional authority at length before upholding "waters of the United States" against a void-for-vagueness challenge . The Court further held that this definition includes even "normally dry arroyos through which water may flow, where such waters will ultimately end up in public waters such as a . . . tributary to a river or stream . . . ." *Id.*, 391 F.Supp. at 1187. See also *United States v. Oxford Royal Mushroom Products, Inc.*, 487 F.Supp. 852, 855 (E.D. Penn. 1980) ("waters of the United States" is not void-for-vagueness as applied to a discharge to a non-navigable stream); *United States v. Metalite Corp.*, 2000 U.S. Dist. LEXIS 11507, *33-35 (S.D. Ind. 2000) ("waters of the United States" is not void-for-vagueness as applied to a discharge to "a ditch flowing through a disputed number of intermediary steps" to a navigable-in-fact water).

13

Existing case law alone would in 2003 have given a person of ordinary intelligence fair notice that discharging waste leachate into the Curry Stream or Joint Stream tributaries of the Sangamon River was forbidden.  Cases such as *United States v. Broncheau*, 597 F.2d 1260, 1263 (9th Cir. 1979), *cert. denied* 444 U.S. 859 (1979), discussed at Section C.2, above, hold that case law alone can define a statutory provision sufficiently to defeat a void-for-vagueness argument. Here, long-standing case law has done so.   And here as in those cases, it is fair ". . . to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line."  *United States v. Bohonus*, 628 F.2d 1167, 1174 (9th Cir. 1980) (citations omitted), *cert. denied* 447 U.S. 928 (1980).  Therefore the Clean Water Act was not vague as to the defendant's particular circumstances of discharging waste leachate into tributaries of the Sangamon River during spring 2003.

The defendant does not address the case law discussed in this Section C.3.b.

c.     **Defendant's actual notice of the streams' regulated status**

The defendant was aware of facts that would give a person of ordinary intelligence fair notice that discharging waste leachate into the Curry Stream or Joint Stream was forbidden.  In fact, the defendant had actual notice that his discharges were illegal.  And by trying to hide his discharges, the defendant showed that he had actual notice.

Beginning in or about February 2002, defendant was the primary person responsible for supervising the disposal of  the boron contaminated water from the Curry facility.  In spring 2002, an IEPA employee personally told the defendant that the boron contaminated water could not be discharged to the Curry Stream without an NPDES permit.  One must have an NPDES permit to discharge pollutants to waters that fall within the Clean Water Act definition of "waters

14

of the United States."  IEPA also communicated this permitting requirement to the Curry

companies during this timeframe.  These facts alone would give a person of ordinary intelligence

or even less-than-ordinary intelligence fair notice that discharging boron contaminated water into

the Curry Stream or Joint Stream was forbidden.

In addition, in 2002 and while defendant was responsible for disposal of the boron

contaminated water, the Curry companies sought on several occasions through IEPA

administrative process to discharge the boron contaminated water untreated into the Curry

Stream and the Joint Stream.  Specifically, the Curry companies sought both an NPDES permit

and special permission called a "provisional variance" to discharge the boron contaminated

water into the Curry Stream and Joint Stream.  Again, if the streams enjoyed no legal protection

then these processes would have been unnecessary.

As stated in Section C.2, above, economic regulations such as the Clean Water Act are

subject to a more lenient void-for-vagueness review because:

> businesses . . . can be expected to consult relevant legislation in advance
> of action.  Indeed, the regulated enterprise may have the ability to clarify the
> meaning of the regulation by its own inquiry, or by resort to an administrative
> process. [*Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455
> U.S. 489, 498 (1982) (citations omitted), *reh. denied* 456 U.S. 950 (1982).]

Applying the Clean Water Act to the defendant's particular circumstances, one can see

the justification for this more lenient review.  Not only could the defendant and the Curry

companies have sought to clarify with IEPA whether the Curry Stream and Joint Stream were

statutorily-regulated waters, IEPA actually told them the year before the defendant's pollutant

discharges that the Curry Stream and Joint Stream were statutorily-regulated waters.  Based on

their understanding that the Curry Stream and Joint Stream were statutorily-regulated waters, the

15

Curry companies sought permission through IEPA administrative processes to dispose of the boron contaminated water in those tributaries while defendant was responsible for that disposal.

Actually being told by IEPA on several occasions including during administrative processes that one could not discharge pollutants into the Curry Stream or Joint Stream, would have given a person of ordinary intelligence fair notice that discharging pollutants into those tributaries was forbidden. Therefore the Clean Water Act was not vague as to the defendant's particular circumstances of discharging waste leachate into these tributaries after having been told by IEPA both personally and through administrative processes that it was forbidden.

And the defendant showed his actual notice of the illegality of his discharges by trying to hide them. *United States v. Weitzenhoff*, 35 F.3d 1275, 1289 (9th Cir. 1993), *cert. denied* 513 U.S. 1128 (1995). The defendant ordered Curry facility employees to install the discharge drainage pipe early before business hours and himself excavated at least part of that pipe's course early in the morning or at night outside business hours. The defendant ordered Curry facility employees to pump boron contaminated water at night, when it would be unobserved and could serve no dust control purpose. The defendant ordered and allowed discharges of boron contaminated water to the Curry Stream in a manner that could appear to IEPA to be accidental discharges, for example by parking tanker trucks near the discharge pipe and letting them overflow from pumping. And the defendant told a Curry facility employee that if an inspector came by and saw the parked trucks discharging, then that employee should say that the trucks had overfilled by accident. Thus the defendant's own actions show that the Clean Water Act was not vague as to the defendant's particular circumstances of discharging waste leachate into the Curry Stream and Joint Stream after having been told by IEPA both personally and through

16

administrative processes that it was forbidden.

The defendant does not address the particular circumstances of his discharges discussed in this Section C.3.c

**d.     Post-2003 events**

Instead of addressing the above regulatory clarification; case law clarification; and the defendant's particular circumstances, the defendant appears to argue that events occurring years after his 2003 discharges have rendered the Clean Water Act definition of "waters of the United States" void-for-vagueness as applied to his particular circumstances.  Specifically, the defendant argues from the Supreme Court decision in *Rapanos v. United States*, 126 S.Ct. 2208 (2006), and its alleged effects on the legal and regulatory landscape.

The Court need not reach these arguments, because the defendant had actual notice that discharging to the Curry Stream and Joint Stream was forbidden.  The Court also need not reach these arguments because *Rapanos* was decided years after the defendant completed his alleged crime.  At the time of defendant's 2003 discharges, long-standing regulations and case law had settled that Clean Water Act jurisdiction extended to the Curry Stream and Joint Stream.  The defendant cannot claim that in 2003 a person of ordinary intelligence would have no notice that the defendant's discharges were forbidden, on the grounds that a court decision three years in the future would change the legal landscape.  A person of ordinary intelligence cannot and need not predict the future.

Should the Court wish to address it, defendant's *Rapanos*-based argument is nonetheless without merit.  Defendant argues essentially that through the *Rapanos* decision, the United States Supreme Court has rendered the Clean Water Act unconstitutionally vague.  The

government believes that the Supreme Court would not so censure itself, were it to consider the

question.[2]

_____

[2]In *Rapanos v. United States*, 126 S.Ct. 2208 (2006), the Supreme Court addressed the jurisdictional scope of the Clean Water Act in a pair of consolidated wetlands cases.  The Supreme Court's June 19, 2006, *Rapanos* opinion vacated the appellate court decisions and remanded both cases for further proceedings.  *Id.*, 126 S.Ct. at 2235 (Scalia, J., plurality).  But because no opinion commanded a majority of the Court, the Justices issued plurality, concurring and dissenting opinions.

Justice Scalia authored a four-justice plurality opinion, which agreed with the United States that the term "waters of the United States" includes at least some waters that are not navigable in the traditional sense.  *Rapanos*, 126 S.Ct. At 2220 (Scalia, J., plurality).  But the plurality concluded that the Clean Water Act extends jurisdiction to "only those wetlands with a continuous surface connection to" a "relatively permanent, standing, or continuously flowing" water connected to traditional navigable waters.  *Id.*, 126 S.Ct. at 2225-2226 (Scalia, J., plurality).  The plurality held that "relatively permanent" waters falling under Clean Water Act jurisdiction include waters that 1) "might dry up in extraordinary circumstances, such as drought;" and 2) are "seasonal," containing no flow during dry months.  *Id.*, 126 S.Ct. at 2221, n. 5 (Scalia, J., plurality).

Justice Kennedy authored an opinion concurring in the judgment and did not join the plurality opinion.  Justice Kennedy agreed with the plurality and the United States that the term "waters of the United States" includes at least some waters that are not navigable in the traditional sense.  *Rapanos*, 126 S.Ct. at 2241 (Kennedy, J., concurring in judgment).  Justice Kennedy's opinion also contained his own standard for Clean Water Act jurisdiction:  the "significant nexus" standard.  Under the significant nexus standard, wetlands are waters of the United States "if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.*, 126 S.Ct. 2248 (Kennedy, J., concurring in judgment).  Regarding wetlands adjacent to non-navigable tributaries, Justice Kennedy stated that "[a]bsent more specific regulations, . . . the [U.S. Army Corps of Engineers] must establish a significant nexus on a case-by-case basis . . . ."  *Id.*, 126 S.Ct. At 2249 (Kennedy, J., concurring in judgment).

Justice Kennedy found the plurality's interpretation of Clean Water Act jurisdiction to be "inconsistent with the Act's text, structure, and purpose."  *Rapanos*, 126 S.Ct. at 2246 (Kennedy, J., concurring in judgment).  Regarding the plurality's first limitation of jurisdiction to bodies of water that are relatively permanent, standing or continuously flowing, Justice Kennedy rejected the plurality's analysis as making "little practical sense in a statute concerned with downstream water quality."  *Id.*, 126 S.Ct. at 2242, 2246 (Kennedy, J., concurring in judgment).  Justice Kennedy also observed that "an intermittent flow can constitute a stream . . . while it is flowing"

The defendant argues that the Clean Water is void-for-vagueness because judicial circuits differ on whether federal jurisdiction extends to waters meeting 1) only Justice Kennedy's standard; or 2) either one of Justice Kennedy's standard or the plurality's standard. The United States is unaware of any instance in which a court has held a statute void-for-vagueness because of a circuit split. Nor should the court set the bar so low, especially in light of "[t]he strong presumptive validity that attaches to an Act of Congress . . . ." *United States v. National Dairy Products Corp.*, 372 U.S. 29, 32 (1963).

Further, the Seventh Circuit has felt itself capable to discerning the proper test. In *United States v. Gerke Excavating*, 464 F.3d 723 (7th Cir. 2006), *reh'g en banc denied* 2006 U.S. App. LEXIS 3007 (7th Cir. 2006), the Seventh Circuit considered which one or more of the *Rapanos* standards applies to determine Clean Water Act jurisdiction. Like *Rapanos*, *Gerke Excavating*

---

and stated that "[i]t follows that the Corps can reasonably interpret the [Clean Water] Act to cover the paths of such impermanent streams." *Id.*, 126 S.Ct. At 2242-2243 (Kennedy, J., concurring in judgment). (Justice Kennedy also found "unpersuasive" the "plurality's second limitation - exclusion of wetlands lacking a continuous surface connection to other jurisdictional waters . . . ." *Id.*, 126 S.Ct. at 2244.

Justice Stevens authored a four-justice dissent upholding U.S. EPA's and the U.S. Army Corps' interpretation of "waters of the United States." *Rapanos*, 126 S.Ct. at 2252-2265 (Stevens, J., dissenting). Justice Stevens explained:

In my view, the proper analysis is straightforward. The Army Corps has determined that wetlands adjacent to tributaries of traditionally navigable waters preserve the quality of our Nation's waters by, among other things, providing habitat for aquatic animals, keeping excessive sediment and toxic pollutants out of adjacent waters, and reducing downstream flooding by absorbing water at times of high flow. The Corps' resulting decision to treat these wetlands as encompassed within the term "waters of the United States" is a quintessential example of the Executive's reasonable interpretation of a statutory provision. [*Id.*, 126 S.Ct. at 2252.]

19

involved a defendant who had illegally filled wetlands.  The *Gerke Excavating* court held that Justice Kennedy's significant nexus test is the sole jurisdictional test, because the Supreme Court could not agree on a standard and Justice Kennedy's standard constituted the narrowest grounds for the Court's outcome.  *Id.*, 464 F.3d at 724.

Approximately four months ago in June 2007, U.S. EPA and the U.S. Army Corps of Engineers released a joint guidance ("jurisdictional guidance") explaining how the government would determine Clean Water Act jurisdiction in light of *Rapanos*.  In support of his void-for-vagueness argument, the defendant asserts without explanation that the joint guidance is ambiguous and vague.  With the defendant providing no specifics, the government can only respond that the joint guidance is a constitutionally firm, reasoned guidance to applying the plurality's and Justice Kennedy's standards to fact-specific analyses in the real world.[3]

---

[3]As applied to the defendant's particular circumstances, the jurisdictional guidance states:

. . . a tributary, for the purposes of this guidance, is the entire reach of a stream that is of the same order (i.e., from the point of confluence, where two lower order streams meet to form the tributary, downstream to the point such tributary enters a higher order stream).  The flow characteristics of a particular tributary will be evaluated at the farthest downstream limit of such tributary (i.e., the point the tributary enters a higher order stream). [Jurisdictional guidance, p. 5, n. 21; see also p. 9.]

Under the jurisdictional guidance then, the Curry Stream as tributary extends from its upstream headwaters down to its confluence with the Joint Stream.  The Curry Stream's flow should be evaluated at its confluence with the Joint Stream.  The Joint Stream as tributary extends from its confluence with the Curry Stream to its confluence with the Sangamon River. The Joint Stream's flow should be evaluated at its confluence with the Sangamon River.

The jurisdictional guidance reflects the government's nationwide position, that Clean Water Act jurisdiction extends to any water satisfying either the plurality's standard or Justice Kennedy's standard.  Jurisdictional guidance, p. 3.  Under the jurisdictional guidance, the government will first extend Clean Water Act jurisdiction under the plurality's standard to any "non-navigable tributaries that are "relatively permanent" – waters that typically (e.g., except

Defendant also argues that GAO-04-297 ("GAO report"), a 2004 U.S. General

Accounting Office report on jurisdictional determinations made by the U.S. Army Corps of

Engineers nationwide, shows that the definition of "waters of the United States" is vague

because Corps determination practices vary.  That practices vary within an agency uninvolved in

this matter does not establish that the definition as applied to the defendant was void-for-

vagueness.  And such variation reflects to some extent the inevitable variation in applying any

regulatory framework to the real world.  Nor does the GAO report condemn the Clean Water Act

or even the Corps as producing arbitrary results.  The government notes that the GAO report

concludes:

>    Whether or to what degree the individual differences in Corps district
>    office practices would result in different jurisdictional determinations in similar
>    situations is unclear, in part, because Corps staff consider many factors when
>    making jurisdictional determinations. [GAO report, cover page, p. 3]

The government further repeats here the Corps' and U.S. EPA's comments on the GAO

report, as reproduced in that report:

>    . . . existing regulations and practices concerning Clean Water Act
>    jurisdiction do not always take into account the variations in water resources that
>    occur in different regions of the country.  For example, the nature and
>    characteristics of wetlands in Florida are almost always very different from
>    wetlands in Alaska or the arid southwest.  Of course, this leads to correspondingly
>    differing assessments of features under consideration as to whether they are

---

due to drought) flow year-round or waters that have a continuous flow at least seasonally (e.g.,
typically three months)."  Jurisdictional guidance, pp. 5-6.  The plurality's standard is simpler to
apply than Justice Kennedy's standard, but often more restrictive.  Where a water does not
satisfy the plurality's standard (or where, as in the Seventh Circuit, the plurality's standard is
legally irrelevant), the government will extend Clean Water Act jurisdiction if that water satisfies
Justice Kennedy's significant nexus standard.  Jurisdictional guidance, pp. 6-7.  To evaluate a
water's significant nexus to a navigable-in-fact water, the government will perform a fact-
specific analysis using hydrological, chemical and biological factors set forth in the jurisdictional
guidance.  Jurisdictional guidance, pp. 7, 9-10.

jurisdictional or not. [Corps comment, GAO report, p. 38]

*   *   *

The draft GAO report notes that conditions that could affect jurisdiction vary geographically and that it is unclear if variation among Districts would result in different jurisdictional determinations in similar situations. We note further that all regulations, by their nature, set out a framework which is then interpreted and applied to various factual circumstances. This is particularly the case with regulations such as those defining "waters of the US," which the [Clean Water Act] recognizes would be applied to a wide variety of geographic and climactic situations. In our view, the current regulations establish a framework that provides useful detail and consistency for applying best professional judgment on a case-by-case basis and avoids one-size-fits-all results. [U.S. EPA comment, GAO report, p. 43]

**4.      The Clean Water Act's Definition of "Pollutant" is Constitutional As Applied to the Defendant's Particular Circumstances**

The July 12, 2007, Superseding Indictment alleges that the defendant knowingly discharged pollutants into waters of the United States without an NPDES permit, specifically by discharging boron and boron contaminated water. The defendant argues that the definition of "pollutant" in the Clean Water Act is too vague for him to have known that waste leachate such as boron and boron contaminated water were pollutants. In so arguing, the defendant fails to address the clear text of Clean Water Act regulations; longstanding case law; and his actual notice that boron and boron contaminated water are pollutants. Applying the Clean Water Act to the defendant's particular circumstances of discharging boron and boron contaminated water into the Curry Stream and Joint Stream, a person of ordinary intelligence would have had fair notice that his contemplated conduct was forbidden.

**a.      Regulations and case law**

The Clean Water Act defines "discharging a pollutant" as any addition of any pollutant to waters of the United States from any point source. 33 U.S.C. §§ 1362(12), 1362(16). The Clean

Water Act defines a "pollutant" to include solid waste, incinerator residue, chemical wastes, industrial waste and municipal waste discharged into water. 33 U.S.C. § 1362(6). Federal Clean Water Act regulations at 40 C.F.R. § 122.2 define "discharge of a pollutant" to include "surface runoff which is collected or channelled [sic] by man." The boron and boron contaminated water are pollutants within the above definitions, being essentially a leachate from the industrial waste in the excavation and consisting of or containing that waste's constituents such as boron. *Reynolds v. Rick's Mushroom Service, Inc.*, 246 F.Supp.2d 449, 455 (E.D. Pa. 2003), *further proceedings* 2003 U.S. Dist. LEXIS 22154 (E.D. Pa. 2003) (rainwater running off piles of waste and containing leachate from that waste could be a Clean Water Act "pollutant"); *U.S. v. Frezzo Brothers, Inc.*, 461 F.Supp. 266, 269-270 (E.D. Pa. 1978), *cert. denied* 444 U.S. 1074 (1980), *rev'd in further proceedings on other grounds* 642 F.2d 59 (3d Cir. 1981), *cert. denied* 464 U.S. 829 (2000) (rainwater running off piles of waste and containing leachate from that waste is a Clean Water Act "pollutant").

   Defendant argues that boron and boron contaminated water cannot be pollutants because the Clean Water Act's definition does not specifically include boron, boron contaminated water, or the defendant's disingenuous mischaracterization of these substances as "rainwater." Even ignoring the above case law, the defendant has made this argument to this Court before and this Court has already ruled against the defendant on this issue. Without mentioning this Court's prior ruling against him, the defendant now seeks a second bite at the apple. The government cites and stands by this Court's prior ruling:

   Defendant, however, appears to suggest that since "boron ash waste water" ["boron contaminated water" in the Superseding Indictment] is not included in the CWA's definition of pollutant, the Court must evaluate whether this alleged discharge caused any harm to the environment or human health in

order to determine whether the alleged substance is a pollutant within the meaning of the Act. Defendant Lippold's contention is unavailing because Congress intended the definition of pollutant to be broadly construed; as a result, courts have broadly construed the definition of pollutant and have accordingly held that even substances that are not specifically listed as a pollutant in the CWA constituted a pollutant within the meaning of the Act. See United States v. Hamel, 551 F.2d 107, 111 (6th Cir. 1977) (finding that petroleum products, such as gasoline, are pollutants within the meaning of the CWA even though they are not specifically listed in the definition); North Carolina Shellfish Growers Ass'n v. Holly Ridge Assocs., LLC., 278 F.Supp.2d 654, 676-77 (E.D.N.C. 2003) (finding that sediment qualifies as a pollutant under the CWA); Tungett v. Papierski, 2006 WL 51148, *2 (E.D. Tenn. 2006) (In broadly construing the definition of "pollutant" under the CWA, the district court found that sediment, soil, dirt, trees and organic debris are pollutants within the meaning of the Act even though such substances are not specifically included in the definition). [*United States v. Lippold*, No. 06-30002, slip op. at 10 (C.D. Il. July 11, 2006)][4]

In *United States v. Eidson*, 108 F.3d 1336 (11th Cir. 1997), the defendants discharged cleaning agents from underground storage tanks at a gas station into waters of the United States. The defendants argued that the Clean Water Act definition of "pollutant" was void-for-vagueness as applied to them, because petroleum-based products weren't explicitly included in the pollutant definition. In upholding the pollutant definition as constitutional, the Court stated that "[a]lthough this definition of pollutant is broad, it is not unduly vague."[5]

Existing case law alone would have given a person of ordinary intelligence fair notice that discharging waste leachate into the Curry Stream and Joint Stream was forbidden. Cases

---

[4]Like the defendant's already-rejected arguments, the defendant's current arguments that the Clean Water Act definition of "pollutant" is void-for-vagueness also have a lack-of-environmental-harm cast. Defendant's Motion To Dismiss Superceding Indictment For Violation of Due Process, pp. 8-10.

[5]The main factor in the *Eidson* court's decision was that the pollutant's smell and appearance provided notice to the defendants that they were dealing with a pollutant. *Eidson*, 108 F.3d at 1343. While the boron contaminated water lacked these factors, the *Eidson* court's observation regarding the definition's scope remains apposite.

such as *United States v. Broncheau*, 597 F.2d 1260, 1263 (9th Cir. 1979), *cert. denied* 444 U.S. 859 (1979), discussed at Section C.2, above, hold that case law alone can define a statutory provision sufficiently to defeat a void-for-vagueness argument.  Here long-standing case law has done so, defining as Clean Water Act "pollutants" waste leachate and other materials not specifically enumerated in the Clean Water Act definition.  And here as in those cases, it is fair ". . . to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line."  *United States v. Bohonus*, 628 F.2d 1167, 1174 (9th Cir. 1980) (citations omitted), *cert. denied* 447 U.S. 928 (1980).  Therefore the Clean Water Act was not vague as to the defendant's particular circumstances of discharging waste leachate into the Curry Stream and Joint Stream.

The defendant does not address the case law discussed in this Section C.4.a.

Additionally, the government notes that the State of Illinois has promulgated a water quality standard for boron that was in effect during the defendant's discharges.  The fact that a boron standard existed would give a person of ordinary intelligence additional notice that his contemplated conduct of discharging boron and boron contaminated water to a tributary of the Sangamon River was forbidden.

Defendant argues that the existence of a boron standard does not make boron a "pollutant," because 1) U.S. EPA and other states have not promulgated boron standards; and 2) on three occasions since its promulgation in 1972, Illinois has granted exceptions to its boron standard.  Defendant's arguments are inapposite.  Boron and boron contaminated water are "pollutants" because they fall within the definition of pollutant in the Clean Water Act, its regulations and longstanding case law.  The existence of Illinois' boron standard gives a person

25

of ordinary intelligence additional notice that discharging boron and boron contaminated water to the Curry Stream and Joint Stream was forbidden.  Regarding the defendant's mischaracterizations of the boron standard, three administrative exceptions in three decades do not make the standard "honored more in its exception than in its application," any more than the standard's existence for over 30 years makes it "archaic."  Defendant's Motion To Dismiss Superceding Indictment For Violation of Due Process, p. 10.

c.　　**Defendant's actual notice that boron and boron contaminated water are pollutants**

The defendant was aware of facts that would give a person of ordinary intelligence fair notice that discharging the boron and boron contaminated water into the Curry Stream and Joint Stream was forbidden.  In fact, the defendant had actual notice that his discharges of boron contaminated water were illegal.  And by trying to hide his discharges, the defendant showed that he had actual notice.

Beginning in or about February 2002, defendant was the primary person responsible for supervising the disposal of  the boron contaminated water from the Curry facility.  In spring 2002, an IEPA employee personally told the defendant that the boron contaminated water could not be discharged to the Curry Stream without an NPDES permit.  IEPA also communicated this permitting requirement to the Curry companies during this timeframe.  These facts alone would give a person of ordinary intelligence or even less-than-ordinary intelligence fair notice that discharging boron contaminated water into the Curry Stream or Joint Stream was forbidden.

In addition, in 2002 and while defendant was responsible for disposal of the boron contaminated water, the Curry companies sought through both an NPDES permit and special permission called a "provisional variance" to discharge the boron contaminated water into the

Curry Stream and the Joint Stream.  The NPDES permit application stated that the discharge would contained elevated boron concentrations.  IEPA denied the provisional variance and told the Curry companies that it would deny the NPDES permit application, both due to concerns about boron pollution.

In February 2003 and still before the defendant's discharges, IEPA officials met with defendant Lippold and other employees of the Curry companies.  At this meeting, an IEPA official stated that analytical monitoring was necessary to determine if boron leachate from the industrial waste had also contaminated the area groundwater and drinking wells.  At this meeting, an IEPA official also stated that the Curry facility should take immediate action to keep the boron contaminated water from entering groundwater or surface waters.

As stated in Section C.2, above, economic regulations such as the Clean Water Act are subject to a more lenient void-for-vagueness review because:

> businesses . . . can be expected to consult relevant legislation in advance of action.  Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process. [*Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982) (citations omitted), *reh. denied* 456 U.S. 950 (1982).]

Applying the Clean Water Act to the defendant's particular circumstances, one can see the justification for this more lenient review.  Not only could the defendant and the Curry companies have sought to clarify with IEPA whether boron contaminated water was a pollutant, IEPA actually told them the year before the defendant's discharges that boron contaminated water was a pollutant.  Based on their understanding that boron contaminated water was a pollutant, the Curry companies sought permission through IEPA administrative processes to discharge the boron contaminated water to the Curry Stream and Joint Stream while defendant

was responsible for that disposal.

Actually being told by IEPA on multiple occasions including during administrative processes that one could not discharge boron contaminated water into the Curry Stream or Joint Stream, would have given a person of ordinary intelligence fair notice that discharging boron contaminated water into those streams was forbidden. Therefore the Clean Water Act was not vague as to the defendant's particular circumstances of discharging boron contaminated water into the Curry Stream and Joint Stream after having been told by IEPA both personally and through administrative processes that it was forbidden.

And the defendant showed his actual notice of the illegality of his discharges by trying to hide them. *United States v. Weitzenhoff*, 35 F.3d 1275, 1289 (9th Cir. 1993), *cert. denied* 513 U.S. 1128 (1995). At Section C.3.c, above, the government has already outlined the defendant's attempts to conceal his discharges. The defendant ordered and allowed surreptitious and nighttime discharges; conducted and oversaw nighttime activity; and instructed a Curry facility employee to lie to regulators. Thus the defendant's own actions show that the Clean Water Act was not vague as to the defendant's particular circumstances of discharging waste leachate into the Curry Stream and Joint Stream after having been told by IEPA both personally and through administrative processes that it was forbidden.

The defendant does not address the particular circumstances of his discharges discussed in this Section C.4.b. But defendant does mischaracterize some facts that bear clarification. The defendant alleges that IEPA allowed the Curry companies to spread the boron contaminated water on Curry facility parking lots as dust control, "under the guise of the facility's NPDES stormwater permit." Defendant's Motion To Dismiss Superceding Indictment For Violation of

Due Process, p. 10.  In actuality, IEPA allowed use of the boron contaminated water for dust control on the explicit condition that no runoff containing boron contaminated water be allowed to enter the Curry Stream.  Contrary to the defendant's mischaracterization, this event alone would again provide a person of ordinary intelligence fair notice that discharging boron contaminated water to the Curry Stream and Joint Stream was forbidden.

**5.     Conclusion**

The Clean Water Act's definitions of "waters of the United States" and "pollutant" are not void-for-vagueness, as applied to the defendant's particular circumstances.  The Clean Water Act and its regulations sufficiently define those terms to have given a person of ordinary intelligence fair notice that discharging boron and boron contaminated water into the Curry Stream and Joint Stream was forbidden.  Longstanding case law has also sufficiently defined those terms to have given a person of ordinary intelligence fair notice that discharging boron and boron contaminated water into the Curry Stream and Joint Stream was forbidden.  And the defendant's and the Curry companies' contacts and administrative interactions with IEPA gave the defendant repeated, actual notice that discharging boron and boron contaminated water into the Curry Stream and Joint Stream was forbidden.  The defendant verified that he received this actual notice by discharging the waste leachate surreptitiously and deceptively.

WHEREFORE, the government moves this Court to deny Defendant's Motion to Dismiss Superceding Indictment For Violation of Due Process.

Respectfully submitted,

RODGER A. HEATON
UNITED STATES ATTORNEY

s/ Patrick J. Chesley
Patrick J. Chesley Bar Number 0434841
United States Attorney's Office
318 South Sixth Street
Springfield, IL 62701
Telephone: 217/ 492-4450
Fax: 217/ 492-4044
E-mail: pat.chesley@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 5, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> Tom Schanzle-Haskins
> Claire A. Manning
> Attorneys at Law
> One West Old Capitol Plaza
> Suite 600
> P.O. Box 2117
> Springfield, IL 62705

> s/ Patrick J. Chesley
> Patrick J. Chesley 0434841
> Assistant United States Attorney
> United States Attorney's Office
> 318 South Sixth Street
> Springfield, IL 62701
> Telephone: (217) 492-4450
> Fax: (217) 492-4044
> E-mail: pat.chesley@usdoj.gov