IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-30002 |
| | ) | |
| GERALD LIPPOLD, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on the Defendant's Motion to Dismiss Superceding Indictment for Violation of Due Process (d/e 85). For the reasons stated below, this Motion is denied.

APPLICABLE LAW

Under Federal Rule of Criminal Procedure 12(b), a defendant can move the pretrial to dismiss a flawed indictment. If an indictment "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend" and "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense," it is sufficient. United States v. Moore, 446 F.3d 671, 676-77 (7th Cir.

1

2006) (internal quotation marks omitted). A court examining the validity of an indictment must view all facts in the light most favorable to the Government, and it should avoid reviewing the indictment in a hypertechnical manner. United States v. Yashar, 166 F.3d 873, 880 (7th Cir. 1999); United States v. Smith, 230 F.3d 300, 305 (7th Cir. 2000). Thus, for purposes of this Motion, the Court accepts the factual allegations in the Superceding Indictment (d/e 79).

## FACTS

On July 12, 2007, the Government filed the Superceding Indictment against Defendant Gerald Lippold (Lippold). According to the Superceding Indictment, Lippold was part owner of a bulk hauling company until 1999. That year, Curry Ready Mix & Builders' Supply, Inc. (Curry Ready Mix) bought the property on which Lippold's hauling company operated. It also agreed to hire Lippold for consulting services. From 1999 until the summer of 2003, Lippold frequently worked from the property owned by Curry Ready Mix. Several Curry Ready Mix subsidiaries (with Curry Ready Mix, the Curry Companies) operated from this property, and the Government alleges that Lippold exercised substantial authority over the Curry Companies' facilities, agents, and employees.

2

According to the Superceding Indictment, the Curry Companies accepted at their facility approximately 35,000 tons of waste from a utility company in March and April of 2001. The waste included fly ash waste and bottom ash waste from coal combustion, and the Curry Companies used the waste to fill a large excavation at the property. Sometime in 2001, though, rainwater began filling the excavation, and boron leached from the waste into the water that accumulated. The boron contaminated the accumulated water. The Government alleges that the boron level in the water was 13 times greater than the concentration the Illinois Environmental Protection Agency (IEPA) allowed.

In June of 2001, the IEPA issued violation notices to the Curry Companies. That summer, the IEPA discussed and negotiated with Lippold and the Curry Companies the proper means for removal and disposal of the waste in the excavation. Later in 2001, the Curry Companies agreed to remove and dispose of the waste. According to the Superceding Indictment, from February 2002 until at least the summer of 2003, Lippold supervised the removal of the waste and the disposal of the boron-contaminated water.

An unnamed stream (Curry Stream) flows west through the Curry property, and a second unnamed stream (Second Stream) flows north just

west of and sometimes on the Curry property. The Curry Stream joins the Second Stream just on or immediately adjacent to the Curry property, creating a third stream (Joint Stream). One mile downstream from the junction of the two initial streams, the Joint Stream flows into the Sangamon River.

In or before the Spring of 2002, the IEPA told the Curry Companies that the boron-contaminated water could not be discharged into the Curry Stream or Joint Stream without a National Pollutant Discharge Elimination System (NPDES) permit from the United States Environmental Protection Agency (EPA) or the IEPA. In March of 2002, the Curry Companies submitted an NPDES application to the IEPA. In May of 2002, Lippold allegedly was aware that an NPDES permit would be required before any of the boron-contaminated water could be discharged into the Curry Stream or Joint Stream. In May or June of 2002, the IEPA informed the Curry Companies that it intended to deny their NPDES permit application, and in June of 2002, the Curry Companies withdrew their application. That same month, the Curry Companies requested a provisional variance from the IEPA allowing them to discharge the boron-contaminated water into the Curry Stream and Joint stream, but they withdrew the request in July of

4

2002 and resubmitted it with modifications in August of 2002. In August of 2002, the IEPA denied the request.

The Government alleges that from March or April of 2003 until the beginning of June 2003, Lippold caused Curry Company agents or employees to discharge the boron-contaminated water into the Curry Stream and Joint Stream by four means. First, it alleges that Lippold had pumps and hoses installed at the facility to pump the boron-contaminated water from the excavation to slopes adjacent to the Curry Stream and Joint Stream, from which the water flowed into the streams. Second, Lippold allegedly had the water from the excavation pumped to a drainage ditch that emptied onto the slope above the Curry Stream, from which the water flowed into the stream. Third, the IEPA permitted Lippold to fill tanker trucks with the boron-contaminated water and spread the water on two parking lots at the facility, to control dust. The IEPA allowed this use of the water on the express condition that no runoff from the lots be allowed to enter the Curry Stream, but Lippold allegedly let the volume of water applied exceed the lots' abilities to absorb it, leading to runoff into the Curry Stream and Joint Stream. Fourth, on some occasions Lippold allegedly ordered that the tanker trucks be overfilled with the boron-

contaminated water such that the water overflowed into the drainage ditch and flowed into the Curry Stream and Joint Stream.

The Government has charged Lippold with violating the Clean Water Act by knowingly causing pollutants to be discharged from point sources into the waters of the United States without an NPDES permit. The Government alleges that the boron and boron-contaminated water are "pollutants" under 33 U.S.C. § 1362(6) and that the pipes, hoses, and tanker trucks were "point sources" under 33 U.S.C. § 1362(14). It also asserts that the Curry Stream, the Joint Stream, and the Sangamon River are all "waters of the United States" under 33 U.S.C. § 1362(7) and 40 C.F.R. § 122.2.

On September 21, 2007, Lippold moved to dismiss the Superceding Indictment arguing that the terms "waters of the United States" and "pollutant" in the Clean Water Act are so vague that a conviction here would violate the Due Process Clause of the Fifth Amendment. The Government filed its Opposition to Defendant's Motion to Dismiss Superceding Indictment for Violation of Due Process (d/e 89) on October 12, 2007. The Government asserts that, as applied to Lippold at least, the Clean Water Act is not unconstitutionally vague.

ANALYSIS

The Fifth Amendment's Due Process Clause requires that a statute clearly delineate the conduct it intends to prohibit. <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108 (1972). "[N]o man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." <u>United States v. Harriss</u>, 347 U.S. 612, 617 (1954). As the Seventh Circuit has noted, the United States Constitution tolerates even less vagueness in criminal statutes than it does in statutes with only civil penalties because the consequences in criminal cases are so much more severe. <u>Karlin v. Foust</u>, 188 F.3d 446, 458 (7th Cir. 1999). A penal statute is void for vagueness if it either fails to define the criminal offense with sufficient definiteness that ordinary people can understand what is prohibited or fails to provide explicit standards to prevent arbitrary and discriminatory enforcement. <u>Kolender v. Lawson</u>, 461 U.S. 352, 357 (1983).

"Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis." <u>Maynard v. Cartwright</u>, 486 U.S. 356, 361 (1988). Because no First Amendment right is at issue here, the Court

will evaluate the vagueness of the Clean Water Act as applied to Lippold's alleged conduct. See United States v. Collins, 272 F.3d 984, 988 (7th Cir. 2001). If Lippold engaged in conduct clearly proscribed by the Clean Water Act, he "cannot complain of the vagueness of the law as applied to the conduct of others." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982). The Superceding Indictment will be dismissed only if the Clean Water Act is vague on the question of whether the particular acts Lippold allegedly committed were prohibited.

I.   WATERS OF THE UNITED STATES

If the waters to which Lippold allegedly discharged pollutants are not intermittent streams, "waters of the United States" is not unconstitutionally vague as applied. The Clean Water Act prohibits the unauthorized discharge of pollutants into "navigable waters." 33 U.S.C. §§ 1311(a), 1362(12). It defines "navigable waters" as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). The Government asserts that the Sangamon River is navigable-in-fact, and Lippold has not contested the Sangamon River's navigability. It is clear to the Court that the Sangamon River is a water of the United States.

Determining whether the Curry Stream and Joint Stream are actually

waters of the United States will take more analysis. Though not binding on the Court, EPA Clean Water Act regulations in effect in 2003 defined "waters of the United States" as:

> (a) All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; . . . .
>
> . . . .
>
> (e) Tributaries of waters identified in paragraphs (a) . . . .

40 C.F.R. § 122.2. The Government contends that the Curry Stream and Joint Stream are clearly tributaries of the Sangamon River. Lippold presented nothing to suggest otherwise, but a review of existing case law allows for a more thorough evaluation of these streams.

Where "judicial explication" of a statute provides a defendant fair notice of the conduct prohibited, a court must reject a void-for-vagueness challenge. United States v. Bohonus, 628 F.2d 1167, 1174 (9th Cir. 1980). Courts have struggled with what waters constitute the "waters of the United States," but their decisions uniformly suggest that if the Curry Stream and Joint Stream are relatively permanently flowing streams that lead into the Sangamon River, then they are waters of the United States. In numerous

9

cases, courts have held that streams flowing into navigable rivers are waters of the United States. See, e.g., United States v. Ashland Oil & Transp. Co., 504 F.2d 1317, 1325 (6th Cir. 1974) ("Certainly the Congressional language must be read to apply to our instant case involving pollution of one of the tributaries of a navigable river."); United States v. Oxford Royal Mushroom Products, Inc., 487 F.Supp. 852, 855 (E.D. Pa. 1980) (classifying a non-navigable stream as a water of the United States). Courts have even held that streams flowing only intermittently and arroyos that are often dry are covered. See, e.g., Driscoll v. Adams, 181 F.3d 1285, 1291 (11th Cir. 1999) (intermittent stream); Quivira Mining Co. v. U.S. EPA, 765 F.2d 126, 129-30 (10th Cir. 1985) (occasionally-flowing arroyo).

Recently, the Supreme Court took up the question of what constitutes a water of the United States, and while its decision was deeply fragmented, it confirmed that the Clean Water Act applies at least to permanently flowing streams. In Rapanos v. United States, the Court addressed whether particular wetlands constituted waters of the United States. Rapanos, 126 S. Ct. 2208 (2006). The facts at issue were not on point with those of the instant case, but the Court's opinions are instructive.

Rapanos produced no clear majority. Justice Scalia's plurality opinion

expressed concern over whether "tributaries" that are in fact "ephemeral channels and drains" constitute water covered by the Clean Water Act. <u>Id.</u> at 2217. The opinion, joined by Chief Justice Roberts and Justices Thomas and Alito, stated:

> In sum, on its only plausible interpretation, the phrase "the waters of the United States" includes only those relatively permanent, standing or continuously flowing bodies of water "forming geographic features" that are described in ordinary parlance as "streams[,] . . . oceans, rivers, [and] lakes." See Webster's Second 2882. The phrase does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall.

<u>Id.</u> at 2225. The plurality clarified that "relatively permanent" waters do not exclude "streams, rivers, or lakes that might dry up in extraordinary circumstances, such as drought . . . [or] seasonal rivers, which contain continuous flow during some months of the year but no flow during dry months." <u>Id.</u> at 2221 n.5. The plurality used this understanding of flowing bodies of water to determine whether wetlands near the bodies constitute waters of the United States.

In a concurring opinion, Justice Kennedy criticized the plurality's conclusion that flowing water can fall under the Clean Water Act only if it is relatively permanently flowing. <u>Id.</u> at 2242 (Kennedy, J. concurring).

> The plurality's first requirement-permanent standing water or continuous flow, at least for a period of "some months," . . . makes little practical sense in a statute concerned with downstream water quality. The merest trickle, if continuous, would count as a "water" subject to federal regulation, while torrents thundering at irregular intervals through otherwise dry channels would not.

Id. According to Justice Kennedy, nothing in the statute suggests that Congress excluded "irregular waterways;" instead, "[some] impermanent streams" should be included. Id. at 2242-43. Justice Kennedy went on to state that he would hold wetlands with a "significant nexus" to navigable-in-fact waters to be within the Clean Water Act's reach. See id. at 2252. He explained that wetlands have a significant nexus to navigable waters where they significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as navigable. Id. at 2248.

Four justices dissented, but their opinion also confirms the clear application of the Clean Water Act to permanently flowing streams. Justice Stevens, joined by Justices Souter, Ginsburg, and Breyer, thought both permanent and ephemeral streams constitute waters of the United States and described the plurality's distinction as "arbitrary" and lacking "common sense." Id. at 2260 (Stevens, J. dissenting) ("But common sense and common usage demonstrate that intermittent streams, like perennial

12

streams, are still streams."). The dissenters went on to conclude that the Army Corps of Engineers' interpretation of waters of the United States as including "wetlands adjacent to traditionally navigable waters" should control the case before them. Id. at 2252.

Thus, while the Court in Rapanos was deeply divided, all justices agreed that the Clean Water Act clearly applies to permanently flowing streams connected to navigable waters. Rapanos post-dated Lippold's actions, but the combination of then-existing cases holding all streams covered and the subsequent lack of debate in Rapanos over permanently flowing streams demonstrates that no question existed or exists regarding whether permanent streams constitute waters of the United States. If the Government can prove that the Curry Stream and Joint Stream are relatively permanent streams, then the streams clearly constitute waters of the United States, and the Clean Water Act is not void-for-vagueness as applied.

Whether intermittently flowing streams constitute waters of the United States is a more complicated issue, but again, the statute is not vague. In Rapanos, the plurality's four justices thought intermittent streams were not covered, but Justice Kennedy and the four dissenters thought they

13

could be. When the Supreme Court does not issue a majority opinion, lower courts sometimes struggle to determine which opinion should govern. The Seventh Circuit holds that lower courts should follow the narrowest ground to which a majority of the justices would have assented if forced to choose; here, it has held that courts should follow Justice Kennedy's opinion. United States v. Gerke Excavating, Inc., 464 F.3d 723, 724 (7th Cir. 2006); see also N. Calif. River Watch v. City of Healdsburg, 496 F.3d 993, 995 (9th Cir. 2007); Environmental Protection Agency & Army Corps of Engineers, Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in Rapanos v. United States & Carabell v. United States, at 8 (June 5, 2007).[1]

This Court is bound to apply the Seventh Circuit's reading of Rapanos and follow Justice Kennedy's opinion. Justice Kennedy's opinion suggests that all intermittent streams flowing into navigable-in-fact waters may possess a significant nexus to those navigable waters. See Rapanos, 126 S. Ct. 2208, 2249 (Kennedy, J. concurring). Because Justice Kennedy did not hold so explicitly, though, an intermittent stream is not covered automatically. An intermittent stream is a water of the United States only

---

[1]Available at http://www.epa.gov/owow/wetlands/pdf/RapanosGuidance6507.pdf.

if the Government can prove that the stream possesses a significant nexus to a navigable-in-fact water.

At the time Lippold allegedly discharged pollutants into these streams, existing case law established that both permanent and intermittent streams were waters of the United States. Rapanos changed the analysis, but the result is the same: intermittent streams still can be waters of the United States. In 2003, Lippold was on notice that his alleged conduct violated the Clean Water Act. Today, individuals are still on notice that such conduct violates the Clean Water Act. Provided the Government can establish that the Curry and Joint Streams possess a significant nexus to the Sangamon River, a conviction of Lippold for discharging pollutants into those streams would not violate due process.

II. POLLUTANTS

Lippold also argues that the term "pollutant" in the Clean Water Act is unconstitutionally vague, but the Court is not persuaded. Under the Clean Water Act, "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). A "pollutant" is defined as: "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked

or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).  Lippold contends that the Government has alleged only that he discharged into the Sangamon River and Curry and Joint Streams rainwater and groundwater contaminated with boron that leached from waste stored in an excavation. Motion to Dismiss, at 9.  But, if an ordinary person reasonably would have understood that discharge of the boron-contaminated water into the river or streams was prohibited, the Clean Water Act is not void as applied.

Boron-contaminated water is not included explicitly within the Clean Water Act's definition of pollutant, but that does not mean the statute is vague.  Case law can define a statutory term sufficiently to defeat a void-for-vagueness argument. United States v. Broncheau, 597 F.2d 1260, 1263 (9th Cir. 1979).  Here, courts have construed the definition of pollutant broadly and held that substances not specifically listed may constitute pollutants under the Clean Water Act.  See, e.g., United States v. Hamel, 551 F.2d 107, 111 (6th Cir. 1977) (petroleum products constitute pollutants); North Carolina Shellfish Growers Ass'n v. Holly Ridge Assocs., LLC, 278 F.Supp.2d 654, 676-77 (E.D.N.C. 2003) (sediment constitutes a pollutant); Tungett v. Papierski, 2006 WL 51148, at *2 (E.D. Tenn. Jan. 10, 2006)

(sediment, soil, dirt, trees, and organic debris are pollutants).

In fact, courts have held that rainwater contaminated by industrial waste constitutes a pollutant. See, e.g., Reynolds v. Rick's Mushroom Service, Inc., 246 F.Supp.2d 449, 455 (E.D. Pa. 2003); United States v. Frezzo Brothers, Inc., 461 F.Supp. 266, 269-70 (E.D. Pa. 1978). The same is true of groundwater. See, e.g., Northern Plains Resource Council v. Fidelity Exploration and Development Co., 325 F.3d 1155, 1160 (9th Cir. 2003). And, it is clear that fly ash waste and bottom ash waste from coal combustion at a utility company constitute "industrial waste":

> "Industrial" means "of, pertaining to, or derived from industry." American Heritage Dictionary 672 (1979). "Industry," in turn, is defined as "the commercial production and sale of goods and services." Id. "Waste" is defined as "any useless or worthless byproduct of a process or the like; refuse or excess material." Id. at 1447. Combining these ordinary meanings, "industrial waste" is any useless byproduct derived from the commercial production and sale of goods and services.

Id. at 1161. Water contaminated by the coal combustion waste is clearly a pollutant. As applied, the Clean Water Act is not unconstitutionally vague regarding the meaning of "pollutant."

THEREFORE, Defendant's Motion to Dismiss Superceding Indictment for Violation of Due Process (d/e 85) is DENIED. The terms

"waters of the United States" and "pollutant" are not vague as applied, and the Clean Water Act is not void.

IT IS THEREFORE SO ORDERED.

ENTER: October 30, 2007

FOR THE COURT:

                                         s/ Jeanne E. Scott
                                         JEANNE E. SCOTT
                                 UNITED STATES DISTRICT JUDGE